# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:20cv1177 (MPS) |
|     v. | : | |
| | : | |
| DAVID MAIGA, in his individual and official | : | |
| capacities, ROLLIN COOK, in his individual | : | |
| and official capacities, ANGEL QUIROS, in his | : | |
| individual and official capacities, JACLYN | : | |
| OSDEN, in her individual and official | : | |
| capacities, and JESSICA SANDLER, in her | : | |
| individual and official capacities, | : | |
|     Defendants. | : | |

## <u>INITIAL REVIEW ORDER</u>

The plaintiff, Joe Baltas, is incarcerated at the Red Onion State Prison ("Red Onion") in Pound, Virginia. He has filed a civil rights complaint under 42 U.S.C. § 1983, against former Commissioner Rollin Cook, District Administrator Angel Quiros, Director of Offender Classification and Population Management David Maiga, Correctional Counselor Supervisor Jaclyn Osden, and Correctional Counselor Jessica Sandler. *See* Compl., ECF No. 1, at 1-6.

The complaint alleges fourteen causes of action asserting violation of Baltas's rights under the First Amendment, Fourth Amendment, Sixth Amendment, Eighth Amendment, Fourteenth Amendment, and the Privileges and Immunities Clause. Baltas seeks compensatory damages in addition to declaratory and injunctive relief. He has also filed an *ex parte* motion for temporary restraining order and for preliminary injunction, an emergency motion for preliminary injunction, a motion to expedite the hearing or ruling on the motion for the temporary restraining order and for preliminary injunction, a motion for an order to show cause, a motion seeking to default the defendants for failing to respond to or oppose the motion for temporary restraining

order and for preliminary injunction, and a motion for a status update. *See* ECF Nos. 4-5, 8-9, 13-14.

For the reasons set forth below, the court will permit Baltas's claims of violation of his First Amendment, Sixth Amendment, Eighth Amendment and Fourteenth Amendment to proceed beyond initial review.

## I.    Standard of Review

The court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A. This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee." *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted). Here, the plaintiff is proceeding *in forma pauperis*.

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A claim is facially plausible if it is supported by facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint

must still include sufficient factual allegations that meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

## II.    Factual Allegations

Baltas was sentenced in Connecticut superior court and was formerly confined within Connecticut Department of Correction ("DOC") facilities.[1]  ECF No. 1 at ¶ 23. In November 2018, Maiga transferred Baltas under the Connecticut Interstate Corrections Compact (the "Compact"), Connecticut General Statutes §§ 18-1-5 through 18-107, to Massachusetts, due to (allegedly false) safety and security concerns. *Id.* at ¶ 25. In September 2019, Commissioner Cook argued that Baltas's state habeas action should be dismissed due to Baltas's transfer. *Id.* at ¶ 26. The next day, Cook and Maiga had Baltas returned to confinement in Connecticut DOC's Northern Correctional Institution. *Id.* at ¶ 27.

On November 15, 2019, Baltas filed a federal action, asserting claims against Maiga and Cook. *Id.* at ¶ 28. On December 20, 2019, Maiga and Cook transferred Baltas to Virginia under the Compact. *Id.* at ¶ 29.

Maiga issued an order instructing the staff transporting Baltas to seize his property, hold it in Connecticut, and to only transport Baltas's legal papers, religious property, and medication. *Id.* at ¶ 30. Baltas alleges that this is a violation of DOC Administrative Directive 6.10, which mandates that a prisoner's  property be transported with the prisoner at the time of transfer. *Id.*

The DOC correctional officials informed Baltas that his transfer was a result of his civil action against DOC officials. *Id.* at ¶ 31. At the time of his transfer, Baltas had nine civil actions pending against DOC officials. *Id.* at ¶ 32. Baltas was transferred to the Red Onion State Prison,

---

[1]    The Court may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). Connecticut's Department of Correction website reflects that Baltas is

a Virginia facility classified as a level five though 6 and Virginia's most secure and highest-level correctional institution reserved for Virginia's most violent and dangerous offenders; the Red Onion has a level of custody higher than any facility within Connecticut DOC. *Id.* at ¶¶ 33-35.

When Baltas arrived at the Red Onion, the corrections staff members stated that they had been informed of his propensity for litigation and that he had been transferred to Virginia so that he could not file any more lawsuits in Connecticut. *Id.* at ¶ 37.

Baltas was processed by the Red Onion and placed in a suicide prevention cell without running water without any cause for approximately two weeks. *Id.* at ¶ 40. He weighed more than 260 pounds at the time of his arrival. *Id.*

Baltas wrote Maiga, Cook and Quiros about their refusal to transport his property and their failure to send it to him after his transfer in accordance with Administrative Directive 6.10. *Id.* at ¶ 41. He also requested his removal from Virginia. *Id.*

On December 22, 2019, Baltas filed a grievance about the conditions at the Red Onion. *Id.* at ¶ 42. Baltas was thereafter threatened by Red Onion Sergeant Meade due to his filing the grievance. *Id.* at ¶ 43. Sergeant Meade indicated that he had arranged for the death of another inmate "just like" Baltas about ten years ago. *Id.* Baltas attempted to report this threat to Virginia administrators, who then threatened him. *Id.* at ¶ 44.

On January 2, 2020, Baltas's Public Defender from his criminal matter wrote to Osden about his concerns about being able to communicate and represent Baltas as well as his concern about Baltas's well-being. *Id.* at ¶ 46.

---

serving a total effective sentence of 115 years of imprisonment. *See* http://www.ctinmateinfo.state.ct.us/.

On January 3, 2020, Baltas was classified as a general population inmate and placed him in general population B6 housing unit. *Id.* at ¶ 47. On the same date as his placement, Virginia officials conducted a shakedown/search of Baltas's entire housing unit and cells. *Id.* at ¶ 48.

The Virginia officials applied the Virginia DOC Operating Procedures ("OPs") to Baltas rather than Connecticut laws, regulations or Administrative Directives. *Id.* at ¶ 49. Accordingly, Baltas was denied access to unrecorded legal calls with his attorneys as he was forced to make all telephone calls on the inmate recorded telephone system at the Red Onion. *Id.* at ¶ 50. The Red Onion officials also refused to accommodate his attorneys' phone calls. *Id.* at ¶ 51. Under Connecticut DOC Administrative Directive 10.7, Baltas had access to unrecorded privileged phone calls with his counsel. *Id.* at ¶ 52. As a result of being housed in Virginia, Baltas was unable to visit or otherwise meet with his counsel, review evidence, or prepare for his civil and criminal matters. *Id.* at ¶ 53.

On January 6, 2020, Baltas wrote to Cook regarding Virginia officials' failure to manage him according to Connecticut laws and DOC Administrative Directives, the deprivation of his property, the threats on his life from the Red Onion officers, and other issues; he copied other officials on this letter, including Quiros. *Id.* at ¶ 54. Baltas also wrote a complaint to Maiga about his property and the threats on his life by Virginia officials. *Id.* at ¶ 55. Baltas sent correspondence to Osden requesting documents and property, and reporting Virginia officials for refusing to manage him according to Connecticut law and Administrative Directives and the threats to his physical safety. *Id.* at ¶ 56.

On January 10, 2020, Sandler responded to Baltas's attorney's correspondence, stating that Baltas had been transferred for an "indefinite" term and that counsel could represent him

through video conferencing. *Id.* at ¶ 57. However, all video conferences, visits or court appearances are actively monitored by Virginia Correction Officials. *Id.* at ¶ 58. Further, no video conferencing was made available to Baltas despite his efforts. *Id.* at ¶ 59.

On January 11, 2020, a search was conducted in the B6 housing unit for weapons in certain cells. *Id.* at ¶ 60. During the search, Sergeant Meade and other correctional staff spread false rumors that Baltas was in Virginia for "Protective Custody" because he was a snitch. *Id.* at ¶ 61. They solicited several inmates to assault him and to stab him in exchange for special treatment. *Id.* During the search, Sergeant Meade had provided a weapon to an inmate who was a ranking gang member and solicited him to perform the attack. *Id.* at ¶ 62.

On January 13, 2020, another inmate was attacked and stabbed by two other inmates in the B6 housing unit. *Id.* at ¶ 63. Although weapons may have been present in the housing unit, the prison officials expressly ordered the unit not to be searched again. *Id.* at ¶ 64.

On January 15, 2020, Baltas refused to sign an authorization form to permit Virginia officials to limit the amount of incoming mail he could receive; and to seize his incoming mail, photocopy it, destroy the originals, and provide Baltas with only the copies. *Id.* at ¶ 65.

