## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:20cv1177 (MPS) |
| v. | : | |
| | : | |
| DAVID MAIGA, in his individual and official | : | |
| capacities, ROLLIN COOK, in his individual | : | |
| and official capacities, ANGEL QUIROS, in his | : | |
| individual and official capacities, JACLYN | : | |
| OSDEN, in her individual and official | : | |
| capacities, and JESSICA SANDLER, in her | : | |
| individual and official capacities, | : | |
| Defendants. | : | |

## RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The plaintiff, Joe Baltas, is incarcerated at the Red Onion State Prison ("Red Onion") in Pound, Virginia. He has filed a civil rights complaint under 42 U.S.C. § 1983, against former Connecticut Department of Correction ("DOC") Commissioner Rollin Cook, District Administrator Angel Quiros, Director of Offender Classification and Population Management David Maiga, Correctional Counselor Supervisor Jaclyn Osden, and Correctional Counselor Jessica Sandler. *See* Compl. ECF No. 1, at pp. 1-6. His complaint alleges constitutional violations related to his transfer by Connecticut DOC officials to Virginia and the conditions of his confinement in Virginia.

In an initial review order dated October 26, 2020, the court concluded that Baltas could proceed on his First Amendment retaliation claims against Cook and Maiga in their individual capacities; his First Amendment claims based on his right to free flow of incoming and outgoing mail, legal mail, right to publications/information, and access to the courts against Cook, Maiga, Quiros, Osden, and Sandler in their individual capacities; his Sixth Amendment claims based on

his rights to speedy trial and effective assistance of counsel against Cook, Maiga, Quiros, Osden, and Sandler in their individual capacities; his Eighth Amendment claims against Cook, Maiga, Quiros, Osden, and Sandler in their individual capacities; and his Fourteenth Amendment claims based on his confinement in administrative segregation without review against Cook, Maiga, Quiros, Osden, and Sandler in their individual capacities. *Baltas v. Maiga*, No. 3:20CV1177 (MPS), 2020 WL 6275224, at *22 (D. Conn. Oct. 26, 2020), Initial Review Order, (ECF No. 16 at 46).

Baltas also moved for a temporary restraining order and preliminary injunction requiring the defendants to arrange for his transfer back to Connecticut and barring them from returning him to Virginia. Mots. for TRO and Prelim. Inj. (ECF Nos. 4 & 5). The Defendants filed their opposition to Baltas's motions for injunctive relief on November 25, 2020. Opposition (ECF No. 29). Baltas has filed a reply thereto. Reply (ECF No. 35).  Baltas has also filed a Motion for a More Specific Statement, which asserts that defendants' opposition to the motions for injunctive relief are conclusory, vague, unsubstantiated, and in bad faith. (ECF No. 34).  This motion is essentially a challenge to the defendants' opposition materials. The court's review of the requests for injunctive relief will consider Baltas's arguments asserted in this motion but will deny the motion to order the defendants to provide any further statements in opposition to the pending motions for injunctive relief.

 After carefully reviewing the record, the Court concludes that the motions for a temporary restraining order and preliminary injunction must be denied.

## I.    FACTS

The following facts are taken from Baltas's complaint (ECF No. 1), his memorandum in support of his motions for a temporary restraining order and preliminary injunction (ECF No. 4-1), his reply with attached exhibits (ECF Nos. 35, 35-1), and the declaration from Counselor Sandler with attachments submitted in support of the Defendants' opposition (ECF No. 29-1). The court also assumes familiarity with and incorporates herein all relevant facts included in the court's initial review order. *Baltas,* No. 3:20CV1177 (MPS), 2020 WL 6275224, Initial Review Order (ECF No. 16).

Baltas was sentenced in Connecticut superior court and was formerly confined within Connecticut DOC facilities.[1]  Compl. (ECF No. 1 at ¶ 23).  In November 2018, Maiga transferred Baltas under the Connecticut Interstate Corrections Compact (the "Interstate Compact"), Connecticut General Statutes §§ 18-1-5 through 18-107, to Massachusetts, due to safety and security concerns (which Baltas asserts are baseless). *Id.* at ¶ 25. In September 2019, Commissioner Cook argued that Baltas's state habeas action should be dismissed due to Baltas's transfer. *Id.* at ¶ 26. Baltas claims that the next day, Cook and Maiga had him returned to confinement in Connecticut DOC's Northern Correctional Institution ("Northern"). *Id.* at ¶ 27.

On November 15, 2019, Baltas filed a federal action, asserting claims against Maiga and Cook. *Id.* at ¶ 28; *see also* Mem. in Support of TRO and Prelim. Inj. (ECF No. 4-1 at 2).

---

[1] The Court may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The Connecticut DOC website reflects that Baltas is serving a total effective sentence of 115 years of imprisonment. *See* http://www.ctinmateinfo.state.ct.us/.