Subsequently, Virginia officials refused to comply with Connecticut law or DOC administrative directives and refused to allow Baltas to receive any social mail or publications; they returned all of such mail to sender stating that he had "refused" the mail. *Id.* at ¶ 66. This caused emotional injury to Baltas's family and friends. *Id.*

Virginia officials also returned all correspondence, materials and documents from Connecticut DOC on the allegedly false basis that Baltas had refused the mail. *Id.* Under the Connecticut DOC Administrative Directives, mail from correctional officials is considered

"privileged" and treated under the same rules as mail from an attorney or court; it cannot be interfered with unless contraband is found in the mail.[2] *Id.* at ¶ 69.

Baltas wrote to both Osden and Sandler about this matter, informing them that he had not refused mail, and requesting that they correct the situation. *Id.* at ¶ 68.

On January 18, 2020, Baltas was stabbed in an attack that was stopped by two other inmates, who intervened on his behalf. *Id.* at ¶ 71. During the attack, Baltas was shot by correction officers with rubber bullets and mace grenades at levels of force greater than that authorized at Connecticut facilities. *Id.* at ¶ 72. Baltas was transported to an outside hospital intensive care unit. *Id.* at ¶ 73.

While in the hospital, Baltas was visited by a Virginia correctional captain who informed him that the correctional officials had set up the attack and would set up another one if did not keep his mouth shut. *Id.* at ¶ 74. The captain threatened Baltas, stating: "There is nowhere you can go in Virginia that we can't get you." *Id.*

On January 19, 2020, Baltas returned to the Red Onion medical unit, where he remained for several days. *Id.* at ¶ 76. He was thereafter placed in isolation of the Restrictive Housing Unit ("RHU").

On January 28, 2020, Baltas's property arrived at the Red Onion. *Id.* at ¶ 78. On February 17, 2020, he was provided with a small portion of his property, but Virginia officials seized and withheld the vast majority of his property that he would have been entitled to possess under Connecticut law and Administrative Directive 6.10(4). *Id.* at ¶¶ 79-80. The property withheld from Baltas included books, publications, clothing, footwear, consumables, and various

---

[2]   The court notes that Connecticut prisoner communications are governed by Connecticut DOC Administrative Directive 10.7, which is publicly available on the DOC website.

electronics such as a television, CD player, typewriter, tablet, and hot pot. *Id.* at ¶ 81. Virginia officials provided Baltas with written notice that his property would be returned to him upon his return to Connecticut. *Id.* at ¶ 82.

On February 18, 2020, Baltas spoke with Red Onion Warden Kiser, who informed him that he would be returned to Connecticut because he could not be safely housed in Virginia. *Id.* at ¶ 83. However, his transfer was placed on hold due to the COVID-19 pandemic. *Id.*

On February 19, 2020, Baltas's criminal attorney filed a motion for speedy trial on his behalf. *Id.* at ¶ 84, ex. 8. His attorney indicated that Baltas was being held involuntarily in Virginia, and that he had not been able to contact his attorney and prepare a defense. *Id.*

On February 24, 2020, Virginia officials returned his time sensitive legal mail to his attorney. *Id.* at ¶ 86. The officials wrote on the mail that Baltas had refused this mail, but Baltas had never even received notice of this action. *Id.*

Baltas subsequently filed a civil action against the Virginia officials responsible for his assault, docket *Baltas v. Clarke*, 20cv276 (W.D. VA). As a result of that filing, Virginia officials spread rumors within the inmate population that Baltas was a snitch. *Id.* at ¶ 88. Again, they solicited inmates to assault Baltas. *Id.* at ¶ 88.

Baltas has been threatened with extreme physical violence and death by multiple Virginia DOC officials and Red Onion inmates. *Id.* at ¶ 89. Baltas wrote to Maiga, Cook, Quiros, Osden and Sandler to report his concerns for his safety and to request that he be immediately transferred out of Virginia. *Id.* at ¶ 90.

In March 2020, Virginia officials again returned Baltas's mail from an attorney and indicated that he had refused the mail without any notice to Baltas. *Id.* at ¶ 91. On April 28,

2020, Baltas was hand delivered a faxed letter from Sandler indicating that all correspondence documents that Connecticut DOC had sent him were returned because he had refused the mail, and that he must comply with Virginia's OPs if he wanted his mail. *Id.* at ¶ 92. She explained further that Connecticut DOC mail was not legal or privileged mail. *Id.* Baltas responded to Sandler that he had never refused his mail and that Connecticut DOC mail was privileged under Administrative Directive 10.7(3). *Id.* at ¶ 94.

On April 29, 2020, Baltas received legal mail from the Connecticut Superior Court that had been returned by Virginia officials as mail refused by Baltas. *Id.* at ¶ 95. It was a notice that Commissioner Cook had filed a petition to dismiss his habeas petition as moot due to his transfer to Virginia. *Id.* Baltas also received notice that the District Court of Connecticut had dismissed his official capacity claims against defendants due to his transfer to Virginia. *Id.* at ¶ 97.

On July 24, 2020, Red Onion Warden Kiser informed Baltas that Connecticut DOC intended to leave him in Virginia and that he had been instructed to return Baltas to the general population. *Id.* at ¶ 98. However, the inmate population and staff at the Virginia DOC intend Baltas physical harm. *Id.* at ¶ 99.

During his confinement in Virginia, Baltas has allegedly sustained threats to his safety, assault, sustained periods of isolation, due process violations, denial of his mail, denial of visitation with family or associates, denial of possessions and property, denial of access to his counsel, and denial of unrecorded communication with his counsel. *Id.* at ¶¶ 100-111. His counsel for his habeas petition was forced to seek a continuance of the scheduled trial in September 2020 because she has been unable to communicate and prepare for trial while Baltas is in Virginia. *Id.* at ¶ 112. Baltas has also been denied a speedy trial and access to courts and

relief. *Id.* at ¶ 113-4. His housing in Virginia has interfered with his counsel's ability to provide effective representation. *Id.* at ¶ 115.

Baltas has also been treated differently than other Connecticut inmates who are managed under the DOC Administrative Directives. *Id.* at ¶ 117. He has been denied the mandated administrative segregation classification review that would have resulted in his removal from that status and his classification in Connecticut as a Level 4 general population inmate. *Id.* at ¶ 120.

From January 2020 through June 2020, Baltas filed and exhausted all of his administrative remedies by filing grievances to Osden, Maiga, Cook and Quiros. *Id.* at ¶ 121. However, Baltas received no response or relief. *Id.*

<u>The Compact and Contract</u>

The Connecticut Compact provides for the exchange of inmates between states. "The purpose of the compact is to provide for the mutual development and execution of such programs of cooperation [between states] for the confinement, treatment and rehabilitation of offenders with the most economical use of human and material resources." *Sadler v. Rowland*, No. 3:01CV1786(CFD)(WIG), 2004 WL 2061127, at *4 (D. Conn. Sept. 13, 2004) (citing Conn. Gen. Stat. § 18–106, Art. I.).[3]

Under Article VI (e) of Section 18-106, the Compact provides:

All inmates who may be confined in an institution pursuant to the provisions of this compact shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be confined in the same institution. The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state.

---

[3]  Virginia's Compact is set forth in Virginia Code § 53.1-216 and provides for identical provisions as enumerated herein.

Under Article IV(f), the Compact states:

(f) Any hearing or hearings to which an inmate confined pursuant to this compact may be entitled by the laws of the sending state may be had before the appropriate authorities of the sending state, or of the receiving state if authorized by the sending state. The receiving state shall provide adequate facilities for such hearings as may be conducted by appropriate officials of a sending state. In the event such hearing or hearings are had before officials of the receiving state, the governing law shall be that of the sending state and a record of the hearing or hearings as prescribed by the sending state shall be made. Said record together with any recommendations of the hearing officials shall be transmitted forthwith to the official or officials before whom the hearing would have been had if it had taken place in the sending state. In any and all proceedings had pursuant to the provisions of this subdivision, the officials of the receiving state shall act solely as agents of the sending state and no final determination shall be made in any matter except by the appropriate officials of the sending state.

Under Article IV(h), the Compact provides:

(h) Any inmate confined pursuant to the terms of this compact shall have any and all rights to participate in and derive any benefits or incur or be relieved of any obligations or have such obligations modified or his status changed on account of any action or proceeding in which he could have participated if confined in any appropriate institution of the sending state located within such state.