Baltas claims that on December 20, 2019, Maiga and Cook transferred him to Virginia under the Interstate Compact. Compl. (ECF No. 1 at ¶ 29); Mem. in Support of TRO and Prelim. Inj. (ECF No. 41-1 at 2). Baltas alleges that DOC correctional officials informed him that his transfer was a result of his civil action against DOC officials. Compl. (ECF No. 1 at ¶ 31). At the time of his transfer, Baltas had nine civil actions pending against DOC officials. *Id.* at ¶ 32.

Baltas was transferred to the Red Onion State Prison, a Virginia facility classified as a Level 5 through 6 and Virginia's most secure and highest-level correctional institution reserved for Virginia's most violent and dangerous offenders; the Red Onion has a level of custody higher than any facility within the Connecticut DOC. *Id.* at ¶¶ 33-35.

Baltas asserts that the Virginia correctional staff have labeled him as a snitch and have encouraged other inmates in the population to attack him. (ECF No. 1 at ¶¶ 61, 88; ECF No. 1 at 4-1 at 2).

### **Involuntary Inmate Out-of-State Transfers Under the Interstate Compact Transfer Agreement**

In her declaration, Correctional Counselor Sandler, who is assigned to DOC's Interstate Compact Office, has explained the process for involuntary Interstate Compact transfers. Sandler dec. (ECF No. 29-1 at ¶¶ 3-8). Connecticut DOC will seek an out-of-state involuntary transfer for a Connecticut inmate who it considers to pose significant safety and security concerns for Connecticut DOC, and who can be more effectively managed in a different state's facility. *Id.* at ¶ 3. Connecticut DOC prioritizes the Connecticut inmates considered for out-of-state transfer based upon the circumstances. *Id.* at ¶ 7.

To effect an involuntary out-of-state transfer, the Connecticut DOC sends a referral packet (including the inmate's criminal history, current criminal offense, classification information, behavioral history, medical and mental health information, substance abuse information, separation profile information, and incarceration history) to states that could accept the inmate. *Id.* at ¶¶ 4-5. The Connecticut DOC also takes into account logistical concerns such as transportation issues when it considers to which states to send the referral packet. *Id.* at ¶ 6. Meanwhile, the states receiving the referral packet consider the exchange history with Connecticut to determine whether to accept a Connecticut inmate. *Id.* at ¶ 5. After a state agrees to house a Connecticut inmate, the Connecticut DOC arranges to transport the inmate to the out-of-state facility. *Id.* at ¶ 8.

### Baltas's Out-of-State Transfers and Confinement Under the Interstate Compact Agreement

Correctional Counselor Sandler's declaration and the attached exhibits reflect the following information concerning Baltas's transfers for confinement in Massachusetts and Virginia. *Id.* at ¶¶ 10-20.

In November 2016, Baltas was transferred to Connecticut DOC's Garner Correctional Institution ("Garner"). *Id.* at ¶ 10. On December 15, 2016, Garner Warden Falcone submitted a request to the Interstate Compact Office for Baltas's transfer to another state due to "safety and security concerns based on his extremely violent behavior and gang influence." *Id.* at p. 10 (Ex. A, Warden Falcone Memo Request). Warden Falcone explained that Mr. Baltas had "a history of

association with the Diablos Motorcycle Gang[;]"[2] had stabbed another inmate with a piece of

metal that he had sharpened in January 2014;[3] and was placed on "High Security status due to a

notebook found in his possession containing staff names, suspected juror names and a list of

names/alias of what appeared to be Diablo leaders throughout the United States and a formula of

how to make a bomb." *Id.* Warden Falcone noted that Baltas had made repeated threats to staff

and had required a cell extraction to remove him from his cell after he barricaded the trap in his

cell door with his mattress and actively resisted staff efforts to remove him, injuring an officer.

*Id.* at p. 11. The Interstate Compact Office was not able to accommodate Warden Falcone's

request at that time. *Id.* at ¶ 11.

     In a memo dated March 13, 2018, Garner Warden Dilworth made another request for

Baltas's involuntary out-of-state transfer. *Id.* at p. 13 (ex. B, Warden Dilworth Memo Request).

He explained that after the 2016 request from former Warden Falcone, Baltas had received seven

disciplinary reports, and "had threatened to stab a staff member, threatened to stab any staff that

enters into his cell, has covered his window refusing direction from staff, and has multiple

disciplinary reports for exposing himself to female staff members." *Id.* In addition, Warden

Dilworth noted that Baltas had multiple separation profiles with staff and inmates at all Level 4

---

[2] In his reply, Baltas contends that this assertion is based solely on his father's connection to the Diablos. He submits an unredacted copy of Warden Falcone's memo, which mentions Baltas's father's connection as well as an "undocumented" claim by Baltas that he had taken control of the Diablos since age 16. Reply Ex. B (ECF No. 35-1 at 17).