Under Article IV(c), the sending state retains jurisdiction over inmate, but the Contract between the sending and receiving states sets forth the responsibilities of each state. *See Barnes v. Fla. Parole Comm'n.*, No. 3:04CV775 (SRU), 2004 WL 1553610, at *2 (D. Conn. July 9, 2004) (citing *Smart v. Goord,* 21 F. Supp. 2d 309, 313 (S.D.N.Y. 1998)). The Contract between Connecticut and Virginia (the "Contract") provides that the receiving state institution has the responsibility to confine inmates from the sending state including, to provide medical care;  to provide for their physical needs; to make available programs for training and treatment; to retain safe custody; to supervise them; to maintain proper discipline and control; and "to make certain that they receive no special privileges and that the sentences and orders of the committing court in the sending state are faithfully executed." Contract for the Implementation of the Interstate

11

Corrections Compact, ¶ 13 (Responsibility of the Offenders Custody).[4] The Contract specifies: "But nothing herein contained shall be construed to require the receiving state … to provide treatment, facilities or programs for any inmate confined pursuant to the Interstate Corrections Compact which it does not provide for similar inmates not confined pursuant to said Compact." *Id.* Relevant to discipline, the Contract provides: "The receiving state, as agent for the sending state, shall have physical control over and power to exercise disciplinary authority over all inmates from sending states. However, nothing contained herein shall be construed to authorize or permit the imposition of a type of discipline prohibited by the laws of the sending state." *Id.* at ¶ 16 (Discipline). The Contract states further that "[i]mates while in the custody of the receiving state shall be subject to all provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed." *Id.* at ¶ 17 (Laws and regulations). At paragraph 20 relevant to hearings, the Contract provides:

> The receiving state shall provide adequate facilities for any hearing by authorities of the sending state, to which an inmate may be entitled by the laws of the sending state. Upon request of the sending state, the authorities of the receiving state will be authorized to and will conduct any such hearings, prepare and submit the record of said hearings,

---

[4] The court takes judicial notice of the Contract attached as an exhibit in a defense response to Baltas's motion for preliminary injunction and temporary restraining order in his case pending in the Western District of Virginia. *See* ECF No. 50-2 at pp. 8-16, *Baltas v. Clarke*, 7:20cv276 (W.D.VA 2020). Judicial notice may be taken of documents filed in other cases and other courts. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir. 1998); *Shakur v. Bruno*, No. 3:12CV984 SRU, 2014 WL 645028, at *1 (D. Conn. Feb. 18, 2014) (noting "the court may properly consider matters of which judicial notice may be taken" and that "courts have taken judicial notice of the agreement only where the plaintiff has referenced the other case, or where the plaintiff has knowledge of the document and the document was integral to the plaintiff's claims."); *Degrooth v. General Dynamics Corp.,* 837 F. Supp. 485, 487 (D. Conn. 1993) (court took judicial notice of document not attached to pleading where plaintiff had notice of document's contents and document was essential to plaintiff's claim), *aff'd,* 28 F.3d 103 (2d Cir.), *cert. denied,* 513 U.S. 1043 (1994). In the instant matter, Baltas's allegations reference provisions of the Contract and assert liberty interests under the Contract. ECF No. 1 at ¶¶ 38, 133; and his motion for status update in the instant case refers this court to the response to his motion preliminary injunction and temporary restraining order (ECF No. 50) in his pending Western District of Virginia case. *See* ECF No. 14.

together with any recommendations of the hearing officials, to the officers or officers of the sending state before whom the hearing would have been had if it had taken place in the sending state.

## III.   Discussion

In the fourteen counts of his complaint, Baltas asserts (1) violation of the First Amendment and Eighth Amendment based on his transfer to Virginia; (2) Fourth Amendment and Fourteenth Amendment violations based on seizure of his property; (3) Eighth and Fourteenth Amendment violations based on his transfer to Virginia confinement under the Compact; (4) deprivation of his state-created liberty interests under the Compact, Contract and Connecticut DOC Administrative Directives in violation of the First, Fourth, Sixth, Eighth and Fourteenth Amendment and the Privileges and Immunities Clause; (5) violation of the First Amendment right to association; (6) violation of his right to access to the courts, right to speedy trial, and effective assistance of counsel; (7) violation of the Fourteenth Amendment Equal Protection Clause; (8) violation of the Eighth Amendment for deliberate indifference to his safety; (9) violation of the Eighth Amendment for failure to protect; (10) violation of the Eighth Amendment by subjecting him to cruel and unusual punishment; (11) declaratory relief and injunctive relief due to unconstitutional policies and customs; (12) supervisory liability for the constitutional violations of subordinates; (13) violation of Fourteenth Amendment due process in connection with disciplinary hearings and review of his administrative segregation; (14) and any other causes of action not articulated in the complaint.[5]

---

[5]   Baltas also alleges state law claims under Connecticut Constitution. However, the court will not address the plausibility of claims under Connecticut law because this initial review for purposes of 28 U.S.C. § 1915A is limited to federal law claims. These claims may be addressed later by the defendants in a motion to dismiss or a motion for summary judgment.

Baltas must also allege the personal involvement of each defendant against whom he asserts a claim for damages under § 1983, and may only recover damages against a supervisory official by showing that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotations omitted); *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

### A.    First Amendment Retaliatory Transfer

In count one, Baltas alleges that Maiga and Cook made the decision to transfer him to a Virginia facility that was dangerous and harsh as retaliation for his having exercised his First Amendment rights.

The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)). Retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted). To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action

against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).

Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *See id.* ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted). Thus, Baltas has satisfied the first prong of his retaliation claim because he has alleged that he had filed numerous cases against the Connecticut DOC officials, including a case involving Maiga and Commissioner Cook on November 15, 2019.

Baltas has also sufficiently alleged the second prong, that he sustained adverse action, because he has alleged he was transferred to an institution with a higher level of custody than any facility in Connecticut.[6] *See, e.g.*, *Warren v. Goord*, 2008 WL 5077004, at *2 (2d Cir. Nov. 26, 2008) (magistrate judge properly concluded that inmate had not met adverse action element of a First Amendment retaliation claim "[b]ecause the conditions in the four-man room at the Attica Correctional Facility infirmary to which Warren was transferred, which constituted the alleged retaliation, were substantially similar to the conditions under which Warren was held prior to his transfer"); *Lebron v. Semple*, 2018 WL 3733972, at *6 (D. Conn. Aug. 6, 2018) ("Plaintiff's allegations do not state a plausible claim for First Amendment retaliation, because there are no facts alleged to suggest that the transfer [from Cheshire to Osborn] was adverse to

___

[6]  It is not clear that Baltas makes a claim that his transfer to Massachusetts was retaliatory in violation of his First Amendment. To the extent that he does, he has failed to sufficiently allege the elements of a retaliatory transfer claim. Even if he can establish the first element of protected activity, he has not alleged facts suggesting that the transfer to Massachusetts imposed more restrictive conditions upon him than his Connecticut confinement and thereby constituted adverse action.

him.") (citations omitted); *Rosen v. Pallito*, 2017 WL 6513663, at \*7 (D. Vt. Dec. 19, 2017) ("It has been held, however that a mere transfer without a corresponding deprivation of privileges does not rise to the level of retaliatory action.") (citation omitted).

Relevant to the third prong, Baltas has also alleged facts that raise an inference of a causal connection because his interstate transfer occurred a little more than a month after he filed his case against Maiga and Cook in federal court. ECF No. 1 at ¶¶ 28-29. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (passage of six months between dismissal of prisoner's lawsuit and alleged act of retaliation by prison officers, one of whom was a defendant in the prior lawsuit, sufficiently supports an inference of causal connection in a First Amendment retaliation claim). Accordingly, Baltas's claim may proceed against Maiga and Cook beyond initial review.[7]

### B.   Transfer in violation of the Eighth Amendment

In his first count, Baltas alleges that Maiga and Cook violated the Eighth Amendment by transferring him to a facility in Virginia with harsh, dangerous and "violative" confinement conditions. ECF No. 1 at ¶ 123. In his third count, he alleges that the defendants "did transfer and/or cause the transfer of Plaintiff to a highly restrictive, harsh, dangerous, atypical and significant Supermax custody without due process and with deliberate indifference to the safety of Plaintiff[.]" *Id.* at ¶ 130.