[3] On March 25, 2015, Baltas pled guilty to violation of Connecticut General Statutes § 53a-60(a)(2) ("Assault in the second degree with intent to cause injury) and § 53a-174a (Possession of a Weapon in a Correctional Institution). *See* publicly-available case detail for *State v. Baltas*, Docket No. N07M-CR14-0276900-S found at: http://www.jud.ct.gov/jud2.htm under Superior Court Case Look-up; Criminal/Motor Vehicle; Convictions -by Docket Number.

DOC facilities, and that Baltas had filed a complaint and administrative remedies asserting that he was at risk at Garner due to an active staff profile and continued fear of staff retaliation. *Id.* Warden Dilworth requested Baltas's transfer out of state "based on his continued behavior impacting facility operations, difficulty in managing him in a level 4 facility, and the length of time remaining on his sentence." *Id.*

In June 2018, the Interstate Compact Office compiled a referral packet to multiple states, requesting acceptance of Baltas's transfer pursuant to the Interstate Compact Agreement. *Id.* at ¶ 13.

On October 30, 2018, the Commonwealth of Massachusetts agreed to accept Baltas under the provisions of the Interstate Compact. *Id.* at ¶ 14, p. 15 (ex. C, Letter MCI-Cedar Junction Manager). This acceptance was contingent upon "inmate Baltas not becoming a management problem and eventual compliance with all required testing." *Id.* at p. 15.

On September 10, 2019, Mr. Baltas returned to Connecticut from Massachusetts in preparation for court proceedings on September 11 and September 26, 2019. *Id.* at ¶ 15. Although he was scheduled to be returned to Massachusetts on September 26, Baltas was instead transferred to Northern for potential placement in the Administrative Segregation Program after he assaulted an officer at the Hartford Correctional Institution. *Id.*

On December 6, 2019, the Connecticut DOC Office of Population Management and Security Department received a letter from the Massachusetts Threat Assessment and Management Unit, stating that Baltas had written a letter to a Massachusetts Superior Court Judge expressing his "disappointment and disgust" with the Massachusetts judge and threatening to kill Massachusetts correctional staff if he returned to Massachusetts. *Id.* at ¶ 16, p. 17 (Ex. D,

7

Letter from Massachusetts Threat Assessment and Management Unit). Massachusetts terminated the Interstate Compact agreement with Connecticut to house Baltas. *Id.* at ¶ 16.

After his return to confinement within the Connecticut DOC, Baltas received fourteen disciplinary reports, including charges for assault on DOC staff, threats, and public indecency. *Id.* at ¶ 17. Sandler explains that the Connecticut DOC considered another involuntary out-of-state transfer for the interest of safety and security; however, the options were limited to states within driving distance because Baltas refused to take the PPD test (a tuberculosis test) required for airplane transport, and Baltas's history of threatening and assaulting other inmates and staff also made it difficult to find a state willing to accept him under the Interstate Compact Agreement. *Id.* at ¶ 18.

After the State of Virginia agreed to an inmate exchange for Baltas, Connecticut DOC transferred to him to the Red Onion in Virginia on December 20, 2019. *Id.* at ¶ 19. Correctional Counselor Sandler explains that prior to Baltas's transfer, the Connecticut DOC ensured that the Red Onion facility had videoconferencing equipment so that Baltas could connect remotely to any legal proceedings in Connecticut. *Id.* at ¶ 20.

The Connecticut DOC Interstate Compact Office later received a letter from Baltas dated December 23, 2019, requesting the Connecticut DOC to forward his money and property to Virginia along with a copy of the Interstate Compact Agreement, copies of DOC grievance forms, and copies of pending grievances. *Id.* at ¶ 21, p. 19 (Ex. E, Letter from Baltas). Correctional Counselor Sandler responded to his letter on December 31, 2019, and sent him the requested materials. *Id.* at ¶ 22.

On January 2, 2020, the Connecticut DOC Interstate Compact Office received a letter from Baltas's attorney with questions regarding his transfer to Virginia. *Id.* at ¶ 23, p. 21 (Ex. F, Letter from Attorney Famiglietti). Correctional Counselor Sandler responded to his letter, explaining that Baltas had been involuntarily transferred to the State of Virginia under Connecticut General Statutes §§ 18-105 to 18-107 and Administrative Directive 1.4(5) and 9.1(9). *Id.* at ¶ 24, p. 23 (Ex. G, Letter from Sandler). She also explained that the transfer was for an indefinite duration and was conducted for safety and security concerns; she provided the telephone number for Attorney Famiglietti to contact the Red Onion State Prison for video conferencing arrangements. *Id.* Sandler was also advised that Virginia inmates complete an attorney block form to ensure privacy during their legal calls, and that Baltas had filled out this form for his telephone calls with counsel. *Id.* at ¶ 25.