---

[7]   Baltas has not alleged the personal involvement of the other defendants in his allegedly retaliatory transfer. Thus, the court will only permit this claim to proceed against Cook and Maiga. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (a defendant's personal involvement in an alleged constitutional violation is a prerequisite to hold a defendant liable for an award of damages under section 1983).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. VIII. It is made applicable "to States through the Due Process Clause of the Fourteenth Amendment." *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991) (citing *Robinson v. California*, 370 U.S. 660, 666-67 (1962)). However, an inmate has no Eighth or Fourteenth Amendment right to be confined at a particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (inmates have no right to be confined in a particular state or a particular prison within a given state); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (transfer among correctional facilities, without more, does not violate inmate's constitutional rights, even where conditions in one prison are "more disagreeable" or the prison has "more severe rules"); *McCarthy v. Teta*, 101 F.3d 108 (2d Cir. 1996) ("McCarthy's due process claim fails because he does not have a liberty interest in a transfer to a federal prison or a different state prison system. Prison transfers do not implicate a liberty interest in the absence of state law suggesting otherwise."); *Andrews v. Semple*, No. 3:17-cv-1233 (SRU), 2017 WL 5606740, at *4 (D. Conn. Nov. 21, 2017) (dismissing due process claim that prison officials refused to transfer inmate to prison facility of his choice, Garner Correctional Institution, because "he has no constitutionally protected right to be housed" at Garner or any other facility); *Remillard v. Maldonado*, No. 3:15-CV-1714(SRU), 2016 WL 3093358, at *3 (D. Conn. June 1, 2016) ("The Eighth Amendment does not require the least restrictive housing for a prisoner."); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."). Thus, Baltas cannot premise an Eighth Amendment or Fourteenth Amendment claim on the mere fact of his interstate transfer to a facility in Virginia.

17

To the extent that he claims that his transfer was made with deliberate indifference to his health or safety in violation of the Eighth Amendment, Baltas must demonstrate both an objective and a subjective element under the Eighth Amendment. To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006). Here, no non-conclusory allegation suggests that any defendant knew or was aware that Baltas would be subjected to conditions that posed a risk of harm to Baltas by transferring him to confinement in Virginia. Thus, Baltas's claim that the defendants violated his rights under the Eighth Amendment by transferring him to Virginia is dismissed as not plausible. *See* 28 U.S.C. § 1915A(b)(1).

C.      **Seizure of Property in violation of the Fourth and Fourteenth Amendments**

In his second count, Baltas complains that Maiga seized and withheld his property in connection with his transfer. He maintains that after his transfer, his property was not sent to him in accordance with the DOC Administrative Directives. Under the Fourth Amendment, a property seizure occurs where "there is some meaningful interference with an

individual's possessory interests in that property." *See Soldal v. Cook Cty, Ill.*, 506 U.S. 56, 61 (1992) (internal quotation omitted).

Baltas's Fourth Amendment claim fails because his property seizure is not covered under the Fourth Amendment. The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). Nor does the Fourth Amendment apply when property is taken from an inmate's cell. *See id.* at 528 n.8 ("the same reasons that lead us to the conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures") and at 538, 540 (O'Connor, J., concurring) (noting "[t]he fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects" and "the constitutional sources that provide [prisoners'] property with protection ... [are] the Fifth and Fourteenth Amendments not the Search and Seizure Clause of the Fourth Amendment."); *see also Conquistador v. Syed*, No. 3:19-CV-1450 (KAD), 2020 WL 229319, at *4-5 (D. Conn. Jan. 15, 2020) (items taken during prisoner's transfer did not implicate a Fourth Amendment seizure). Thus, Baltas does not have a plausible Fourth Amendment seizure claim.

In challenging a property deprivation under the Fourteenth Amendment Due Process Clause, Baltas must avail himself of the adequate remedies guaranteed under state law rather than the court. The Due Process Clause of the Fourteenth Amendment protects a plaintiff against the denial of a protected property interest without due process of law. *Ramos v. Malloy*, No. 3:18-CV-615 (VAB), 2018 WL 1936144, at *3 (D. Conn. Apr. 24, 2018). A prisoner can state a due process claim for loss of property if the state has not created adequate post-deprivation

remedies. *See Edwards v. Erfe*, 588 Fed. App'x 79, 80 (2d. Cir. 2015); *Hudson*, 468 U.S. at 533 (1984). "The existence of state remedies, therefore, determines whether a Fourteenth Amendment claim for deprivation of property without due process is cognizable in federal court." *Conquistador v. Hannah*, No. 3:19-CV-1293 (KAD), 2019 WL 4346346, at *4 (D. Conn. Sept. 12, 2019).

Here, Baltas has adequate post-deprivation remedies in either Virginia or Connecticut with regard to his property deprivation. Under Virginia law, he may resort to the Virginia Tort Claims Act ("VTCA"), which adequately provides for this remedy in Virginia. *See Epperson v. Smith*, No. 4:16-CV-00050, 2018 WL 2470735, at *8 (W.D. Va. May 31, 2018) (holding that Virginia law provided adequate post-deprivation remedy); s*ee also Barbour v. Wheeler*, No. 7:10-cv-00089, 2010 WL 1816625, at *1 (W.D. Va. Apr. 30, 2010) (prisoner had remedy under VTCA). Likewise, the State of Connecticut provides a remedy for lost or destroyed property. Under Connecticut General Statutes § 4-141, *et seq.*, a prisoner may bring a claim against the Connecticut Claims Commission, unless there is another administrative remedy for his claim. *See* Conn. Gen. Stat. § 4-142.[8] Thus, the court will dismiss this claim.

Although Baltas complains that Maiga failed to comply with the Administrative Directive 6.10 regarding transfer of his property, such failure does not constitute a basis for relief under Section 1983 because "a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. §

---

[8]   The Connecticut Department of Correction has established an administrative remedy procedure relevant to an inmate's lost or destroyed property. *Ramos*, No. 3:18-CV-615 (VAB), 2018 WL 1936144, at *3 (citing Administrative Directive 9.6(16)(B)).

1983." *Fine v. UConn Med.*, No. 3:18-CV-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019) (citation omitted). This claim will also be dismissed.

### D.   Deprivation of State Created Liberty Interests

In his fourth cause of action, Baltas claims that the defendants deprived him of "state created liberty interests granted to him through statute, compact contract and [administrative directives] in violation his First, Fourth, Sixth, Eighth, and Fourteenth Amendment rights." ECF No. 1 at ¶ 133. In this same count, Baltas alleges that the defendants deprived him of the "Privileges and Immunities he is entitled to as a citizen of Connecticut under Connecticut jurisdiction in violation of his Fourteenth Amendment rights[.]"[9]  *Id.* at ¶ 134. This claim appears to assert that the defendants have violated his rights guaranteed under the Compact and relevant Contract.

An interstate compact only constitutes federal law if: (1) it falls within the scope of the Constitution's Compact Clause; (2) it receives congressional consent; and (3) its subject matter is

---

[9] The court notes that the Privileges and Immunities Clause analysis is not relevant to Baltas's claims concerning his deprivations as an inmate transferred to Virginia under the Compact. Thus, the court construes Baltas's allegation to assert a Fourteenth Amendment equal protection violation, which he has specifically alleged in his seventh cause of action. The Privileges and Immunities Clause under the Fourteenth Amendment provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. CONST. AMEND. XIV, § 1. The Clause operates to "place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those states are concerned." *Schoenefeld v. Schneiderman*, 821 F.3d 273, 279 (2d Cir. 2016). The Clause "prevents a State from discriminating against citizens of other States in favor of its own." *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 382 (1978) (internal quotation omitted). To prevail on a claim under the Privileges and Immunities Clause, a plaintiff must demonstrate that a state has burdened nonresident activity that is "sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause." *Schoenefeld*, 821 F.3d at 279 (quoting *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64 (1988)). The Supreme Court has cautioned that constitutionally protected privileges and immunities are burdened "only when [challenged] laws were enacted for the protectionist purpose of burdening out-of-state citizens." *McBurney v. Young*, 569 U.S. 221, 227 (2013). Here, Baltas's claims do not concern a burden on nonresident activity that would fall within the purview of the Privileges and Immunities Clause.

appropriate for congressional legislation. *Cuyler v. Adams,* 449 U.S. 433, 439-40 (1981). The Supreme Court explained that Congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause. *Id.* at 440. Where an agreement is not "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States," it does not fall within the scope of the Clause and will not be invalidated for lack of congressional consent. *Id.*

Baltas's allegations have not established that the Compact constitutes federal law as approved by Congress pursuant to the Compact Clause with subject matter appropriate for federal legislation. Other courts have declined to recognize a federal action under 42 U.S.C. § 1983 based on violation of the provisions under the relevant state Compact. *See Ghana v. Pearce,* 159 F.3d 1206, 1208 (9th Cir. 1998); *Stewart v. McManus,* 924 F.2d 138, 142 (8th Cir. 1991); *Denham v. Schwarzenegger*, No. CVF05-0995AWIDLB, 2005 WL 3080857, at *5 (E.D. Cal. Nov. 16, 2005). As the Ninth Circuit observed, "[t]he Compact's procedures are a purely local concern and there is no federal interest absent some constitutional violation in the treatment of these prisoners." *Ghana,* 159 F.3d at 1208. Further, the Compact does not confer a liberty interest for purposes of a Section 1983 claim. *Id.* ("the Compact is not federal law and does not create a constitutionally protected liberty interest" for purposes of Section 1983). Although the Compact has mandatory language, it does not itself "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 1209 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *see also Garcia v. Lemaster*, 439 F.3d 1215, 1219 (10th Cir. 2006)("Application of [receiving state's] procedures to out-of-state inmates housed in [receiving

state's] prisons does not impose an 'atypical or significant hardship' on such prisoners."); *see also Terry v. New Jersey Dept. of Corrections*, 2006 WL 3780761 *4 (D.N.J. Dec. 21, 2006)("Nothing in the Interstate Corrections Compact imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life so as to give rise to a liberty interest in transfer."); *Taylor v. Levesque*, No. 3:03CV1347(HBF), 2005 WL 3050973, at *2 (D. Conn. Nov. 10, 2005), *aff'd*, 246 F. App'x 772 (2d Cir. 2007) ("Taylor cannot rely merely upon the mandatory nature of language in state statutes or prison directives to demonstrate a violation of due process. An inmate's right to have relevant laws, regulations and directives obeyed is not a federal right protected by the civil rights statute or the Constitution." (internal citation omitted)).