On January 6, 2020, Baltas refused to sign Virginia's mail policy, which permits Virginia to review nonlegal mail; the Virginia mail policy provides that "[a]t security Level 2 and above facilities, the envelope and all enclosed contents will be photocopied with a maximum of three photocopied pages front and back delivered to [the inmate]; and the original envelope and all enclosed contents will be shredded in the facility mailroom." *Id.* at ¶ 26, p. 25 (Ex. H, Mail Policy Notice with Baltas's Refusal to Sign). An inmate's refusal to sign the mail policy notice results in nonlegal correspondence being returned to the Postal Service. *Id.*

On January 13, 2020, the Connecticut DOC Interstate Compact Office received a letter from Baltas, requesting of a copy of the Connecticut DOC Administrative Directives. *Id.* at ¶ 27, p. 27 (Ex. I, Letter from Baltas). The inmate must pay $.25/ page and postage, and Baltas's request would have cost him approximately $195. *Id.* at ¶ 28. Due to the expense to Baltas and

his refusal to accept Virginia's mail policy, Correctional Counselor Sandler contacted the

Virginia Interstate Compact Coordinator and the Red Onion facility attorney to see if Baltas

could access the Connecticut DOC Administrative Directives online. *Id.* On January 15, 2020,

she spoke with the Red Onion facility attorney about assisting Baltas to gain access to the

Connecticut Administrative Directives. *Id.* The attorney confirmed that Red Onion inmates do

have access to the internet and that Baltas could access the Directives online. *Id.*

On January 18, 2020, Baltas was injured in an assault by inmates at the Red Onion.

Compl. (ECF Nos. 1 at ¶¶ 71-73, 4-1 at p. 2). On January 20, 2020, Virginia contacted the

Connecticut Interstate Compact Office to notify them that Baltas had been involved in an assault

two days earlier. Sandler dec. (ECF No. 29-1 at ¶ 29). Correctional Counselor Sandler was

advised that he received medical care and that the facility would separate him from the other

inmates involved in the assault upon his return to the housing unit. *Id.* She was also advised that

the facility could move Mr. Baltas into protective custody at his request, but that Baltas had

rejected the offer of placement in protective custody. *Id.*

On February 3, 2020, the Connecticut DOC Interstate Compact Office received a letter

from Baltas dated January 6, 2019 (addressed to former Commissioner Cook) that complained

about Connecticut DOC's failure to transfer his property and his money in an inmate trust

account, and the conditions at the Red Onion. *Id.* at ¶ 30, p. 29 (ex. J, Letter from Baltas to

Cook). Correctional Counselor Sandler explains that she had previously taken care of his

concerns about his property and money in Connecticut. *Id.* at ¶ 31. She had contacted his

previous Connecticut DOC facility to inquire about his property and make sure that it was

shipped to Virginia; she also had arranged for Connecticut DOC Inmate Accounts to forward the

balance of Mr. Baltas's inmate trust account to Virginia. *Id.* In response to Baltas's complaints about the Red Onion prison conditions and his safety concerns, Sandler called the Virginia Interstate Compact Coordinator the day she received Baltas's letter. *Id.* at ¶ 32. She was informed that Baltas remained safely housed in segregation, and that he has a continuous offer for protective custody that would provide housing at a separate correctional facility within Virginia. *Id.* at ¶ 33. According to Sandler's declaration, as of November 16, 2020, Baltas was still rejecting the offer from the Virginia Department of Corrections to place him in protective custody. *Id.*

In his reply, Baltas has provided the September 3, 2020 affidavit of Red Onion Assistant Warden Fuller, who averred that Baltas is being confined in Red Onion's restricted housing unit ("RHU") on SD-2 status, which is the least restrictive RHU status; and that Baltas is allowed to walk unrestrained to showers or recreation, has access to outdoor recreation, has a personal television, is permitted more commissary than other RHU inmates, and has a single cell.  Reply Ex. A (ECF No. 35-1, Fuller aff. at ¶¶ 10, 23, 25, 27, 29, 30). Warden Fuller explained that Baltas's RHU assignment is appropriate for him as a highly monitored environment in light of his criminal and incarceration history, and that Baltas needs to be housed separately from the offenders who attacked him due to concerns that Baltas might seek retaliation against his attackers (or their family) or that the attackers or other members of their group would seek further to harm Baltas. *Id.* at ¶ 46, 47, 54.

In his reply brief, Baltas asserts that he has no access to video conferencing,[4] unrecorded legal calls, or internet access. Reply (ECF No. 35 at 13). He maintains that no one has ever spoken with him about an offer for protective custody. *Id.* He also states that because, in his view, Virginia correctional officers arranged for the assault against him and because the gang members who assaulted him have fellow gang members in the protective custody units of other Virginia facilities, placing him in protective custody – even at another Virginia prison – would not effectively protect him. (*Id.* at 5.)

## II.    LEGAL STANDARD

A district court has wide discretion in determining whether to grant preliminary injunctive relief. *See Moore v. Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005) (Sotomayor, J.). The same standard applies for granting a temporary restraining order and a motion for a preliminary injunction. *Stoneway Capital Corp. v. Siemens Energy Inc.*, 2020 WL 764457, at *1 (S.D.N.Y. Feb. 14, 2020); *Foley v. State Elections Enforcement Com'n*, 2010 WL 2836722, at *3 (D. Conn. July 16, 2010) (internal citations omitted).