Thus, Baltas has not raised an inference that the Compact constitutes a federal law or that he retains a state-created liberty interest under the Compact, Contract or Connecticut DOC Administrative Directives, and the court must dismiss this count. However, the court will consider whether Baltas has stated any plausible claims of constitutional violation against the defendants as a result of his incarceration in Virginia while he remained under Connecticut DOC jurisdiction.

### E.    First Amendment Freedom of Association and Right to Information

In his fourth count, Baltas alleges that the defendants have deprived him of communication and association with friends and peers and access to information in violation of his First Amendment rights. He seeks damages and a declaratory ruling.

### 1.    Denial of Visitation with Family and Friends

The Supreme Court has observed that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); s*ee also Malave v. Weir*, 750 F. App'x 65, 67 (2d Cir. 2019) (summary order) (noting that "*Overton* did not consider whether there is a First Amendment right to visitation in prison. . . ." and that "[c]ases in this circuit also have not clearly established a right to spousal visitation in prison."). Moreover, a prisoner's constitutional right is not violated by limitations on visitation if the procedure "bear[s] a rational relation to legitimate penological interests." *Miller v. Annucci*, No. 17-CV-4698 (KMK), 2019 WL 4688539, at *13 (S.D.N.Y. Sept. 26, 2019) (quoting *Overton*, 539 U.S. at 132); *see also Patterson v. City of New York,* No. 11-CV-7976, 2012 WL 3264354, at *7 (S.D.N.Y. Aug. 9, 2012) ("[L]imitations on visits that are reasonably related to a legitimate penological interest do not violate a prisoner's constitutional right."). A court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton,* 539 U.S. at 132.

Here, Baltas has not alleged sufficient facts to raise an inference that the limitations on his visitation with family and friends is not reasonably related to legitimate penological goals. Thus, Baltas has not raised a plausible inference that his First Amendment right to freedom of association has been violated during his Virginia confinement.

Baltas has alleged that he has been denied visitation with family or associates in violation of Connecticut DOC Administrative Directive 10.6. ECF No. 1 at ¶ 109. However, the Virginia facility is not required to provide treatment for an inmate confined under the Compact that it does not provide for similar inmates not confined under the Compact. C.G.S. § 18-106,

Article VI (e) ("All inmates who may be confined in an institution pursuant to the provisions of this compact shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be confined in the same institution."); *see also* Contract ¶¶ 13, 17.

Generally, court decisions considering the question of whether the sending or receiving state regulations apply to an inmate transferred under the Interstate Corrections Compact have determined that the receiving state rules apply to the transferred inmate. *See Tinker v. Menard*, No. 2:18-CV-12-WKS-JMC, 2018 WL 3869137, at *5 (D. Vt. July 25, 2018), *report and recommendation adopted*, No. 2:18-CV-12, 2018 WL 3862697 (D. Vt. Aug. 14, 2018) (citing *Daye v. State*, 171 Vt. 475, 480 (2000)) ("[a] common sense reading of these provisions must allow authorities having daily, physical custody of a transferred inmate to determine the discipline, visitation, classification, and grooming aspects of the inmate's incarceration.") (quotation and citation omitted)); *Stewart,* 924 F.2d at 141 ("We do not read the Interstate Corrections Compact or the implementing contract to require the application of Kansas disciplinary rules and regulations to a transferred prisoner."); *Barrett v. Peters*, 274 Or. App. 237, 243–44, 360 P.3d 638, 642 (2015), *aff'd*, 360 Or. 445, 383 P.3d 813 (2016) (citing cases that "stand for the same general proposition that the *ICC* does not obligate a *receiving state* to provide a transferred inmate the exact same treatment that the inmate would receive in the sending state and, that the *ICC* does not entitle a transferred inmate to the application of the sending state's *institutional policies*"); *see also Glick v. Holden,* 889 P.2d 1389, 1393 (Utah Ct. App. 1995) (denying prisoner's claim that he was entitled to benefit of policies and procedures of sending state). Moreover, the fact that Baltas is not permitted visitation in accordance with the

Connecticut Administrative Directive does not constitute a violation of his constitutional rights, and it would not constitute such a violation even if he were housed in Connecticut. *See Riddick v. Chevalier*, No. 3:11CV1555 SRU, 2013 WL 4823153, at *4 (D. Conn. Sept. 9, 2013). The court must dismiss this claim as not plausible.

### 2.   Denial of Communications and Right to Information.

A prisoner also has a First Amendment right to "free flow of incoming and outgoing mail." *Davis*, 320 F.3d at 351. Further, "inmates have a First Amendment right to access to publications consistent with prison security[.]" *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995); *see also Prison Legal News v. Cheshire*, No. 1:04CV173DAK, 2005 WL 8174874, at *2 (D. Utah Feb. 3, 2005) ("[i]nmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison."). "Restrictions on prisoners' mail are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation ... and must be no greater than is necessary or essential to the protection of the governmental interest involved." *Id.* (quotation and citation omitted).

A single incident is generally insufficient to establish a constitutional violation. *See Steve v. Arnone*, 627 Fed. App'x 50 (2d Cir. 2016) (affirming dismissal of claim based on only one incident of interference with legal mail). However, "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir.

1986)). Generally, a plaintiff must allege "specific allegations of invidious intent or of actual harm where the incidents of mail tampering are few and thus the implication of an actionable violation is not obvious on its face." *Id.; see also Riley v. Semple*, No. 3:17-CV-45 (VAB), 2017 WL 507214, at *3 (D. Conn. Feb. 7, 2017).

Here, Baltas's allegations are sufficient to establish a First Amendment violation based on interference with his right to the free flow of mail and to receive publications. He has adequately alleged that he notified Connecticut DOC officials Sandler and Osden that his mail was being improperly returned to sender, ECF No. ¶¶ 68, 94, and that he filed grievances with Maiga, Cook and Quiros about the issues alleged in his complaint. *Id.* at ¶ 121. Construed most favorably to Baltas, the allegations suggest that the defendants received notice of the alleged First Amendment violation but failed to prevent the ongoing violation of Baltas's rights, although Baltas remained under Connecticut DOC jurisdiction. For purposes of initial review, the court will permit these claims to proceed against the defendants for further development.[10]

## F.    Interference with Legal Communications

In his sixth cause of action, Baltas alleges that the defendants interfered with his communications with his attorney. He alleges violations of Fourteenth and Sixth Amendment rights based on deprivations of access to his counsel, effective assistance of counsel, right of access to the courts, and right to speedy trial. Baltas's complaint and exhibits reflect that he had a

---

[10]    *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (reversing dismissal of Grullon's claim against warden although he had alleged that he sent a letter to the warden complaining of prison conditions. "At the pleading stage, even if Grullon had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means—that the Warden in fact received the Letter, read it, and thereby became aware of the alleged conditions of which Grullon complained.").

criminal case pending in Connecticut superior court during his incarceration, that his counsel notified Osden of difficulty representing Baltas while incarcerated in Virginia, that Sandler responded to that correspondence, and that he filed grievances with Maiga, Cook and Quiros about the issues alleged in his complaint. ECF No. ¶¶ 46, 57, 121, exs. 3, 8.

Interference with Baltas's "legal mail implicates [his] rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).

### 1.    Interference with Legal Mail

For the reasons previously stated relevant to interference with his free flow of mail, the court will permit Baltas's First Amendment claim to proceed on the basis that the defendants failed to ensure Baltas's access to his legal mail while he remained under Connecticut DOC jurisdiction. *See* ECF No. 1 at ¶ 91.