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir. 2005) (Sotomayor, J.) (citation and internal quotation marks omitted); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Under this standard, a movant must establish "a threat of irreparable

---

[4] However, the court notes that Baltas was able to participate in his habeas hearing on August 3, 2020, "from Virginia via interactive audiovisual device." *Baltas v. Comm'r of Correction*, No. CV195000247S, 2020 WL 6121447, at *1 (Conn. Super. Ct. Sept. 16, 2020).

harm" and either (1) "a probability of success on the merits" or (2) "sufficiently serious

questions going to the merits to make them a fair ground for litigation, and a balance of

hardships tipping decidedly in favor of the moving party." *Moore*, 409 F.3d at 510 (internal

citations omitted).[5] To demonstrate irreparable harm, a plaintiff must show "an injury that is

neither remote nor speculative, but actual and imminent and that cannot be remedied by an award

of money damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).

     "To prevail on a motion for preliminary injunctive relief, the moving party must establish

a relationship between the injury claimed in the motion and the conduct giving rise to the

complaint." *Vega v. Lantz*, 2006 WL 2642416, at *2 (D. Conn. Sept. 14, 2006) (internal citations

omitted); *see also Taylor v. Rowland*, 2004 WL 231453, at *2–*3 (D. Conn. Feb. 2, 2004)

(concluding that a motion for preliminary injunctive relief was not proper because it was

"unrelated to the issues in the amended complaint").

     If the movant seeks a "mandatory preliminary injunction that alters the status quo by

commanding some positive act," rather than a "prohibitory injunction seeking only to maintain

the status quo," then the burden of proof is even greater. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401,

406 (2d Cir. 2011) (internal quotation marks and citation omitted). Such a mandatory injunction

"should issue only upon a clear showing that the moving party is entitled to the relief requested,

or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* A

---

[5] "A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Otoe-Missouria Tribe of Indians v. New York State Dept. of Financial Services*, 769 F.3d 105, 110 (2d Cir. 2014). I need not consider in this case whether the Connecticut DOC's transfer of Baltas to Virginia constitutes "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," however, because the lower, "fair-ground-for-litigation" standard does not apply here for the independent reason that Baltas is seeking a mandatory injunction, as discussed below.

party seeking a mandatory injunction must therefore demonstrate both "a clear or substantial likelihood of success on the merits" and irreparable harm. *See Jolly v. Coughlin*, 76 F.3d 468, 473-474 (2d Cir. 1996).

"In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted). Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a). Injunctive relief afforded by a court must be narrowly tailored or proportional to the scope of the violation and must extend no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 531 (2011). Thus, the court should reject "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Id.*

A federal court generally holds a hearing on a motion for preliminary injunction, but hearings are not required in all cases. *See Drywall Tapers & Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL–CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n,* 954 F.2d 69, 76-77 (2d Cir. 1992). "[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997). Thus, if the record before the court demonstrates no factual dispute to be resolved by an evidentiary hearing, the court may

14

grant or deny the motion without hearing oral testimony. *Lopez v. McEwan*, No. 3:08CV678(JCH), 2009 WL 179815, at *1 (D. Conn. Jan. 23, 2009) (citation and internal quotation omitted).

Upon review of the complaint, motions, memoranda, Baltas's reply and the attached exhibits, and Correctional Counselor Sandler's declaration and the attached exhibits, the court concludes that there are no material facts in dispute and that neither oral testimony nor argument would assist in the court's understanding of the factual record or the relevant legal principles. *See Stiggle v. Arnone*, No. 3:13-CV-00238 JAM, 2014 WL 4230919, at *1 n.3 (D. Conn. Aug. 26, 2014) (citing James W. Moore, et al., *Moore's Federal Practice* ¶ 65.04[3] (2d ed. 1995)). The court can resolve Baltas's motions for a temporary restraining order and preliminary injunction without a hearing on the present record.

## III.     DISCUSSION

Baltas is seeking a mandatory injunction to alter, rather than maintain, the status quo; he requests an order to be transferred back to Connecticut and to bar DOC from returning him to a Virginia facility. Thus, his injunctive requests are subject to the higher burden of proof for a mandatory injunction, and he must make a "clear showing" that he is entitled to the relief requested, or that "extreme or very serious damage will result" if he is not transferred back to Connecticut. *See Cacchillo*, 638 F.3d at 406. The court will first consider the issue of irreparable harm.

### A.     Irreparable Harm

Baltas asserts that his incarceration at the Red Onion endangers his "personal physical safety and very mortality." Mem. in Support of TRO (ECF No. 4 at 1). Specifically, he maintains

that he will be "attacked again and possibly killed" if he remains in Virginia custody. *Id.* at 3; *see also* Reply (ECF No. 35 at 4).