### 2.    Access to Courts

It is well established that inmates have a constitutional right of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Miller v. Semple*, 2019 WL 6307535, at *4 (D. Conn. 2019) ("Prisoners have a constitutional right of access to the courts that may not be unreasonably obstructed by the actions of prison officials."). To state a claim for denial of access to the courts, a plaintiff must demonstrate that he suffered an actual injury, *see Lewis*, 518 U.S. at 351-53—that is, he must allege that "defendant's conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court," *Baker v. Weir*, 2016 WL 7441064, at *2 (D. Conn. 2016) (quoting *Brown v. Choinski*, 2011 WL 1106232, at *5 (D. Conn. 2011)).

Here, Baltas's complaint indicates that resolution of his criminal and civil matters have been delayed and that he was unable to prepare for his civil or criminal matters, including a defense in his criminal case, as a result of his incarceration in Virginia. ECF No. 1 ¶ 53, ex. 8 (motion for speedy trial stating Baltas has been unable to prepare for defense); *see Lewis*, 518 U.S. at 353 (suggesting that the injury requirement of an access to courts claim is satisfied if an "inmate could demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." (footnotes omitted)).   Construing the allegations most favorably to Baltas, the court will permit this claim to proceed against the defendants beyond initial review.

### 3.    Effective Assistance of Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI; *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). Under the Sixth Amendment, a criminal defendant is constitutionally entitled to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). The Sixth Amendment right to effective assistance of counsel "only applies to a defendant's trial and first appeal as of right, not to appeals afforded on a discretionary basis, collateral proceedings, or civil proceedings such as civil rights claims challenging prison conditions." *Bourdon v. Loughren,* 386 F.3d 88, 96 (2d Cir. 2004) (citing *Pennsylvania v. Finley,* 481 U.S. 551, 555-57 (1987)); *see also Wolff v. McDonnell*, 418 U.S. 539, 576 (1974) (rejecting application of Sixth Amendment to claim that "would insulate all mail from inspection, whether related to civil or criminal matters").

In the specific context of criminal defendant inmate's access to counsel, the Second Circuit concluded that a restriction on a criminal defendant's contact with his or her attorney is

"unconstitutional where the restriction unreasonably burdened the inmate's opportunity to consult with his [or her] attorney and to prepare his defense." *Benjamin v. Fraser,* 264 F.3d 175, 187 (2d Cir. 2001) (quotation and citation omitted).[11] "Examples of unconstitutional limits on prisoners' rights to counsel include a ban on all visits by paralegals employed by criminal defense counsel and repeated delays in meetings between prisoners and attorneys that resulted in attorneys forgoing the meetings." *Schick v. Apker*, No. 07-CV-5775, 2009 WL 2016926, at *2 (S.D.N.Y. July 10, 2009) (citing *Smith v. Coughlin,* 748 F.2d 783, 789 (2d Cir. 1984) and *Benjamin,* 264 F.3d at 187). However, "states have no obligation to provide the best manner of access to counsel" and "restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel." *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988). Thus, a denial of one method of communicating with an attorney does not give rise to a constitutional violation if the inmate plaintiff has an another means of communicating with counsel. *See Lowery v. Westchester Cty. Dep't of Correction*, No. 15-CV-4577, 2017 WL 564674, at *3-4 (S.D.N.Y. Feb. 10, 2017); *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at *7 (S.D.N.Y. Mar. 11, 2014) ("Because Groenow has not alleged that he was denied all opportunities to consult confidentially with his attorney, he has not plausibly alleged a Sixth Amendment violation" even though "monitoring telephone calls with his attorney most likely had a chilling effect on Groenow's ability to communicate effectively with his attorney"); *Schick*, 2009 WL 2016926, at *2 (prison officials' refusal to grant plaintiff's request for an unmonitored call with his criminal appellate attorney on' three occasions "did not

---

[11]     A plaintiff need not show "actual injury" to have standing for a Sixth Amendment claim. *Id.* at 184-187.

'unreasonably burden' his opportunity to consult with counsel and to prepare his appeal" where plaintiff had other means of access to his attorneys).

Baltas's complaint suggests that he was unable to receive mail from his counsel, was not provided with video conferencing, and his telephone calls were monitored telephone. For purposes of initial review, the court will permit this claim to proceed against the defendants for further development.

### 4.    Speedy Trial

The Supreme Court has explained that "[t]he speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative.'" *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quoting *Barker v. Wingo,* 407 U.S. 514, 522 (1972)). For these reasons, the Supreme Court has formulated a four-factor balancing test for evaluating a defendant's claim that his or her speedy trial right has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly." *United States v. Ghailani*, 733 F.3d 29, 42–43 (2d Cir. 2013) (quoting *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012)). Although "no single factor is dispositive and ... each serves to guarantee a fundamental, enumerated right of the accused," the Second Circuit has explained that " '[t]he length of the delay is to some extent a triggering mechanism,' because until there exists 'some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *United States v. Tigano*, 880 F.3d 602, 612 (2d Cir. 2018) (quoting *Barker*, 407 U.S. at 530).

Baltas's complaint has attached the motion for speedy trial dated February 19, 2020, in his criminal matter. ECF No. 1 at ex. 8. Here, Baltas has alleged that he still has not been brought to trial. [12] ECF No. 1 at ¶ 113. Construing the allegations most favorably to Baltas, the court will permit this claim to proceed against the defendants for further development.

### G.    Equal Protection Violation

In his seventh cause of action, Baltas asserts that his Fourteenth Amendment right to equal protection was violated because he was treated differently than similarly situated individuals in the jurisdiction of Connecticut DOC and that the defendants improperly allowed for the Virginia DOC operating procedures to be applied to him. ECF No. 1 at ¶ 145.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It does not mandate identical treatment for each individual or group of individuals. Instead, it requires that similarly situated persons be treated the same. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980). The plaintiff has not alleged that the

---

[12]    It is not clear whether this allegation refers to Baltas's habeas trial rather than the criminal matter under docket H141H-CR-19-733623-S. *See id.* However, the court notes that it could locate no pending criminal case involving Baltas on the Connecticut judicial website.

32

defendants treated him differently or discriminated against him because of his membership in a protected class or based on some suspect classification.

Absent allegations to support "class-based" discrimination, an individual may state an equal protection claim by alleging that he or she has been intentionally and "irrationally singled out as a . . . class of one." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008). A plausible class of one claim requires the plaintiff to demonstrate an "'extremely high degree of similarity'" with the person to whom he or she is comparing himself or herself. *Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir. 2006)). Thus, Baltas must demonstrate the existence of a person who is "prima facie identical" to him or her and who was treated differently. *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (internal quotation marks and citation omitted). The similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *See Witt v. Vill. of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at *5 (S.D.N.Y. Mar. 27, 2015), *aff'd.*, 639 F. App'x 44 (2d Cir. 2016) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

Baltas has not identified another inmate comparator who was treated differently so as to raise an inference of an equal protection violation. Thus, the facts in the complaint do not state a plausible violation of the Fourteenth Amendment Equal Protection Clause.

### H.    Eighth Amendment

In his Eighth, Ninth and Tenth causes of action, Baltas asserts violation of the Eighth Amendment. In his eighth count, he alleges that the defendants have acted with deliberate

indifference to his safety and failed to protect him from serious harms that he was exposed to at the Red Onion. ECF No. 1 at ¶ 148. He alleges that the defendants had notice of threats of harm to Baltas. *See id.* at ¶ 54-57, 90, 121, 148. In his ninth count, he alleges that the defendants acted with deliberate indifference to his safety and failed to protect him from serious and imminent risks of harm. *Id.* at ¶ 152. Baltas alleges that the defendants had notice and were aware that Baltas was assaulted and subjected to threats of future harm. *Id.* In his tenth cause of action, Baltas alleges that defendant have subjected him to cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at ¶ 157. Thus, the court considers whether Baltas has stated any plausible Eighth Amendment claims against the named defendants.

"The Eighth Amendment requires prison officials to 'take reasonable measures to guarantee the safety of the inmates,'" and "[t]hat extends to 'protect[ing] prisoners from violence at the hands of other prisoners.'" *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Farmer*, 511 U.S. at 833). An Eighth Amendment claim of deliberate indifference to safety requires a prisoner to show that: (1) he was subject to conditions of confinement that posed an objectively serious risk of harm, as distinct from what a reasonable person would understand to be a minor risk of harm; and (2) a defendant prison official acted not merely carelessly or negligently but with a subjectively reckless state of mind akin to criminal recklessness (*i.e.*, reflecting actual awareness of a substantial risk that serious harm to the prisoner would result). *See Morgan*, 956 F.3d at 89.