The court recognizes that Baltas was assaulted and injured while allegedly housed in the B6 general population unit at the Red Onion on January 18, 2020. Compl. (ECF No. 1 at ¶ 63); Sandler dec. (ECF No. 29-1 at ¶ 29). It has been almost a year since that occurred, however, and the record indicates that Baltas does not presently face a risk of imminent harm. Baltas has submitted no evidence of subsequent attacks or attempts to attack him, and he is now housed in a single cell in a closely monitored RHU at the Red Onion. *See* Sandler dec. (ECF No. 29-1 at ¶ 33); Reply ex. A (ECF No. 35-1, Fuller aff. at ¶¶ 29, 46, 47, 54). Indeed, the affidavit of Red Onion's Assistant Warden Fuller, which Baltas submitted with his reply brief,[6] undermines any suggestion that he faces an imminent risk of harm. Fuller avers that since January 18, 2020, there have been no more attempts by anyone at Red Onion to harm him physically, that the offenders who attacked him are not housed in his pod, will not be permitted to interact with him, and have been referred for prosecution as a result of the assault. ECF No. 35-1 at 8. Fuller also avers that there are no plans to move him to general population, and he will remain in the RHU, where he has been since the attack. *Id.* at 11 ("His complaints that he is going to be imminently moved back to general population are not correct."). Given these facts, which Baltas does not contest, his own averment that Virginia corrections officials threatened him shortly after the assault that they would "get him" if he did not keep his "mouth shut," ECF No. 1 at ¶ 74, is

---

[6] The affidavit was apparently filed originally in another federal action Baltas has brought against Virginia corrections officials in the United States District Court for the Western District of Virginia. See ECF No. 35-1 at 3.

insufficient to show irreparable harm or even to warrant an evidentiary hearing. Baltas has not kept his "mouth shut" since the assault, making various complaints to Virginia corrections officials detailed in Fuller's affidavit, continuing to litigate his state and federal actions in Connecticut, and filing a new case against Virginia corrections officials in the Western District of Virginia; and yet he has not faced further attacks.

Further, although Baltas complains about his conditions of confinement and insists that he should be allowed to reside in general population at a prison in another state, it is not at all clear that his wish to reside in general population would be fulfilled if he were returned to Connecticut. As Fuller's affidavit notes, Virginia officials have kept him in the RHU, albeit in the least restrictive status in that unit, not simply for his own protection but also because of his previous disciplinary history in Connecticut, as well as concerns that he might seek to retaliate against his attackers. ECF No. 35-1 at 11. And while housed in Connecticut, Baltas has for long periods not been housed in general population, spending time instead in both the DOC's chronic discipline and administrative segregation programs and other restrictive housing settings, including at Northern, Connecticut's own "supermax" facility. ECF No. 29-1 at para. 15; *see also Baltas v. Rivera*, 19cv1043, ECF No. 81 at 23-34 (discussing Baltas's placement in restrictive housing and finding no genuine dispute of material fact that he remained on chronic discipline status when transferred to Massachusetts).[7] Further, given the large number of separation profiles involving him and other inmates in Connecticut DOC facilities, a transfer to a Connecticut facility would not remove the danger that he might face assaults from other inmates.

---

[7] The Court may take judicial notice of findings in other cases. *See Allen v. City of Yonkers*, 803 F. Supp. 679, 697 n.22 (S.D.N.Y. 1992).

*See* ECF No. 29-1 at 13 (Warden Dilworth memo noting that Baltas "has multiple profiles at all level 4 facilities with include both staff and inmate" and "[h]e has been transferred multiple times during his incarceration," and describing the "multiple profiles" as a "management challenge").

Finally, Baltas's current conditions of confinement allow him to walk unrestrained to showers or recreation, have access to outdoor recreation, keep a personal television, and receive more commissary than other RHU inmates. He also has privacy during legal calls and access to videoconferencing for legal proceedings in Connecticut. *See* Sandler dec. (ECF No. 29-1 at ¶¶ 20, 25). In short, Baltas has failed to show he faces irreparable harm if the Court does not order the defendants immediately to retrieve him from the Red Onion prison in Virginia.

**B.    Substantial Likelihood of Success**

Although the failure to show irreparable harm is, by itself, a sufficient basis to deny the motion for injunctive relief, *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 Fed. Appx. 31, 36 (2d Cir. Oct. 26, 2015)("Because irreparable harm is the sine qua non for preliminary injunctive relief, we conclude that [the plaintiff's] motion for a preliminary injunction fails at the irreparable harm stage, and we do not reach the other components of the preliminary injunction inquiry."), I will also address whether Baltas has carried his burden to show a "clear or substantial likelihood of success on the merits of his claims." *Jolly*, 76 F.3d at 473. The defendants have briefed the likelihood of success on the merits of only Baltas's First Amendment retaliatory transfer claim, apparently because that is the only claim I discussed in my initial review order in connection with Baltas's requested injunction requiring his return to Connecticut.

18

See ECF No. 16 at 42-45.[8]  Baltas's brief also mentions his Eighth Amendment claim, and so I will address that as well.