Considering the allegations of the complaint to be true, the court concludes Baltas has alleged that he was subjected to a risk of serious harm in the form of threats to his physical well-being from staff and inmates at the Red Onion, that he suffered an attack from other inmates, that

he sustained a use of force from Virginia correctional staff at a level greater than that tolerated in Connecticut. Further, his allegations raise an inference that the defendants had notice of the threats of harm and the harm that Baltas suffered from the assault and use of force, but the defendants took no action to ensure his safety or protect him from such harms, although he remained under Connecticut DOC jurisdiction. For purposes of initial review, these allegations are sufficient to state Eighth Amendment claims against defendants for deliberate indifference to his safety and/or for failure to protect Baltas. The court permits this claim to proceed beyond initial review for further development.

## I.     Hearings and Review

In his thirteenth cause of action, Baltas alleges that he was subjected to multiple hearings under the Virginia OPs that denied him access to video evidence as required under Connecticut DOC Administrative Directive 9.5; and that he was not provided with the reviews as required under Connecticut Administrative Directive 9.4. ECF No. 1 at ¶¶ 119, 165, 166. Although the terms of the Contract provide that Baltas is subject to the Virginia's disciplinary authority, laws and regulations, Contract at ¶¶ 16, 17, the court considers whether he has alleged any violation of his rights under the Fourteenth Amendment Due Process Clause.

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property." U.S Const. amend. XIV. "Liberty interests protected by the Fourteenth Amendment may arise from two sources -- the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983). The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the

procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court recognized that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Id.* at 483-84. A plaintiff has a protected liberty interest only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship. *See Tellier v. Fields,* 280 F.3d 69, 80-81 (2d Cir. 2000).

### 1.   Disciplinary Hearings

Baltas asserts that he was not allowed access to video evidence for his disciplinary hearings in Virginia in accordance with Connecticut DOC Administrative Directive 9.5. However, under the Fourteenth Amendment, an inmate subject to a disciplinary hearing is entitled to advance written notice of the charge, adequate time to prepare a defense, a written statement of the reasons for the disciplinary action taken, and a limited opportunity to present witnesses and evidence in his defense. *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974) ("Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply.").[13]  Accordingly, even assuming that Baltas had a cognizable liberty interest in connection with his disciplinary hearings, he has failed

---

[13] In *Hewitt*, the Supreme Court held that prior to placing an inmate on administrative confinement, he "must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation."459 U.S. at 476. As long as these two requirements are met, the non-adversary proceeding is held "within a reasonable time following the inmate's transfer" to administrative segregation, "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Id.* & n.8.

to allege a violation of the Fourteenth Amendment based on the failure to provide him access to video evidence.

### 2.      Reviews of Administrative Segregation

Baltas has alleged that he has remained in the "RHU and isolation" for "eighth months and ongoing" without any review. ECF No. ¶¶ 106, 107, 166.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court applied the *Sandin* analysis to a due process claim asserted by inmates who had been classified for placement in a high-security state prison for safety and security, rather than disciplinary reasons. *See id.* at 223. The Court concluded that the restrictive nature of the conditions in the high-security facility, coupled with the fact that the inmates' confinement under those conditions was indefinite, "impose[d] an atypical and significant hardship" on the inmates and gave "rise to a liberty interest in their avoidance." *Id.* at 223-24.

In light of Baltas's alleged "eight month and ongoing" duration of confinement in segregation, the court concludes that he has sufficiently alleged atypical and/or significant conditions as compared to the basic conditions of prison life so as to give rise to a liberty interest. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (holding that "in determining whether [an inmate] endured an atypical and significant hardship" a district court should consider the duration of the inmate's confinement in segregation and "the extent to which the conditions [in] ... segregation differ from other routine ... conditions" in general population.") (internal quotation marks and citation omitted). Thus, the court considers whether his procedural due process rights have been violated.

Due process requires that prison officials engage in periodic review of the administrative

confinement, but it does not require that an inmate receive a hearing, be present, or provide statements for these periodic reviews. *Proctor v. LeClaire*, 846 F.3d 597, 609-12 (2d Cir. 2017) (quoting *Hewitt*, 459 U.S. at 476). In *Proctor,* the Second Circuit directed that a periodic review must provide a meaningful evaluation that considers recent conduct in determining whether valid institutional safety reasons justify continued segregation. *Id.* at 610-11. Prison officials cannot merely "go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in [administrative segregation] no matter what the evidence shows." *Id*. at 610. Such reviews are needed to ensure that segregated confinement is not pretextual. *Hewitt*, 459 U.S. at 477 n.9.

To the extent Baltas alleges that he has not received any review of his administrative segregation, the court concludes that Baltas has raised a plausible Fourteenth Amendment procedural due process violation relating to his long-term confinement on administrative segregation without meaningful, periodic reviews. Because he has alleged that he notified the defendants of his administrative segregation but they failed to ensure compliance with due process, the court will permit this claim to proceed against the defendants beyond initial review for further development.[14]

### J.      Supervisory Liability

In his twelfth cause of action, Baltas alleges that the defendants are liable for failure to supervise subordinate staff and their agents. Baltas cannot sue a defendant for damages solely because of his or her supervisory position. *See Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.

---

[14] The court notes that it is not clear whether he complained to Sandler about his administrative segregation without review. However, all aspects of this ruling are without prejudice to a defense motion to dismiss.

1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under § 1983). The court has already articulated the standards for a holding a defendant liable under a theory of supervisory liability. This decision has set forth Baltas's plausible claims for the defendants' liability based on the alleged constitutional violations under the relevant standards.

### K.     Official Capacity Claims

The complaint includes requests for declaratory and injunctive relief and a temporary restraining order, preliminary injunction, and permanent injunction in addition to declaratory relief. *See* ECF No. 1 at p. 42.[15] The plaintiff has also filed motions for temporary restraining order and preliminary injunction seeking orders directing the defendants to remove him from Virginia confinement. *See* ECF Nos. 4, 5. Baltas seeks a default judgment because the defendants have not opposed the motion seeking a restraining order or a preliminary injunction. ECF No. 13.

A plaintiff may proceed against a DOC official in his or her official capacity to the extent he alleges an ongoing constitutional violation. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). "A plaintiff may sue a state official acting in his official capacity—notwithstanding the

---

[15]   The eleventh cause of action seeks declaratory and injunctive relief on the basis of unconstitutional customs, practices, polices or procedures created by the defendants. ECF No. 1

Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). However, the exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

### 1.    Injunctive Relief

In his complaint and motions for a temporary restraining order and a preliminary injunction, Baltas requests to be transferred from his Virginia confinement to Connecticut, to never be confined in Virginia, and to prohibit interstate transfers while he or other inmates have pending criminal or civil actions. *See* ECF No. 1 at ¶¶ 143, 150, 154-155, ECF Nos. 4, 5. He has also requested that the court order the defendants to provide some due process protections prior to transferring an inmate under the Compact; and order that such transfers have a limited term and be related to a legitimate penological interest beyond a statement that the transfer serves the interest of safety and security. ECF No. 1 at ¶¶ 131, 143. Relevant to his confinement in administrative segregation at the Red Onion, he requests that the court order review of his status and order his release from administrative segregation. ECF No 1 at ¶ 168. He also requests that the court order the defendants not to retaliate against him. ECF No. 1 at ¶ 124.

Under Rule 65(b)(1), Fed. R. Civ. P., a district court may issue a TRO "if specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and the movant certifies in writing any efforts made to give notice and the reasons why it should not be

at ¶¶ 159-160.

required." *Id*. Thus, the "[t]he purpose of a temporary restraining order is to preserve an existing situation *in status quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers School Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (internal quotation marks and citations omitted).

When considering whether to issue a temporary restraining order, the court employs the same standard used to review a request for a preliminary injunction. *See Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 272 (N.D.N.Y. 2015) (citing *inter alia Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992)). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To warrant preliminary injunctive relief, the moving party must demonstrate (a) that he or she will suffer "irreparable harm" in the absence of an injunction, and (b) either (1) a "likelihood of success on the merits or (2) sufficiently serious questions going to the merits [of the case] to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary injunctive relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011) (internal quotation marks omitted).

If a party seeks a permanent injunction, he or she "must demonstrate (1) irreparable harm ... and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). Thus, the standard for a permanent injunction is similar to the standard for a preliminary injunction, but a plaintiff must show actual success rather than a likelihood of success. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a). Injunctive relief afforded by a court must be narrowly tailored or proportional to the scope of the violation and extending no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 531 (2011). Thus, "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution" should be rejected. *Id.* "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer*, 511 U.S. at 846-47) (other citations omitted). Moreover, a plaintiff may only proceed with a request for injunctive relief against a defendant official who has some connection with enforcement of allegedly unconstitutional act. *See Scozzari v. Santiago*, No. 3:19-CV-00229 (JAM), 2019 WL 1921858, at *6 (D. Conn. Apr. 29, 2019) (citing *Ex parte Young*, 209 U.S. at 157).