### 1.  *First Amendment Retaliatory Transfer Claim*

Baltas alleges that Defendants Maiga and Cook transferred him to Virginia in response to a lawsuit filed in this court on November 15, 2019. Compl. (ECF No. 1 at ¶¶ 28-29).  To sustain his First Amendment retaliation claim, Baltas must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The first prong is not in dispute as protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted). In addition, for purposes of this ruling, the court assumes that Baltas has satisfied the second prong of adverse action. Thus, the issue is whether Baltas has demonstrated a "clear or substantial likelihood of success" as to the third prong – causation.  "The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in

---

[8] I dismissed Baltas's request for injunctive relief against Virginia officals with respect to review of and release from alleged "administrative segregation" at the Red Onion prison in Virginia.  ECF No. 16 at 44 & n.17.  Baltas's other claims that I allowed to proceed – alleged interference with his mail in violation of the First Amendment and denial of his Sixth Amendment rights – have not been addressed by Baltas or the defendants in the preliminary injunction/TRO briefs and would not, even if proven, warrant an injunction requiring Baltas's return to Connecticut.

the prison officials' decision to discipline the plaintiff." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Williams v. Hesse*, No. 916CV1343GTSTWD, 2020 WL 1480105, at *6 (N.D.N.Y. Feb. 19, 2020), *report and recommendation adopted*, No. 916CV1343GTSTWD, 2020 WL 1470800 (N.D.N.Y. Mar. 26, 2020) (quotation and citation omitted).

On initial review of the complaint, the court concluded that Baltas's allegations had raised an inference of a causal connection because his interstate transfer occurred a little more than a month after he filed his case against Maiga and Cook in federal court. *Baltas v. Maiga*, No. 3:20CV1177 (MPS), 2020 WL 6275224, at *9 (D. Conn. Oct. 26, 2020) (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (passage of six months between dismissal of prisoner's lawsuit and alleged act of retaliation by prison officers, one of whom was defendant in the prior lawsuit, sufficiently supported inference of causal connection in First Amendment retaliation claim)).

Now, however, there is a more developed evidentiary record, and it shows that Baltas's out-of-state transfer had been sought by two Connecticut DOC Wardens due to Baltas's history of violence and management difficulties within the Connecticut DOC system long before the protected activity alleged to have motivated Maiga and Cook to transfer him to Virginia.  It also shows that Baltas's December 2019 transfer to Virginia occurred shortly after Massachusetts terminated its agreement. In December 2016, Warden Falcone requested Baltas be considered for an involuntary transfer to an out-of-state facility due to Baltas's "extremely violent behavior and

gang influence," which raised safety and security concerns. *See* Memo from Warden Falcone (ECF No. 29-1 at pp. 10-11). In June 2018, Connecticut DOC compiled an out-of-state referral packet for Baltas after another request, this time from Warden Dilworth, due to Baltas's "continued behavior impacting facility operations, difficulty in managing him in a level 4 facility, and the length of time remaining on his sentence." *See* Memo from Warden Dilworth (ECF No. 29-1 at pp. 13-14). Regardless of the truth of the two Wardens' allegations about Baltas's behavior – which he disputes – it is undisputed that they initiated the transfer requests years before he sued Maiga and Cook in November 2019.[9] Further, Connecticut DOC transferred Baltas to Virginia on December 20, 2019, after a Massachusetts Judge received a threatening letter from Baltas on December 5, 2019, and Massachusetts terminated its agreement to house Baltas. *See* Sandler declar. (ECF No. 29-1 at ¶ 16), Letter from Massachusetts Threat Assessment and Management Unit, (ECF No. 29-1 at p. 17). Again, regardless of whether Baltas actually sent the threatening letter, it is clear that Massachusetts, the Connecticut DOC's first choice for a transfer jurisdiction, no longer wanted to house him and so informed the Connecticut DOC; the memo from the Massachusetts authorities to the CT DOC "inquiring as to why Baltas was moved to Massachusetts" and asking if this could "be avoided in the future" is dated a mere two weeks before Baltas was transferred to Virginia. (ECF No. 29-1 at 17; ECF No. 1 at ¶ 29.)

---

[9] Baltas lists other actions that he filed and that were pending at the time of his transfer to Virginia (ECF No. 1 at para. 32), but he does not allege that any of those other lawsuits named as defendants Maiga or Cook, the two individuals he has sued for First Amendment retaliation in this case. Several of the actions identified are habeas petitions, which, of course, cannot seek to impose personal liability on any individual; two of the federal actions identified were filed in 2019, one in 2018 and one in 2017. None of the actions seeking to impose personal liability on Connecticut DOC officials were filed before Warden Falcone made the original transfer request in 2016. These other actions thus do not help Baltas's case on the causation prong, because their timing does not suggest that the defendants in this case arranged for his transfer to Virginia in December 2019 to retaliate against him for filing them.