Here, Baltas makes several requests in his complaint and motions for this court to order his transfer back to Connecticut and permanently prohibit his transfer back to Virginia. This court previously denied such request on the basis that the court lacks authority to order the defendants to transfer him back to Connecticut. *See* ECF No. 86, *Baltas v. Frenis*, No. 3:18-cv-1168 (D. Conn. Feb. 20, 2020) (noting that courts cannot order the DOC to transfer an inmate because the Court "must defer to the Executive Branch for the safe and secure operation of and proper attainment of penological objectives in the State's correctional institutions") (citing *Cofone v. Manson*, 594 F.2d 934 (2d Cir. 1979)); *see also Olim,* 461 U.S. at 248. However,

42

Baltas's claims that Maiga and Cook transferred him to confinement in Virginia constitutes First Amendment retaliation may now proceed beyond initial review, and Baltas's transfer from Virginia may be construed most broadly as relief for an ongoing retaliatory transfer to confinement in Virgina. *See Baltas v. Erfe*, ECF No. 19, No. 3: 19cv1820 ("As the plaintiff notes, the Court does have authority to issue orders to CT DOC officials, and such orders might be sufficient to undo the transfer to Virginia, provided such a claim was part of this case and the plaintiff made the requisite showing. … If plaintiff wishes to file a separate action challenging his transfer to Virginia on retaliation grounds, he may do so."). Thus, at this juncture, the court will consider his motions for temporary restraining order and preliminary injunction to remove him from Virginia confinement.

Baltas cannot, however, proceed against Cook in his official capacity because Cook is no longer the DOC Commissioner and, therefore, does not have the capacity to provide any requested relief. *See Ex parte Young*, 209 U.S. at 157 (defendant official must have some connection with enforcement of allegedly unconstitutional act).[16] Baltas may proceed on this request for injunctive relief against Maiga and Interim Commissioner Quiros under Federal Rule of Civil Procedure 25(d) ("An action does not abate when a public officer who is a party in an official capacity ... ceases to hold office while the action is pending[,] [and] [t]he officer's successor is automatically substituted as a party."). Accordingly, the court will instruct the clerk to arrange for service of this complaint on Maiga and Quiros in their official capacities. The court will instruct the defendants to show cause why Baltas's request to be transferred back to

---

[16] *See* https://portal.ct.gov/DOC (showing that Angel Quiros is the current Interim Commissioner).

Connecticut should not be granted. The defendants are also requested to address Baltas's request that defendants be prevented permanently from housing Baltas in Virginia.

However, Baltas's requests for this court to order Connecticut DOC officials to implement certain procedures prior to an interstate transfer or to prevent them from ordering interstate transfers for Baltas or other inmates with pending criminal and civil actions would unduly involve the court in in DOC's role to control and monitor the prison inmate population. As the United States Supreme Court has explained, "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions; Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

With respect to his request for an injunctive order for a review of, and release from, his administrative segregation in Virginia, the Court has no authority over the officials at a Virginia state prison and this request for an injunctive order is not plausible. *See Baltas v. Erfe*, ECF No. 15, No. 3: 19cv1820 ("this Court lacks authority over any officers at a Virginia state prison, so the Court does not have the authority to grant the injunctive relief the plaintiff seeks"); *see also Sadler*, No. 3:01CV1786(CFD)(WIG), 2004 WL 2061127, at *4 (finding no personal jurisdiction over Virginia DOC officials in suit by Connecticut prisoner based on his confinement in Virginia under Compact).[17]

Finally, Baltas's request for an order for the defendants to stop retaliating against him must be dismissed because "an injunction [must] be 'more specific than a simple command that

---

[17] For purposes of this initial review, the court has considered as plausible claims asserting Connecticut DOC defendants' damages liability. However, the court has no authority to issue injunctive

the defendant obey the law.'" *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018)

(*quoting City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011)).

Thus, the court must dismiss these requests for injunctive relief.

### 2.    Declaratory Relief

Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity

from legal relationships without awaiting a violation of that right or a disturbance of the

relationship." *Colabella v. Am. Inst. of Certified Pub. Accts.*, C.A. No. 10-CV-2291

(KAM)(ALC), 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (citations omitted).

"Declaratory relief operates prospectively to enable parties to adjudicate claims before either side

suffers great damages." *Toliver v. Comm'r Semple*, No. 3:16-CV-1899 (SRU), 2016 WL

7115942, at *3 (D. Conn. Dec. 6, 2016) (referencing *In re Combustion Equip. Assoc., Inc.*, 838

F.2d 35, 37 (2d Cir. 1988)).

At Paragraph 144 of his sixth cause of action, Baltas seeks a declaratory ruling stating

that the transfer to an out-of-state facility while matters are pending in Connecticut courts

violates his constitutional rights. ECF No. 1 at ¶ 144. However, as previously explained, Baltas

does not have a constitutionally-protected right to be confined at a particular institution, and

therefore, he cannot premise his request for declaratory relief on an alleged unconstitutional

transfer. *See Olim,* 461 U.S. at 248.

At paragraph 168 of his thirteenth cause of action, Baltas requests declaratory relief

concerning the alleged unconstitutional administrative segregation without review and providing

for his release. ECF No. 1 at ¶ 168. Again, this court has no authority over the officials in

Virginia. Further, to the extent Baltas seeks a declaration that the acts and omissions by the

orders against Virginia officials, none of whom have been named as defendants.

defendants have violated his constitutional rights in the past, such request is not plausible. *See Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* ... to claims for retrospective relief."). Accordingly, the court will dismiss the requests for declaratory relief.

## ORDERS

In accordance with the foregoing analysis, the court enters the following orders:

(1) The case shall proceed on Baltas's First Amendment retaliation claims against Rollin Cook and David Maiga in their individual capacities; his First Amendment claims based on his right to free flow of incoming and outgoing mail, legal mail, right to publications/information, and access to the courts against Cook, Maiga, Angel Quiros, Jaclyn Osden and Jessica Sandler in their individual capacities; his Sixth Amendment claims based on his rights to speedy trial and effective assistance of counsel against Cook, Maiga, Quiros, Osden and Sandler in their individual capacities; his Eighth Amendment claims against Cook, Maiga, Quiros, Osden and Sandler in their individual capacities; and his Fourteenth Amendment claims based on the confinement in administrative segregation without review against Cook, Maiga, Quiros, Osden, and Sandler in their individual capacities.[18] All other claims are dismissed without prejudice.

The Court instructs the defendants to file a response to Baltas's motions for temporary restraining order and preliminary injunction [ECF Nos. 4 & 5] within **thirty days** of this Order's filing date. This Order renders Baltas's motion to expedite [ECF No. 8], motion for order to show cause [ECF No. 9], and motion for default judgment [ECF No.13] as MOOT. The motion

---

[18]   This ruling construes the facts most favorably to Baltas and assumes that DOC retains jurisdiction over Baltas, the defendants had notice of the violations, and that defendants had some capacity to prevent or remedy the alleged constitutional violations. This Initial Review Order is without prejudice to a motion to dismiss.

46

for request for status update [ECF No. 14] is also rendered MOOT by this Initial Review Order, which has set forth the status of Baltas's claims. Those motions [ECF Nos. 8, 9, 13, and 14] are DENIED as moot.

(2) **The Clerk shall** verify the current work address of Rollin Cook, David Maiga, Angel Quiros, Jaclyn Osden, and Jessica Sandler, with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to them at their confirmed addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If any defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal Service is directed to effect service of the Complaint and this Order on Interim Commissioner Angel Quiros and David Maiga in their official capacities at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within **twenty-one (21) days** from the date of this Order and to file a return of service within thirty (30) days from the date of this Order. **Defendants are instructed to file a response to the motions for temporary restraining order and preliminary injunction within 30 days of this Order.** The defendants are also requested to address Baltas's request that the defendants be prevented permanently from housing Baltas in Virginia.

(4) **The Clerk shall** send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(5) The defendants shall file a response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. The defendants may also include any and all additional defenses permitted by the Federal Rules.

(6) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within **six months  (180 days)** from the date of this Order. Discovery requests need not be filed with the Court.

(7) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court.  The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(8) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(9) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(10)  If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the

notification of change of address. He should also notify the Defendants or defense counsel of his new address.

(11) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

_____/s/_____
Michael P. Shea
United States District Judge

**SO ORDERED** this 26th day of October 2020, at Hartford, Connecticut.