This evidence dispels the inference of a causal connection based on the temporal proximity between Baltas's November 2019 lawsuit against Maiga and others and his alleged retaliatory transfer, at least for purposes of the present motion. The impetus for Baltas's transfer arose years before he filed his November 2019 lawsuit, and the fact that the transfer to Virginia followed closely on the heels of Massachusetts's apparent decision to reject Baltas as a transferee strongly suggest that he cannot satisfy the causation component of his First Amendment retaliation claim. At the very least, on the record before the court, Baltas has failed to demonstrate a "substantial or clear" likelihood of success on the merits with respect to the causation component and thus with respect to his First Amendment retaliation claim. *See also Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 412 (D. Conn. 2016), *aff'd,* 720 F. App'x 79 (2d Cir. 2018) ("finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration, because prisoner claims of retaliation are examined with skepticism and particular care and because courts have been cautioned to recognize that prison officials have broad administrative authority." (internal citations and quotation marks omitted)).

In his reply brief, Baltas asserts that the fact that the Assistant Attorney General argued for dismissal of his habeas actions based on his incarceration outside of Connecticut supports his claim of retaliatory transfer. Reply (ECF No. 35 at 10, 11); Reply ex. E (35-1 at 4, Sept. 11, 2019 hearing transcript); Reply ex. G (35-1 at 49-66, August 3, 2020 transcript). His theory is apparently that the State's assertion of this argument after the transfer suggests that Maiga and Cook arranged the transfer to set up the argument – and did so to retaliate against him for his November 2019 lawsuit. But he submits no evidence to support this speculative notion. In any event, the State's arguments seeking dismissal met with only mixed success: Although in one

habeas case, the state superior court dismissed the petition because Baltas's petition seeking release from administrative segregation was moot after his transfer, *Baltas v. Comm'r of Correction*, No. CV174008753S, 2019 WL 6999141, at *1-*2 (Conn. Super. Ct. Nov. 22, 2019), in another, the state court rejected the argument for dismissal based on Baltas's incarceration outside of Connecticut because the Interstate Compact did not preclude the DOC from conducting a new disciplinary hearing via interactive audiovisual device. *Baltas*, No. CV195000247S, 2020 WL 6121447, at *3.

2. *Eighth Amendment Claim*

Because Baltas's motion also refers to the Eighth Amendment, ECF No. 4-1 at 7, I address whether he has made a showing of "substantial or clear" likelihood of success on the merits with respect to his Eighth Amendment claim as well. The court concludes that he has not satisfied that standard.

The Eighth Amendment claim the court allowed to proceed on initial review was based on Baltas's allegations that he reported to Connecticut DOC officials threats that were made against him by Virginia corrections officers – both before the January 18 assault and afterwards. ECF No. 16 at 34; *see also* ECF No. 1 at ¶¶ 54-57, 90. The evidence in the record indicates, however, that upon being informed of the January 18 assault, Counselor Sandler was advised that Baltas had received medical care and that the facility would separate Baltas and the other inmates involved in the assault when Baltas returned to his housing unit. ECF No. 29-1 at ¶ 29. Counselor Sandler was also advised that the facility could move Baltas into protective custody at his request but that he had rejected the officer of placement in protective custody. *Id*. Although Baltas disputes that he was offered, or rejected, protective custody, he does not dispute that

Counselor Sandler was so advised by Virginia corrections officers, and it is Counselor Sandler's state of mind (and that of the other Connecticut DOC defendants) that is at issue on the Eighth Amendment claim. *See Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003)("[I]n prison-condition cases [including cases alleging inadequate protection from prisoner-on-prisoner violence] the state of mind requirement is one of deliberate indifference to inmate health or safety." (internal quotation marks and alterations omitted)). He also does not dispute – and in fact submitted to the Court with his reply – the averments of Red Onion Assistant Warden Fuller that he is currently safe from the inmates who attacked him in an RHU and that there have no further attempts to harm him. Thus, whatever Baltas may be able to prove about the knowledge of Connecticut DOC officials of the risks he faced before the January 18 assault occurred – proof that may entitle him to money damages after a trial --, on this record he has not shown a "clear or substantial" likelihood that he will be able to prove an *ongoing* Eighth Amendment violation based on a failure to protect him after the assault by Connecticut DOC officials. And without proof of ongoing harm, he is not entitled to injunctive relief. *See Hardy v. Fischer*, 701 F. Supp.2d 614, 619 (S.D.N.Y. 2010)("[A]n ongoing constitutional violation more closely resembles irreparable injury than does a constitutional violation that was suffered in the past and which can be remedied only by money damages.").

## IV.    CONCLUSION

For the foregoing reasons, the motions for a temporary restraining order and preliminary injunction (ECF Nos. 4 & 5) are DENIED.   The motion for a more specific statement (ECF No. 34) is also DENIED.

SO ORDERED at Hartford, Connecticut this 6th day of January 2021.


_____/s/_____
Michael P. Shea
United States District Judge