## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:20cv1177 (MPS) |
| v. | : | |
| | : | |
| DAVID MAIGA, in his individual and official | : | |
| capacities, ROLLIN COOK, in his individual | : | |
| and official capacities, ANGEL QUIROS, in his | : | |
| individual and official capacities, JACLYN | : | |
| OSDEN, in her individual and official | : | |
| capacities, and JESSICA SANDLER, in her | : | |
| individual and official capacities, | : | |
| Defendants. | : | |

## <u>MEMORANDUM OF DECISION ON DEFENDANTS'</u><br><u>MOTION FOR SUMMARY JUDGMENT</u>

The plaintiff, Joe Baltas, who was formerly incarcerated at the Red Onion State Prison

("Red Onion") in Pound, Virginia, commenced this civil rights action under 42 U.S.C. § 1983,

asserting constitutional violations related to his transfer to Virginia and the conditions of his

confinement in Virginia against former Connecticut Department of Correction ("DOC")

Commissioner Rollin Cook, former Deputy Commissioner and current Commissioner Angel

Quiros, Director of Classification and Population Management David Maiga, and Correctional

Counselors Jessica Sandler and Jacklyn Osden. Compl., ECF No. 1, Am. Compl., ECF No. 63;

Notice of Address, ECF No. 149.[1]

---

[1]  As discussed below, Baltas was transferred to Virginia in December 2019, but as of July 26, 2021, he was again housed within Connecticut DOC. Pl.'s Notice of Address, ECF No. 149 (dated July 26, 2021); *see also* Defs.' Notice of VA DOC Request for Transfer, ECF NO. 144. The publicly-available DOC website shows that he is serving a sentence of 115 years for murder. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=339650; *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (court may "take judicial notice of relevant matters of public record.").

After initial review of the amended complaint under 28 U.S.C. § 1915A, the Court permitted the case to proceed on Baltas' individual capacity claims on the following constitutional claims:  (1) First Amendment retaliation; (2) deprivation of his First Amendment right to free flow of mail, communication with counsel, and access to the courts; (3) Sixth Amendment violations; (4) Fourteenth Amendment equal protection violation; and (5) Fourteenth Amendment due process violation.[2] Initial Review Order ("IRO"), ECF No. 116; Compl., ECF No. 63.[3]

Defendants have filed a motion for summary judgment on all claims against them. Mot. for Summ. Judg., ECF No. 229. Defendants have submitted a memorandum of law (ECF No. 229-1), a Local Rule 56(a)1 statement of facts (ECF No. 229-2) and supporting exhibits (ECF No. 229-3 to 229-9). Baltas has filed an opposition (ECF No. 245), a Local Rule 56(a)2 statement (ECF No. 246) and supporting exhibits (ECF No. 246-1 to 246-4). Both Defendants and Baltas have filed reply memoranda. Defs.' Reply, ECF No. 256, Pl.'s Reply, ECF No. 263.

After thoroughly considering the extensive materials submitted by the parties, the court will grant Defendants' motion for summary judgment.

---

[2]  The court's initial review did not address Baltas' claims under Connecticut state law. *See* IRO at 2 n.1.

[3]  After initial review, Court also permitted Baltas to proceed on official capacity claims against Maiga and Quiros for any ongoing constitutional violations alleged in his amended complaint. *Id.* at 116. The Court notes that Baltas has since transferred from the Red Onion to Connecticut DOC MacDougall-Walker Correctional Institution. *See* Notice of Address, ECF No. 149. Thus, any requests for injunctive relief relevant to his transfer to Virginia DOC custody are now moot as Baltas is now housed within Connecticut DOC. *See* Order, ECF No. 152, Order, ECF No. 207. *See also McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020)  ("An inmate's transfer from a prison facility moots his claims for declaratory or injunctive relief against officials of the transferring facility.").

## I.    FACTS[4]

The Connecticut DOC's Interstate Management Unit ("IMU") is responsible for

transferring Connecticut inmates to out-of-state facilities under the Interstate Corrections

Compact ("ICC"). Defs.' Rule 56(a) at ¶ 2. [5]  Out-of-state transfers can occur on a voluntary

basis (when the inmate consents) or on an involuntary basis (when the inmate does not consent).

*Id.* The IMU seeks involuntary interstate transfers for an inmate after a warden or another

supervisor within DOC submits a request and the IMU has authorization from Director Maiga to

search for a state to accept the inmate. *Id.* at ¶ 3.

When seeking a transfer for an inmate, the IMU sends a referral packet to States that

could logistically accept the inmate. One factor that States consider in deciding whether to accept

a Connecticut inmate is the inmate exchange history with Connecticut DOC. *Id.* at ¶ 5.

The IMU usually has a list of Connecticut inmates being considered for out-of-state

transfers, and it prioritizes transferring inmates based upon the specific circumstances. *Id.* at ¶ 6.

After a State agrees to house a Connecticut inmate as an out-of-state inmate, the IMU arranges to

transport the Connecticut inmate to the out-of-state facility. *Id.* at ¶ 7. In accordance with ICC

---

[4]    The Defendants have informed Baltas of the requirements for filing his papers in opposition to the motion for summary judgement under Local Rule 56. Notice to Pro Se Litigant, ECF No. 239-10. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." To the extent that Baltas' Rule 56(a)2 Statement does not comply with Local Rule 56, the Court may consider Defendants' statement of fact to be admitted if supported by evidence.

contracts, Connecticut must retake an inmate who is housed in another state if the receiving state requests removal of that inmate *Id.* at ¶ 10; *see* Osden decl. at ¶ 23.

The IMU relies on the receiving State to provide notification about a Connecticut inmate's safety being in jeopardy and to make sure that any appropriate action is taken. Defs.' Rule 56(a) at ¶ 12. Maiga, who is Director of Offender Classification and Population Management and Director of Sentence Calculation and Interstate Management, avers that Connecticut DOC assumes that a receiving State manages an inmate in an appropriate manner, but he also received confirmation from the Virginia Interstate Coordinator that the VA DOC had no concerns about continuing to house Mr. Baltas, even after the incidents described below. Maiga decl. at ¶¶2, 12, 19.

ICC Contract Between Connecticut and Virginia

The contract for implementation of the ICC between Connecticut and Virginia provides:

Inmates while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed.

Defs.' Rule 56(a) at ¶ 8; *see* Sandler decl. at ¶ 67, ex. BB at ¶ 17. It also requires Virginia DOC to afford Connecticut transfer inmates care and treatment (including the furnishing of subsistence and all necessary medical and hospital services and supplies); provide for the physical needs of the Connecticut transfer inmates; and retain and supervise Connecticut transfer inmates in safe custody. Defs.' Rule 56(a) at ¶ 9; *see* Sandler decl. at ¶ 68, ex. BB at ¶ 13.

Baltas' Transfer to Massachusetts

---

[5]   Defendant Sandler is a correctional counselor supervisor for the DOC who was previously assigned to DOC's IMU. *Id.* at ¶ 1.

In December 2016, DOC Garner Correctional Institution ("Garner") Warden Falcone submitted a request to the IMU for Baltas' out-of-state transfer due to "safety and security concerns based on [Baltas'] extremely violent behavior and gang influence."[6]   Defs.' Rule 56(a) at ¶ 13; Sandler decl. at ¶ 11, ex. A. Warden Falcone's letter stated that Baltas had an association with the Diablos Motorcycle Gang; had stabbed another inmate with a "shank" in 2014; was discovered in 2014 to be in possession of a notebook listing the names of jurors, the names of Diablo leaders throughout the U.S., and instructions for making a bomb; had made repeated threats against correctional staff; had barricaded himself inside his cell and then resisted staff's efforts to remove him from the cell resulting in a staff member's injury; and had "separation profiles" with other inmates, making it difficult to transfer him to a different facility within the Connecticut DOC. Defs.' Rule 56(a) Statement at ¶ 13. Warden Falcone stated that Baltas' "gang influence and propensity to violence pose a significant risk to the operation of the institution." Sandler Dec., Ex. A. Baltas was not transferred to an out-of-state facility in response to Warden Falcone's request. Defs.' Rule 56(a) at ¶ 14.

In a memo dated March 13, 2018, DOC Garner Warden Dilworth made another request for Baltas' out-of-state transfer. *Id.* at ¶ 15. Warden Dilworth's memo "provide[d] additional information that continues to support our belief that inmate Baltas poses a significant risk to the operation of the institution." Sandler Dec., Ex. B. The memo stated that after Warden Falcone's out-of-state transfer request, Baltas had received seven disciplinary reports for misconduct, including threatening to stab staff, covering his cell door window, and exposing himself to female staff members; that he had multiple staff and inmate profiles at all level four facilities

---

[6]   The Court takes judicial notice of information on the DOC website showing that Falcone served as Warden Garner in 2016 and Dilworth served as Garner Warden in 2018. *See*

within Connecticut DOC; that he had numerous separation profiles with staff and inmates; and that he had filed a "complaint with his attorney" and administrative remedies representing that he was at risk due to his active profile with a staff member and his fear of retaliation. *Id. See* Sandler decl. at ¶ 13, ex. B.

In June 2018, the IMU compiled a referral packet requesting multiple states to accept the Baltas' transfer. Defs.' Rule 56(a) at ¶ 16. On October 30, 2018, the Commonwealth of Massachusetts agreed to accept Baltas "under the provisions of the Interstate Compact Agreement … contingent upon inmate Baltas not becoming a management problem[.]" *Id.* at ¶ 17; Sandler decl. at ¶ 15, ex. C.

The IMU was responsible for coordinating the court appearances for Baltas as a Connecticut inmate transferred to an out-of-state facility. Defs.' Rule 56(a) at ¶ 18. While Baltas was housed in the Massachusetts correctional facility, the IMU was having problems arranging for videoconferencing between the Connecticut Superior Court and Massachusetts Department of Correction. *Id.* DOC has a fugitive unit that can transport inmates back to Connecticut for court dates, but DOC's preference is to have inmates appear remotely by video due to safety and security risks associated with transporting inmates. *Id.* at ¶ 19.

Baltas had numerous court dates in Connecticut in 2019 while he was housed in the Massachusetts correctional facility. *Id.* at ¶ 20. On July 31, 2019, Counselor Supervisor Osden inquired with the Connecticut Superior Court's clerk's office in Rockville, Connecticut, about whether the Superior Court could connect to the videoconferencing equipment at the Massachusetts facility for Baltas' court dates. *Id.*

---

https://portal.ct.gov/DOC/Facility/Garner-CI.

On August 2, 2019, the IMU received an email from staff at the Connecticut Superior Court indicating difficulty with effecting videoconferencing for Baltas at his Massachusetts facility (Souza-Baranowski Correctional Center). *Id.* at ¶ 21. Although Defendant Sandler attempted to assist the Connecticut Superior Court by connecting the clerk's office with the videoconferencing scheduler at the Massachusetts facility, the Connecticut Superior Court had not yet resolved the videoconferencing issue by August 19, 2019. *Id.* at ¶¶ 22-23. Connecticut Superior Court staff informed Sandler that Baltas needed to return in-person to Connecticut for two court dates in September 2019. *Id.* at 23.

On September 10, 2019, Baltas was transferred to Connecticut DOC for his court date on the following day. *Id.* at ¶ 24. The IMU decided to retain Baltas within Connecticut DOC custody until the second court date on September 25, 2019. *Id.* at ¶ 25. On September 12, 2019, Hartford Correctional Center ("HCC") reported that Baltas choked and punched an HCC correctional officer; Baltas was then transferred to Northern Correctional Institution ("Northern"). *Id.* at ¶ 26.

After a conversation between Sandler and a Massachusetts DOC staff member, a determination was made that Baltas should not return to Massachusetts. *Id.* at ¶ 28. Sandler avers that this decision was made for several reasons including: (1) the fact that the IMU generally tries to ensure that inmate exchanges between states are balanced, but Baltas posed a management issue for Massachusetts and Connecticut was returning a Massachusetts inmate who also posed management issues; and (2) the IMU was not certain that it could resolve the videoconferencing issue during Baltas' incarceration in Massachusetts so that Connecticut

7

DOC's Fugitive Unit would not have to transport Baltas from Massachusetts for his court appearances. Sandler decl. at ¶¶ 26-28; *see* Defs.' Rule 56(a) at ¶¶ 27-29.

Transfer to Virginia DOC

Thereafter, Director Maiga authorized the IMU to seek another out-of-state facility for Baltas. *Id.* at ¶ 31. Maiga avers that he authorized the search for another out-of-state facility as the safety and security concerns that had necessitated Baltas' transfer to Massachusetts were still present. Maiga decl. at ¶ 5. The IMU decides which States to pursue for an out-of-state transfer. Defs.' Rule 56(a) at ¶ 33. After Defendant Sandler commenced the search for another State to house Baltas, she spoke with Virginia DOC staff on September 24, 2019 about transferring Baltas under the ICC. *Id.* at ¶¶ 36, 37.

After Sandler made clear to Virginia DOC that Baltas needed to have capacity to have videoconferences at his Virginia facility for his Connecticut court matters, Virginia DOC determined that it had videoconferencing equipment compatible with the Connecticut Superior Court. *Id.* at ¶¶ 38, 40.

Virginia DOC accepted Baltas on November 8, 2019. *Id.* at ¶ 40. It was the only State correctional entity that agreed to accept Baltas. *Id.* at ¶ 34.

At the time, Virginia DOC had one inmate whom Virginia DOC needed to transfer out-of-state. *Id.* a ¶ 39. On December 20, 2019, Connecticut transferred Baltas to Virginia as part of an inmate exchange with Virginia DOC. *Id.* at ¶ 41, 42; Sandler decl. at ¶ 34. Other Connecticut DOC inmates have been transferred to Virginia DOC in the past, and there are currently multiple Connecticut inmates housed within Virginia DOC. Defs.' Rule 56(a) at ¶ 99.

The IMU received a letter from Baltas dated December 23, 2019, which requested Connecticut DOC to forward his money, property, a copy of the DOC ICC contract, copies of Connecticut DOC grievance forms, and copies of pending grievances. *Id.* at ¶ 43. On December 31, 2019, Defendant Sandler responded to Baltas' letter and sent him ten Level 1 and 2/3 Grievance forms. *Id.* at ¶ 44. Baltas asserts that she did not send him any other requested materials. Pl.'s Rule 56 (a) at ¶ 44.

On January 2, 2020, the IMU received a letter from Baltas' attorney, Robert Famiglietti, which posed questions about Baltas' transfer to Virginia. Defs.' Rule 56(a) at ¶ 46. Defendant Sandler responded to Attorney Famiglietti's questions. *Id.* at ¶ 47. On January 13, 2020, the IMU received another letter from Baltas, which requested all of DOC's administrative directives. *Id.* at ¶ 48. Defendant Sandler avers that on January 15, 2020, she contacted the Virginia Red Onion attorney about providing Baltas with copies of the Connecticut administrative directives, and that the attorney informed her that inmates could access the directives online. *Id.* at ¶ 49; Sandler decl. at ¶ 43. Baltas contests this. ECF No. 246-1 ¶ 34.

On January 18, 2020, Virginia DOC informed Defendant Sandler by email that Baltas had been stabbed, and that Virginia DOC would provide more information in the next several days. Defs.' Rule 56(a) at ¶ 50. On January 21, 2020, Defendant Sandler received a telephone call from Virginia DOC to advise her that Baltas had received medical care, that the other inmates involved in the assault would be separated from him, and that he could be moved into protective custody at his request or at the discretion of the Virginia DOC. *Id.* at ¶ 51; Sandler

decl. at ¶ 45.[7] That same day, she sent a follow-up email to Virginia DOC ICC staff regarding

the telephone call, stating:

> Just to follow up, it was reported that on Saturday January 19, 2020 at approximately
> 1:48 pm, two offenders assaulted Offender J. Baltas … Offender Baltas was transported
> to Norton Community Hospital for assessment and treatment if needed. At this time
> offender Baltas is back in custody of the Red Onion Correctional Facility, currently in
> medical isolation. He will be moved back to his housing unit and the offenders involved
> in the altercation will not be housed with him. If need be, offender Baltas can be placed
> in Protective Custody at his request or at the discretion of the VA DOC.

*Id.* at ¶ 46, ex. R. In an email response that day, the Virginia DOC ICC staff member wrote:

"That is correct. We will keep you posted of any pertinent information or changes. At this time,

there are no concerns about housing Mr. Baltas in Virginia." *Id.* Defendant Sandler received a

copy of the incident report and forwarded it to Director Maiga. Defs.' Rule 56(a) at ¶ 53.

Director Maiga forwarded the incident report up the chain of command to District Administrator

Murphy. *Id.* at ¶ 54.

After then-Deputy Commissioner Quiros learned from Maiga's email about the assault,

he informed Commissioner Cook, who inquired whether there was a plan to return Baltas to

Connecticut. *Id.* at ¶¶ 55-56. Quiros avers that he does not recall receiving letters from Baltas in

January 2020, and that Maiga's email was the first time he recalls being made aware of issues

concerning Baltas' incarceration in Virginia DOC. Quiros decl. at ¶¶ 8-9.[8]

Former Commissioner Cook avers that he can recall no letter received from Baltas in

January 2020, that his former office has no record of such letter, and that he became aware of

---

[7] Baltas objects to Sandler's description of the call as hearsay, but because it is offered to show
the effect on Sandler, rather than for the truth of the statements made by the Virginia DOC, it is not
hearsay.

[8] Baltas asserts that he mailed Quiros a copy of his letter reporting his conditions and threats to
his safety on January 6, 2019. Pl.'s Rule 56(a) at ¶ 55 (citing ex. 3 ¶ 16-17, att. A, D, E, F, G).

Baltas' confinement in Virginia from an email about the assault forwarded to him by then-Deputy Commissioner Quiros. Cook decl. at ¶¶ 8-9.[9]

Director Maiga informed Deputy Commissioner Quiros that Virginia DOC had no issues about continuing to house Baltas. Defs.' Rule 56(a) at ¶ 58. Deputy Commissioner Quiros avers that he interpreted Virginia DOC's representation to mean that the situation had been addressed and that Baltas could be safely housed in Virginia. Quiros decl. at ¶ 11. Thus, Deputy Commissioner Quiros determined that Baltas would remain housed within the Virginia DOC. Defs.' Rule 56(a) at ¶ 59. The IMU expected that if Virginia DOC determined that it could not safely and appropriately manage Baltas, it would request that Connecticut remove Baltas from Virginia DOC custody. *Id.* at ¶ 91.

Due to safety concerns, Virginia DOC housed Baltas in the Red Onion restrictive housing unit ("RHU") following the assault. *Id.* at ¶ 62. The Red Onion Officer's Log Sheet reflects that Baltas' Restrictive Housing Status was reviewed on December 31, 2019, January 21, 2020, January 27, 2020, February 5, 2020, February 10, 2020, February 24, 2020, March 2, 2020, March 23, 2020, April 6, 2020, April 20, 2020, May 4, 2020, June 1, 2020, July 27, 2020, August 24, 2020, September, 21, 2020, October 19, 2020, November 16, 2020, December 7, 2020, January 4, 2021, February 22, 2021, March 1, 2021, April 5, 2021, and May 25, 2021. *See id.* at ¶ 63; Sandler decl. at ex. HH.

Defendant Sandler avers that she confirmed that Baltas' RHU conditions provided for his access to daily recreation, three showers per week, commissary, email, video visits, an in-cell television, and access to medical and mental health professionals. Sandler decl. at ¶¶ 50-51. She

---

[9] Baltas claims that Cook received his January 6, 2020 letter within seven days of its mailing. Pl.'s Rule 56(a) at ¶ 57 (citing Pl.'s decl. (ECF No. 246-2) at ¶¶ 15-17, ex. F (letter to Cook).

avers further that Virginia DOC advised her that Baltas refused its offers for alternative housing in Sussex I State Prison in protective custody.[10] *Id.* at ¶¶ 52-53, exs. T, U.

In a letter (stamped for receipt on February 3, 2020), Baltas complained about his conditions, threats from facility staff, and deprivation of his property and inmate trust account funds. Sandler decl. at ex. V. The letter's envelope was addressed to "Interstate Compact Administrator Rollin Cook" at the "Interstate Compact Office" at 1153 East Street South, Suffield, Connecticut (Cook's address was at the main office in Wethersfield, Connecticut). *See id.* The envelope contains a stamp indicating that it was received in the mailroom on January 10, 2020, and an "unable to forward for review" sticker dated "01/17/20." *Id.* Both former Commissioner Cook and Deputy Commissioner Quiros aver that they do not recall having received any letters from Baltas in January 2020. Quiros decl. at ¶ 8; Cook decl. at ¶¶ 7-8.

By February 3, 2020, Defendant Sandler had already taken steps to ensure that Baltas' property was transferred to Virginia and that the funds in his Connecticut inmate trust account were forwarded to his Virginia inmate trust account. Defs.' Rule 56(a) at ¶ 71. On February 3, 2020, Sandler called the Virginia ICC coordinator to ensure that Baltas' issues were being addressed and to confirm that he was appropriately and safely housed at Red Onion. *Id.* at ¶ 72. The Virginia ICC Coordinator never informed the IMU that Baltas' safety was in jeopardy or that his needs were not being reasonably met by Virginia DOC. *Id.* at ¶ 92. The IMU and Director Maiga had been assured through communications with Virginia DOC staff that Baltas

---

[10] In protective custody, an inmate has access to outdoor recreation, daily recreation, daily showers, meals delivered for consumption in the protective custody pod, approximately 4-5 hours of out-of-cell time daily, the ability to interact and socialize with other offenders during recreation without the use of physical restraints, daily phone access, weekly commissary, and access to a personal television and a kiosk for use of a JPay device. *See id.* at ex. T.

was being housed appropriately and any safety concerns had been addressed. *Id.* at ¶ 89; Sandler decl. at ¶ 72; Osden decl. at ¶ 20; Maiga decl. at ¶ 18.

The IMU attempted to mail correspondence to Baltas, but it was returned as he had refused to sign the Virginia DOC mail policy, which permits Virginia DOC to review non-legal mail. Defs.' Rule 56(a) at ¶¶ 73-74. Baltas was, however, still able to send mail and receive legal mail. *Id.* at ¶¶ 75, 94. For legal telephone calls, Virginia DOC permits an inmate to submit a request to block attorney numbers from recording and monitoring. *See* Sandler decl. at ¶ 77, ex. CC (attorney number block request form). The attorney block request form advises inmates that "it may take up to 30 days for [the block request form] to be processed[;]" that the inmate will not receive a confirmation that the recording block is in place; and that "[w]hen … the recording block is in place, [the inmate does] not hear the message that the call is being recorded and monitored." *Id.* The IMU received the Officer Log that showed Baltas had participated in numerous legal telephone calls during his Virginia confinement. Defs.' Rule 56(a) at ¶ 96. Baltas avers that he noticed periodic beeps during his attorney calls indicating that the calls were recorded or monitored. *See* Pl. decl. at ¶¶ 21-22, ECF No. 246-2.

On April 28, 2020, Defendant Sandler requested Virginia DOC to hand-deliver a letter to Baltas, advising that he must consent to the mail policy in order to receive mail from Connecticut DOC. Defs.' Rule 56(a) at ¶ 76. In response, Baltas mailed the IMU a letter complaining about Virginia DOC's mail policy and his prior assault. *Id.* at ¶ 77.

In April 2021, the IMU received a letter (forwarded from the Office of Governor Lamont) from Baltas' attorney, Frank Cannatelli, regarding Baltas' assertedly "cruel and inhumane" segregated confinement in Virginia DOC. *Id.* at ¶ 78; Sandler decl. at ex. Z. In a

letter, Defendant Osden wrote a response explaining DOC could not release any specific case information about Baltas but offered to address "the nature of [his] concern in a general manner with the public information that is available." Defs.' Rule 56(a) at ¶ 79; Sandler decl. at ¶ 64, ex. AA. Her letter went on to explain that under the ICC contract between Virginia and Connecticut, the receiving institution is responsible for, *inter alia*, providing the inmate with "care and treatment," and to retain the inmate in "safe custody[.]" *Id.* Osden elaborated that "the expectation is that Virginia will house Baltas as they deem fit" but the DOC IMU "regularly communicate[s] about our interstate inmate population with our counterparts in our contracted states." *Id.*

The IMU received a habeas order dated February 24, 2020 from the Connecticut Superior Court for Baltas to appear on March 25, 2020 in Connecticut for his criminal case. Defs.' Rule 56(a) at ¶ 82; Osden decl. at ex. A. Defendant Sandler made arrangements for Baltas' return to Connecticut for this court date. Defs.' Rule 56(a) at ¶ 83. The IMU subsequently learned that this court date was first continued to May 13, 2020, after the Governor's declaration of a public health emergency due to COVID-19, and was later postponed a second time to July 22, 2020. *Id.* at ¶¶ 84-85; *see* Osden decl. at ex. B (emails between DOC and Superior Court staff regarding postponement). Osden avers that in September 2020, the IMU learned that Baltas no longer had pending criminal charges in Connecticut. [11] Osden decl. at ¶ 11.

---

[11] The Court takes judicial notice of the Connecticut judicial website showing that Baltas has only a pending criminal case for charges of assault on a public officer (criminal matter H13W-CR21-0193646-S). The record for this case shows an offense and arrest date of August 31, 2021, after Baltas had been transferred back to Connecticut.

*See* https://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=5f28a5c1-355e-47b7-82b9-66a47125f80e.

Baltas admits that his Connecticut criminal case for which DOC had a habeas order for his appearance was dismissed because the speedy trial date had expired. *Id.* at ¶ 87;[12] Baltas dep. at 85, ECF No. 272. He represents that days after that dismissal, he was served with a warrant, and that he signed the warrant and requested a speedy trial on July 28, 2020. *See* Pl.'s Rule 56(a) at ¶ 86 (citing Defs.' ex. HH, 7/28/2020 entry to Officer Log); Baltas decl. at ¶¶ 47-48,  ex. S, ECF No. 246-2 at pp. 150-151. He maintains that Osden failed to have him brought to Connecticut for any proceeding and that he still has not had his day in court on his criminal matter.[13] *Id.* at ¶ 49.

Baltas has admitted that Virginia DOC generally accommodated his court appearances in Connecticut. Pl.'s Rule 56(a) at ¶ 97. Baltas asserts, however, that he could not appear in-person for his criminal case, H14-CR-19-0733623-S, on: January 13, 2020 (Baltas was represented by counsel and the matter was continued to February 10, 2020); February 10, 2020 (Baltas was represented by counsel); and February 24, 2020 (Baltas was represented by counsel and the court continued the matter to March 25, 2020 with an order for Baltas to be transported to court on that date to address his speedy trial motion). Pl.'s decl. at ex. R, ECF No. 246-2 at pp. 136-149.

Other Inmates

Baltas claims that he and Connecticut inmates Barletta and Trabakoulos have identical inmate histories. Defs.' Rule 56(a) at ¶ 98.

---

[12] Defendants represent that there is no record of this case on the Connecticut judicial website.

[13] The Connecticut judicial website shows only a 2015 conviction for Baltas based on a January 2014 offense. As previously noted, he has also only one pending criminal matter for an August 31, 2021 offense.

Defendant Osden avers that the IMU has not received any requests for inmate Trabakoulos's out-of-state transfer and has not had to seek his transfer. Osborn decl. at ¶ 16. She is not familiar with Trabakoulos. *Id.*

Inmate Barletta was previously transferred to Virginia DOC in 2000; was returned to Connecticut DOC and then transferred to Oregon and New Mexico correctional facilities; and was again returned to Connecticut DOC upon request from both Oregon and New Mexico. Defs.' Rule 56(a) at ¶¶ 103-104. The IMU does not generally request a state to accept the same inmate a second time. *Id.* at ¶ 105. Osden avers that in 2019, when the DOC transferred Baltas to Virginia, it had no pending requests to transfer Barletta out of state. Osden Decl. ¶ 19, ECF No. 229-4 at 4.

<u>Classification Reviews</u>

Osden represents that the IMU conducted regular classification reviews in January 2020, July 2020, January 2021, and July 2021 while Baltas was housed in Virginia DOC. Osden decl. at ¶ 25.[14] She avers that the IMU reviewed any new information about Baltas to determine if it should adjust his risk score (escape history, severity or violence of current offense, history of violence, length of confinement, presence of pending charges and/or detainers, discipline history, security risk group membership, and overall risk score) or needs score (medical need, mental health need, education need, substance abuse treatment need, vocational/work skill need, sex treatment need, community resources need). *Id.*

## II.   LEGAL STANDARD

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107,

16

113-14 (2d Cir. 2017). In reviewing the summary judgment record, a court must "construe the

facts in the light most favorable to the non-moving party and must resolve all ambiguities and

draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715

F.3d 417, 427 (2d Cir. 2013). The moving party bears the initial burden of informing the court of

the basis for its motion and identifying the admissible evidence it believes demonstrates the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party meets this burden, the nonmoving party must set forth specific facts

showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.

2009). The non-moving party cannot "rely on conclusory allegations or unsubstantiated

speculation but must come forward with specific evidence demonstrating the existence of a

genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir.

2015) (quotation marks and citation omitted). Although the court is required to read a self-

represented "party's papers liberally and interpret them to raise the strongest arguments that they

suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not

create a material issue of fact" and do not overcome a properly supported motion

for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Affidavits

or declarations used to support or oppose a motion for summary judgment must be made on

personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P.

56(c)(4).

## III.    DISCUSSION

Defendants argue (1) that Baltas failed to exhaust his administrative remedies in

compliance with the Prison Litigation Reform Act ("PLRA") for any of his claims for relief; (2)

---

[14]  Osden does not attach any reviews to her declaration.

that there is no evidence to support claims of his First, Sixth, Eighth, or Fourteenth Amendment violation; and (3) that defendants are shielded from liability by qualified immunity.[15]  Mem., ECF No. 229-1.

### A.    Exhaustion of Administrative Remedies[16]

The PLRA, which governs actions brought by prison inmates, requires a prisoner to exhaust administrative remedies prior to filing a federal lawsuit regarding prison conditions. 42 US.C. § 1997e(a). [17]

Failure to exhaust is an affirmative defense under the PLRA; *Jones v. Bock*, 549 U.S. 199, 217 (2007); and a defendant bears the burden to prove that an inmate did not exhaust his or her remedies prior to filing the action in court. *See Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."). Although a defendant bears the burden on this affirmative defense at all times, the plaintiff may still have to adduce evidence in order to defeat a motion for summary judgment. *See Hudson v. Kirkey*, No. 920CV0581 (LEK/DJS), 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (explaining that once defendant introduces evidence of a functional grievance system, plaintiff could not survive summary judgment without submitting competent evidence to indicate unavailability).

---

[15] Defendants have asserted failure to exhaust and qualified immunity as affirmative defenses. Answer, ECF No. 166 at 6-7.

[16] The Court includes herein the undisputed facts relevant to the issue of exhaustion in compliance with the PLRA.

[17] Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Section 1997e(a) applies to all claims regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and it requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court. *See Woodford*, 548 U.S. at 95. Thus, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (citing *Woodford*, 548 U.S. at 83–84).

The exhaustion requirement may be excused, however, when the remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 642-643 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738). The United States Supreme Court has established three circumstances under which an inmate need not exhaust the administrative procedure as it is deemed unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or

intimidation." *Id.* at 643-644. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

It is not sufficient for a plaintiff to exhaust his administrative remedies after filing his complaint; a plaintiff must exhaust his administrative remedies prior to filing the action in federal court. *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds*, *Porter*, 534 U.S. 516; *Gulley v. Bujnicki*, No. 3:19-CV-903 (SRU), 2019 WL 2603536, at *3 (D. Conn. June 25, 2019).

 "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Bock*, 549 U.S. at 218. Connecticut Administrative Directive 9.6 sets forth "a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority[.]" A.D. 9.6(1).[18]

The Connecticut DOC Directive provides that "Connecticut inmates housed in other state/jurisdictions must utilize and exhaust the Inmate Administrative Remedies Process of the receiving state/jurisdiction for an issue relating to any aspect of an inmate's confinement that is subject to the receiving state/jurisdiction's authority." *See* A.D. 9.6(5)(K); Baltas decl. at ex. B. It also states: "Connecticut inmates housed in other states/jurisdictions shall have 30 calendar days to file a grievance with the Connecticut Department of Correction upon exhausting the receiving state/jurisdiction's Inmate Administrative Remedies Process." *Id.*

The Connecticut DOC Inmate Handbook for Inmates Incarcerated Out of State provides, in relevant part:

---

[18] Baltas has attached a copy of the relevant version of Administrative Directive 9.6. *See* Baltas decl. at attachment B, ECF No. 246-1 at 31-45.

**ADMISTRATIVE REMEDY (GRIEVANCES)** - Connecticut inmates housed in other states/jurisdictions must utilize and exhaust the Inmate Administrative Remedies Process of the receiving state/jurisdiction for an issue relating to any aspect of an inmate's confinement that is subject to the receiving state/jurisdiction's authority. Connecticut inmates housed in other states/jurisdictions shall have thirty (30) calendar days to file a grievance with the Connecticut Department of Correction upon exhausting the receiving state/jurisdiction's Inmate Administrative Remedies Process or if submitting a grievance that is specific to the State of Connecticut. The Interstate Compact Supervisor is the "Unit Administrator" for the purposes of a level 1 review. If you do not agree with the response of the Interstate Compact Office Supervisor, you may appeal to the Director of Sentence Calculation and Interstate Management.

If you would like a copy of Administrative Directive 9.6 or need to obtain Inmate Administrative Remedy (Grievance) forms, please contact our office at the address listed in section 1.

Defs.' Rule 56(a) at ¶¶ 108-109; Osden decl. at ex. C (p. 5). Defendant Osden is the ICC Supervisor for Connecticut DOC. Defs.' Rule 56(a) at ¶ 113.

Thus, Baltas was obligated to first exhaust his Virginia administrative remedies for his claims that concerned issues arising from his confinement subject to Virginia's authority—in this instance, (1) his First Amendment claims asserting that he was deprived of his right to free flow of mail, interference with his legal communications and access to the courts, (2) Sixth Amendment right to counsel claims resulting from the implementation of the Virginia DOC procedures, and (3) his Eighth Amendment claims based on his unlawful conditions of confinement and deliberate indifference to his safety while housed at the Red Onion. S*ee* ECF No. 116 at 12-13, 16-26.

Virginia Administrative Remedies

Defendants have attached the Virginia DOC Administrative Remedies Procedure, Operating Procedure 866.1, and the declaration of Red Onion Grievance Coordinator Meade. Defs.' Rule 56(a) at ¶ 110; Meade decl. at ¶ 3, ex. A.[19]

---

[19] Meade's declaration attaches Virginia Procedure 866.1. ECF No. 229-8 at p. 5. Meade explains

Procedure 866.1 provides for "Regular Grievances" and "Emergency Grievances." *See* 866.1-IV-0(2); *Id.* at VI (Regular Grievance procedure); *Id.* at VII (Emergency Grievance procedure). Under Procedure 866.1-VII, "*Emergency Grievances* are provided for offender reporting and expedited staff responses to allegations that an offender is subject to a substantial risk of imminent sexual abuse and to situations or conditions which may subject the offender to immediate risk of serious personal injury or irreparable harm." *Id.* at A. An inmate exhausts administrative remedies "only when a Regular Grievance has been carried through the highest eligible level of appeal without satisfactory resolution of the issue." 866.1-IV-O(2). Thus, the "[s]ubmission of an Emergency Grievance does not satisfy the exhaustion of remedies requirement; the offender must submit the issue on a Regular Grievance if not satisfied with the Emergency Grievance response. The exhaustion of remedies requirement will be met only when the Regular Grievance has been appealed through the highest eligible level without satisfactory resolution of the issue." 866.1-IV-O(2)(a).

Baltas filed one grievance only while housed within Virginia custody at the Red Onion. Defs.' Rule 56(a) at ¶ 112. This grievance was an "Emergency Grievance" filed and received on December 26, 2019; it complained about being subjected to "severe & harsh conditions" in "an isolation/suicide/mental health cell" with "no furnishings besides a bunk & a toilet[,]" "a window that cannot be seen out[,]" and "a light on 24 hrs a day[.]" Meade decl. at ¶ 5, ex. B.[20] Baltas' Emergency Grievance was denied for the stated reason that his "grievance [did] not meet the definition for an emergency." *Id.* The staff response advised Baltas to "[p]lace a medical sick

---

that Operating Procedure 866.1 was revised on January 1, 2021. Meade decl. at ¶ 3.

[20] Baltas' grievance noted "P.2 attached," but Defendants have provided only one page of his grievance. *See id.*

call request if you need medical attention." *Id.* The record shows no appeal or other grievance filed by Baltas under Procedure 866.1. *See* Defs.' Rule 56(a) at ¶ 11; Meade decl. at ¶ 5.

Baltas argues that he sent numerous grievances to the Connecticut IMU to complain about his transfer to Virginia and his conditions under Virginia procedures. *See* Baltas decl. at ¶ 5, ex. A- ECF No. 246-1 at 4-30. However, to the extent he is asserting that he made Connecticut DOC officials aware of his First, Sixth and Eighth Amendment deprivations resulting from the Virginia DOC procedures, his confinement conditions, and his safety concerns, "notice alone is insufficient" to satisfy the PLRA exhaustion requirement. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Vidro v. Erfe*, No. 3:18-CV-00567 (CSH), 2019 WL 4738896, at *5 (D. Conn. Sept. 26, 2019).

The Supreme Court has explained:

Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).

*Woodford*, 548 U.S. at 90 (citation and internal quotation marks omitted). The present record shows that Baltas failed to exhaust his administrative remedies for these constitutional claims subject to Virginia authority in compliance with the PLRA by first satisfying all of the steps to exhaust his administrative remedies under Procedure 866.1.

Further, the record fails to suggest that Baltas' administrative remedies under Procedure 866.1 for his claims subject to Virginia authority were not available to him. *See Otero v. Purdy*,

2021 WL 4263363, at *10 (D. Conn. Sept. 20, 2021) (noting plaintiff's prior grievance filing demonstrated availability of administrative remedies).

Baltas maintains that he would have been subjected to retaliatory attacks if he filed any further grievances under Procedure 866.1. *See* Pl.'s decl. at ¶¶ 18-19. He states that he was threatened by Virginia officials after he filed his grievance and was subsequently "attacked and stabbed" by another inmate "as a result of those officials arranging for that violence;" he asserts that he could not safely file any further grievances after the attack or he would suffer some abuse or violence by staff, and that Red Onion staff failed to provide him with any grievance forms. *Id.* at ¶¶ 19-20. Baltas's claim that the inmate assault was orchestrated by staff to retaliate against him for filing an Emergency Grievance (which was denied) is wholly speculative and lacking substantiation. Further, Baltas fails to describe any specific dates or individuals who threatened him with violence or retribution if he filed any further grievances in Virginia.[21] Likewise, he fails to provide any specifics about how he was prevented from having access to grievances at the Red Onion or who refused to provide him with a grievance and when any such deprivation occurred. Baltas' claims of intimidation and inability to access grievance forms are too conclusory to establish unavailability of his administrative remedies. *Jackson v. Downstate Corr. Facility*, 2018 WL 3650136, at *6 (S.D.N.Y. July 31, 2018) (rejecting argument that a threat prevented the plaintiff from filing a grievance as "wholly unsupported by any evidence and [as] conclusory insofar as [the] [p]laintiff point[ed] to no facts regarding such intimidation"); *Medina v. Kaplan*, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018) ("Conclusory allegations of

---

[21] It is worth noting that the U.S. District Court for the Western District of Virginia dismissed a similarly vague claim by Baltas accusing three VDOC officers of retaliating against him for filing that lawsuit. *See Baltas v. Clarke*, 2021 WL 1080516, at *27 (W.D. Va. Mar. 18, 2021) ("Nothing about this [threatening] allegation establishes which defendants threatened Baltas, when they did so, or what—

intimidation are insufficient to establish the unavailability of administrative remedies.... There is

no allegation that the threat was even related to her grievance and ability to exhaust available

administrative relief."); *Khudan v. Lee*, 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016)

(rejecting claim that correctional staff intimidated plaintiff from filing grievances where

"Plaintiff fails to specify the dates of any threats, the names of any officers who threatened him,

and the locations in [the prison] where these alleged threats took place."); *Heyliger v.

Gebler,* 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment,

notwithstanding plaintiff's testimony that his "original grievance was discarded by prison

officials," where plaintiff "never described or named the individual who allegedly took this

action"), *aff'd,* 624 Fed. App'x. 780 (2d Cir. 2015); *see also Veloz v. New York,* 339 F. Supp. 2d

505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming [plaintiff] did

submit the grievances," plaintiff "offer[ed] no evidence that any particular officer thwarted his

attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing

grievances must have been the cause of his grievances being lost"), *aff'd,* 178 Fed. App'x. 39 (2d

Cir. 2006).

Accordingly, the Court concludes that the record raises no suggestion that Baltas'

administrative remedies under Procedure 866.1 were unavailable for him to exhaust his First and

Sixth Amendment claims arising from implementation of the Virginia DOC procedures or his

Eighth Amendment claims arising from his conditions and safety concerns while housed at the

Red Onion. Because Defendants have met their burden of demonstrating no genuine issue of

material fact relevant to Baltas' non-exhaustion of his remedies under Procedure 866.1, and there

is no issue of fact relevant to unavailability of his remedies, the Court will grant the motion for

specifically—that [they] said or did to him that was threatening.").

summary judgment on Baltas' First and Sixth Amendment claims arising from implementation of the Virginia DOC procedures and on his Eighth Amendment claims related to his conditions and safety concerns while housed at the Red Onion. Because Baltas failed to exhaust these claims in compliance with the PLRA, the Court need not address the merits of these claims. *See Feaster v. U.S. Bureau of Prisons*, 37 F. App'x 15, 17 (2d Cir. 2002) (declining to review the merits of claims that failed on nonexhaustion grounds).

<u>Connecticut Administrative Remedies</u>

The Court considers next whether Baltas has exhausted his administrative remedies for his claims of First Amendment retaliatory transfer, Fourteenth Amendment equal protection violation, Sixth Amendment speedy trial and denial of access to counsel violations resulting from Connecticut DOC staff failures, violation of his constitutional right to access to the court claims resulting from Connecticut DOC staff failures to facilitate his court appearances, and his Fourteenth Amendment due process claims based on his continuing Administrative Segregation status in Connecticut without review.

The Defendants argue the plaintiff filed no grievances with the IMU while he was in Virginia. The Defendants note that the Inmate Handbook for Inmates Incarcerated Out of State states that "inmates housed in other states/jurisdictions shall have thirty (30) calendar days to file a grievance with the Connecticut Department of Correction upon exhausting the receiving state/jurisdiction's Inmate Administrative Remedies Process or if submitting a grievance that is specific to the State of Connecticut." Osden decl. at ex. C (p. 5). The Handbook also makes the Impact Compact Supervisor the Unit Administrator for purposes of initiating a grievance. *Id.*

Under Administrative Directive 9.6, the Level-1 Grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the Grievance.[22] A.D. 9.6(6)(C). The Unit Administrator must respond in writing to the Level-1 Grievance within thirty business days of his or her receipt of the Grievance. *See* A.D. 9.6(6)(I). The Connecticut grievance procedure also provides for Level-2 and Level-3 appeals.

Defendant Osden avers that Baltas failed to file any grievances with the IMU after he was transferred to Virginia. Osden decl. at ¶ 29. Baltas counters that he did send Level-1 Grievances to the IMU by United States mail. Baltas decl. at ¶ 5-6, ECF 246-1 at 4. He claims that he received no response to his Level-1 Grievances, and so sent Level-2 Appeals to Defendant Maiga at the "IMU/Office of [Population Management]" by U.S. Mail, and after not receiving any response, sent his Level-3 Appeals to the Commissioner but received no response. *Id.* at ¶¶ 8, 11. Baltas has attached to his declaration copies of Level-1, Level-2, and Level-3 grievances filed in January through July 2020, complaining about, *inter alia*, his retaliatory transfer, lack of access to the courts and his counsel, denial of his right to a speedy trial, mail tampering, his conditions of confinement, and his continued Administrative Segregation status in Connecticut. *See id.* at ex. A, ECF No. 246-1 at 10-30. In support of his assertion that the IMU received these grievances, Baltas points to an email dated April 28, 2020 from Sandler to Red Onion stating: "He is sending our office documents and we are unable to respond because he is refusing to sign

---

[22] Administrative Directive 9.6 requires an aggrieved inmate to first seek informal resolution prior to filing a grievance. A.D. 9.6(6)(A). It provides that "the inmate shall submit a written request via CN 9601, Inmate Request Form" in the event that "the verbal option does not resolve the issue." *Id.* Administrative Directive 9.6(6)(C) specifically states that the inmate must include a copy of the Inmate Request Form (CN 9601) with the grievance (CN 9602) or an inmate must explain its absence. A.D. 9.6(6)(C). But it is not clear whether this provision for informal resolution applies to a Connecticut inmate housed in another state who is challenging matters falling only under Connecticut's jurisdiction.

for social mail on your end." *See* Baltas decl. at ¶ 24, ex. C, ECF No. 246-1 at 48; Sandler decl.

at ¶ 61, ex. X. Thus, Baltas maintains that he filed his grievances and appeals through all of the

steps of Administrative Directive 9.6, but Defendants either failed, or refused, to respond to his

administrative remedies. Pl.'s Opp. at ¶ 11.

Although it is not clear whether Baltas actually sent the grievances attached to his

declaration or whether they were received by IMU, the Court must view the record evidence in

the light most favorable to the non-moving party, who is Baltas. Thus, the Court assumes that

these grievances were sent and received at the IMU. *See Parker v. Staff*, 2020 WL 6927631, at

\*7 (D. Conn. Nov. 24, 2020) (viewing evidence most favorably to plaintiff and assuming that

grievances were filed by plaintiff, although it was not clear that plaintiff had ever filed the

grievances). Here, reasonable inferences of fact drawn in Baltas's favor suggest that he

exhausted his administrative remedies and that correctional officials failed to respond. *Hayes v.*

*T. Dahlke*, 976 F.3d 259, 270-71 (2d Cir. Oct. 5, 2020) (holding that "an inmate exhausts

administrative remedies when he follows the procedure in its entirety but the CORC fails to

respond within the 30 days it is allocated under the regulations" and citing consistent other

circuit case law). [23]

Thus, with all inferences of fact construed most favorably to Baltas as the non-moving

party, the record at least raises questions of fact concerning whether Baltas exhausted his

administrative remedies for his claims of First Amendment retaliatory transfer, Fourteenth

Amendment equal protection violation, Sixth Amendment speedy trial and access to counsel

---

[23] Baltas also argues that his administrative remedies should be deemed unavailable because he
did not have access to Directive 9.6 while housed at the Red Onion, Sandler did not send him the
Directive, and he had no internet access. Pl.'s Mem. at 13. The Court notes that Baltas's attached Level-1
through Level-3 grievances reflect that he was well informed of the Connecticut administrative remedy

violations resulting from Connecticut DOC staff failures, violation of his constitutional right to access to court based on Connecticut DOC staff failures to facilitate his court appearances, and Fourteenth Amendment due process violations based on his continuing Administrative Segregation status in Connecticut without review. The Court will proceed to consider the merits of these claims.

### B.    Merits and Qualified Immunity

Defendants maintain that Baltas cannot establish that Defendants violated his rights under the First, Sixth, and Fourteenth Amendments. Alternatively, Defendants assert that they are entitled to qualified immunity.

### 1.    First Amendment Retaliatory Transfer

In his amended complaint, Baltas alleged that he had a "history of filing grievances and civil actions against [DOC] beginning in 2017," that he was transferred by Maiga in November 2018, that Maiga relied on the transfer to obtain a dismissal of his habeas action TSR-cv-17-4008753-S due to mootness, and that he was returned to Connecticut but later transferred to Virginia on December 20, 2019, less than one month after he filed a federal civil action, *Baltas v. Erfe*, 19cv1820 (MPS) on November 15, 2019. Am. Compl. at ¶¶ 23, 25, 26, 28, 29, 16, 169. The Court permitted Baltas to proceed on his First Amendment claim against Maiga, Cook, and Quiros for allegedly transferring him to Virginia to retaliate against him for his protected speech.

To sustain a First Amendment retaliation claim, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). Protected speech or activity

procedures under Directive 9.6(6).                29

includes filing a lawsuit, an administrative complaint, or a prison grievance. *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted). "[O]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (citation omitted). "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002).

A plaintiff may demonstrate the necessary causal connection between the adverse action and the protected conduct or speech through circumstantial evidence, including the temporal proximity between an inmate's conduct and speech and adverse action, proof of prior good behavior by the inmate, vindication in a disciplinary proceeding arising from the alleged retaliation, and statements by the retaliator concerning his or her motivation. *See Jones v. Wagner*, No. 3:20-CV-00475 (VAB), 2022 WL 1525134, at *9 (D. Conn. May 13, 2022) (citation omitted).

If the plaintiff's case satisfies these elements, "the defendants must then show by a preponderance of the evidence that they would have disciplined the plaintiff 'even in the absence of the protected conduct.'" *Graham*, 89 F.3d at 79 (citing *Mount Health Sch. Distr. v. Doyle*, 429 U.S. 274, 287 (1977)); *see Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless

of the presence of retaliatory motive, however, a defendant may be entitled to summary

judgment if he can show dual motivation, *i.e.*, that even without improper motivation the alleged

retaliatory action would have occurred.") "A finding of sufficient permissible reasons to justify

state action is readily drawn in the context of prison administration" because prisoners'

retaliation claims are examined "with skepticism and particular care" due to the ease with which

they may be fabricated and because "courts have been cautioned to recognize that prison officials

have broad administrative authority." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 412 (D.

Conn. 2016), *aff'd,* 720 F. App'x 79 (2d Cir. 2018) (internal citations and quotation marks

omitted)).

Defendants do not challenge Baltas' retaliation claim as to the first or second prongs.

Defendants argue (1) that Baltas cannot show a causal connection between his protected speech

and his transfer to Virginia; (2) that Defendants Maiga, Quiros, and Cook had no personal

involvement in searching for a transfer state for Baltas; and (3) that the evidence demonstrates

legitimate non-retaliatory reasons for Baltas' transfer to Virginia. Defs.' Mem., ECF No. 229-1

at 18-22.

Defendants maintain that that former Commissioner Cook, then-Deputy Commissioner

Quiros, and Director Maiga cannot be held liable for a retaliatory out-of-state transfer for Baltas

because they lacked direct personal involvement in the transfer process. Defs.' Mem. at 20-22.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v.

Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885

(2d Cir. 1991)). A supervisory official "may not be held liable for damages merely because he

held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). To "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) (constitutional violation "must be established against the supervisory official directly."). The present record raises at least an inference that former Commissioner Cook, then-Deputy Commissioner Quiros, and Director Maiga all had some involvement in Baltas' transfer to Virginia. *See* Maiga decl. at ¶¶ 4-5 (averring that Maiga's practice is to confer with the "executive team" – including the Commissioner and Deputy Commissioner – in response to requests for involuntary out-of-state transfers).

The Court next considers whether the present record raises an inference of a causal connection between Baltas' protected conduct and the alleged retaliatory transfer. Although "temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," "some further evidence of retaliatory animus" is required before an inmate's retaliation claim may proceed to trial. *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) (citing *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003)). Baltas makes several assertions in opposition materials to show that his transfer had a causal nexus with his prior protected activity. *See* Pl. Opp. at 16-18. According to Baltas, the fact that Cook and Quiros argued to dismiss his habeas case due to his transfer out of state demonstrates a retaliatory motivation for his transfer. Pl.'s Opp. at 17. But that argument is speculative; Cook and Quiros almost certainly would have made the same legal argument to dismiss the habeas action in the event of a *voluntary* transfer, which suggests that the making of the argument says

nothing about the intent behind the transfer. In any event, the habeas court itself likely would have dismissed the action regardless of whether Cook and Quiros raised the argument, because the transfer made the case moot. *See Baltas v. Comm'r of Correction*, No. CV174008753S, 2019 WL 6999141, at *1-*2 (Conn. Super. Ct. Nov. 22, 2019) (In Baltas's action seeking release from administrative segregation, stating, "[a]s there is no factual dispute that the petitioner is no longer in administrative segregation by his own concession to the court, the court finds that there is no actual case or controversy at issue in this matter.").

Baltas next claims that during his transport, certain unnamed Connecticut and Virginia DOC prison officers informed him that he was being transferred due to his prior litigation and to interfere with his ability to litigate against Connecticut DOC officials. *See* Pl.'s Opp at 17; Am. Compl. at ¶¶ 31, 37. But Baltas has not provided specific information about who made the statements, whether such persons participated in the decision to transfer him, or whether they had personal knowledge of the reasons for the transfer. Nor has he adduced any evidence to substantiate an inference that his transfer to Virginia had a causal nexus to his prior protected activity. *See Adams v. Rock*, 2015 WL 1312738, at *10 (N.D.N.Y. Mar. 24, 2015) (assertions of complaint or affidavit may be deemed conclusory if they are unsubstantiated by any other direct evidence) (internal alterations and citations omitted); *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (conclusory allegations, speculation or conjecture are insufficient to resist summary judgment). Baltas's assertion that unnamed correctional officers informed him that he was being transferred to Virginia to retaliate against him for his First Amendment protected activity is too conclusory to raise a question of fact to defeat summary judgment. *See*

*DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("A Court cannot credit a plaintiff's merely speculative or conclusory assertions.").

Baltas next complains that the two warden out-of-state transfer requests citing management issues in connection with his Connecticut incarceration were false. Pl.'s Opp. at 17. But it is undisputed that the two DOC wardens requested Baltas's transfer prior to the IMU's efforts to secure an out-of-state facility to house him. *See* Warden Falcone Memo, ECF No. 246-3 at 39; Warden Dilworth Memo, ECF No. 246-3 at 48. Any inaccuracy in the representations in the Wardens' request memos would not raise a question of fact about whether Defendants Maiga, Quiros or Cook sought to have Baltas transferred due to a retaliatory animus.

Baltas also points out that Warden Dilworth's transfer request referred to Baltas's prior grievances. Pl.'s Opp. at 17. But, when read in context, the memo makes clear that the reference to Baltas's grievance filings is offered as further evidence of safety concerns raised by Baltas's continued presence in the DOC and thus further support for the transfer request. *See* Sandler decl. at ex. B.  The sentence mentioning Baltas's grievances appears at the end of a paragraph stating that Baltas had received seven additional disciplinary reports, that he had threatened to stab staff, that he had covered his cell window after refusing direction from staff, and that he had exposed himself to female staff. The sentence at issue then adds that in his grievance filings, Baltas himself had raised concerns for his safety due to "an active staff profile" and "continued fear of retaliation from staff." ECF No. 229-3 at 20. The memo then goes on to discuss Baltas's staff and inmate profiles at other "level 4" DOC facilities, his prior placements on Chronic Discipline and Ad Seg, the length of his sentence, and his underlying crimes of murder and assault. No reasonable juror could reasonably infer from this memo that Warden Dilworth – let

alone any of the Defendants – wanted to transfer Baltas out of state because he had filed some

grievances.[24]

---

[24] On August 15, 2022, Baltas filed an "addendum" to his opposition to Defendants' motion for summary judgment [ECF No. 245] with an attached exhibit 1 [ECF No. 254-1]. He represents that he has received an "unredacted profile screen" entitled "Special Management Profile," which shows twelve separation profiles dated between 2006 and 2018 and the reasons for separating Baltas from the other named inmates. ECF No. 245-1. Baltas argues that exhibit 1 undermines Defendants' assertion that his transfer was necessary due to management difficulties in light of his separation profiles. This "addendum" does not affect the Court's analysis or conclusions.  First, the document is essentially a sur-reply filed without permission, as required by Local Rule 7(d) ("No sur-replies may be filed without permission of the Court, which may, in its discretion, grant permission up a showing of good cause."). Even if the Court construes the addendum as requesting permission to file a sur-reply, Baltas has not shown good cause for the Court to permit him to assert new arguments and submit new evidence – with no opportunity for the Defendants to reply -- now after the motion for summary judgment motion has been pending for approximately eight months. He maintains that Defendants willfully denied him access to this information and that he received the unredacted profiles document from an unidentified third-party source. He has not, however, explained how Defendants acted improperly in denying him access to the reasons for his separation profiles or how he received this unredacted separation profiles document. Nor has he provided the Court with any showing that the document is authentic. For these reasons, the Court will not consider the addendum and attached exhibit 1 as part of Baltas's opposition to the motion for summary judgment.

Moreover, even assuming it was proper for the Court to consider exhibit 1 and even assuming its authenticity, exhibit 1 raises no inference that Defendants Maiga, Quiros, or Cook retaliated against Baltas by transferring him to Virginia. Baltas argues that the reasons given for the separation profiles are fabricated, arbitrary, or vague. He notes that the first two profiles from 2006 involve two inmates who assaulted him; that inmate Almond falsely claimed Baltas sexually assaulted him in order to obtain a single cell; that the reason given for separating him from inmate Rios—trying to control cell over Rios--is vague; that a separation profile with his brother and fellow Diablo is impermissible; that inmates Binenette and Paschal falsely reported that he threatened them to obtain protective custody; and that the stated reason for separating him from inmate Lamb due to his telling others that Lamb was a snitch is false and inappropriate. *Id.* But Baltas cannot create issues of fact by disputing the accuracy of the reasons for his separation profiles based on his own assessment of their merits. The document, which also includes separation profiles for four other inmates for fighting, reflects that Baltas had a record of having violent and threatening interactions with other inmates and provides support for statements in the memos requesting transfer submitted by the two Wardens and representing that Baltas presented management and safety issues during his Connecticut DOC confinement prior to his transfer in 2019.

Baltas next asserts that an email exchange between Sandler and the Virginia DOC Red Onion staff indicated that Virginia DOC was transferring a litigious inmate to Connecticut. Pl.'s Opp. at 18 (referring to ex. 10, ECF No. 246-3 at 84-85). But the email in this exchange that refers to an inmate going to court was written by a nondefendant Virginia DOC official and concerns an inmate who was then in Virginia, not Baltas. ECF No. 246-3 at 85. This document thus sheds no light on whether Defendants Maiga, Cook, and Quiros acted with a retaliatory animus against Baltas to obtain his transfer to Virginia.

Finally, Baltas claims that the fact he remained incarcerated at the Red Onion—despite Defendants' awareness of the abuse and injuries he sustained in Virginia—supports his claim that his transfer to Virginia was motivated by a retaliatory animus. Such a speculative and unsubstantiated assertion is insufficient to raise an inference of causation.

Based on the present evidentiary record, no reasonable jury could conclude that Defendants Cook, Quiros, or Maiga transferred Baltas to Virginia to retaliate against him in

---

Baltas also asserts that he needed to be confined in accordance with his sentence, but the relevant inmates in the separation profiles were housed only at a single level 4 facility (MacDougall-Walker Correctional Institution). Thus, he maintains that at the time of his transfer, he could have been housed "without issue or hardship" at other Connecticut DOC level 4 facilities, Corrigan, Cheshire or Garner. ECF No. 245 at 3. However, Warden Dilworth's March 2018 request for Baltas' out-of-state transfer due to safety and management concerns noted that Baltas had "multiple profiles at all level 4 facilities which include both staff and inmate." ECF No. 229-3 at 20. Baltas has not shown that that statement was untrue when it was made, not least because the document he has submitted is not dated and it is not clear when it was generated or how recently it was updated.  (Although there is a notation stating "9/18 updated" preceded by a succession of three-digit numbers, it is not clear what this means and whether, if it refers to a time, it is referring to the month and date or the month and year.)  And he certainly has not shown that any of the Defendants knew or should have known that the statement in the Warden's memo was untrue when made.  Finally, it is not clear whether exhibit 1 contains all of the separation profile information relevant to Baltas' transfer to Virginia in December 2019.

violation of the First Amendment. Thus, the motion for summary judgment will be granted in Defendants' favor on Baltas' First Amendment retaliatory transfer claim.

### 2. Fourteenth Amendment Equal Protection

Baltas asserts that Defendants treated him differently than Connecticut inmates Barletta and Traboukolos. *See* Am. Compl. at ¶ 198; *Baltas*, 2021 WL 2206966, at *7.

The Fourteenth Amendment Equal Protection Clause does not mandate identical treatment for each individual but "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, a plaintiff must allege facts showing that: (1) he or she was treated differently from similarly situated individuals, and (2) the discriminatory or different treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). A plaintiff must demonstrate evidence of "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted). Prisoners are not a protected class under the Equal Protection Clause. *Graziano v. Pataki*, 689 F.3d 110, 117 (2d Cir. 2012).

Even when a suspect classification is not at issue, however, the Equal Protection Clause still requires that individuals be treated the same as "similarly situated individuals." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). In particular, Baltas can still show an Equal Protection violation if he demonstrates that he was treated as a "class of one." Under a "class of one" theory, Baltas must show that "he has been intentionally treated differently from

37

others similarly situated and that there is no rational basis for the difference in treatment." *See*

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To do so, Baltas must demonstrate

the existence of a person who is "prima facie identical" to him and who was treated differently.

*Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (internal quotation marks and citation

omitted). In the Second Circuit, class-of-one plaintiffs "must show an extremely high degree of

similarity between themselves and the persons to whom they compare themselves." *Clubside v.*

*Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). The similarity between the

plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out

for reasons that so lack any reasonable nexus with a legitimate governmental policy that an

improper purpose—whether personal or otherwise—is all but certain." *See Witt v. Village of*

*Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at *5 (S.D.N.Y. Mar. 27, 2015), *aff'd*,

639 F. App'x 44 (2d Cir. 2016) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level

of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was

not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d

124, 129 (2d Cir. 2005).

Here, the record raises no inference of an equal protection violation. It is undisputed that

Warden Dilworth submitted a March 2018 request to the IMU for Baltas' out-of-state transfer

due to difficulty managing Baltas in Connecticut, and Virginia was the only State to accept

Baltas at the time. *See* Defs.' Rule 56(a) at ¶ 15. Moreover, Defendant Osden has averred that the

IMU did not have an out-of-state transfer request for either Barletta or Trabakoulos at the time relevant to Baltas' transfer.[25] Osden decl. at ¶¶ 16, 19.

Baltas claims that he is particularly similar to inmate Barletta, who was formerly transferred to Virginia and then returned to Connecticut. Pl.'s Opp. at 19. But there is no dispute that Barletta had previously been transferred to Virginia and returned to Connecticut DOC, and that the IMU does not generally request a state to accept an inmate for a second time. Defs.' Rule 56(a) at ¶ 105.

In sum, no evidence suggests that inmates Trabakoulos or Barletta were "prima facie identical" to Baltas so as to raise an inference that Baltas was treated differently from them without any rational basis or legitimate penological reason. Based on this record, no reasonable juror could find in favor of Baltas on his claim of Fourteenth Amendment equal protection violation. Accordingly, the Court grants the motion for summary judgment in Defendants' favor on Baltas' Fourteenth Amendment equal protection claim.

### 3. Denial of Right of Access to the Courts

Baltas asserts that his criminal and civil matters were delayed due to his incarceration in Virginia DOC and his inability to prepare for his cases.[26] He alleges that Defendants refused to

---

[25] Further, Baltas differs from Trabakoulos as to his offense and sentence. The Connecticut DOC website shows that Baltas is serving 115 years of incarceration for murder, while Trabakoulos is serving only 18 years for Robbery in the First Degree. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=241869.

[26] The Court does not address Baltas' claims related to alleged deprivations caused by being subjected to the Virginia mail regulations. Such claims were subject to Virginia authority but not exhausted through the Virginia grievance procedures. *See also Baltas v. Clarke*, No. 7:20CV00276, 2021 WL 1080516, at *14 (W.D. Va. March 18, 2021) (noting "that many of Baltas' issues with his confinement in Virginia arise from his mistaken understanding that he is not subject to the policies and regulations of the VDOC," but "while in the custody of the VDOC, Baltas is subject to all the provisions of law and regulations' applicable to other inmates in Virginia.") (internal quotation marks omitted).

have him transported to Connecticut so that he could appear for his habeas matter in February, March, and June 2020, Am. Compl. at ¶ 161, and that he was permitted to attend court proceedings only through video conferencing while shackled and handcuffed to a security chair, which made it impossible to write, sort papers, or represent himself. *Id.* at ¶ 121.

It is well settled that inmates have a First Amendment "right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey*, 518 U.S. 343, 350 (1996). The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825. To state a claim for denial of access to the courts, an inmate is required to demonstrate that he suffered an actual injury as a result of the conduct of the defendants. *Lewis*, 518 U.S. at 351-53. To establish an actual injury, an inmate must allege facts showing that the defendant took or was responsible for actions that hindered his efforts to pursue a "nonfrivolous" legal claim. *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) ("Whether access claim turns on a litigating opportunity yet to be gained or an opportunity already lost. . . plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim" that he sought to pursue or seeks to pursue in court) (quoting *Lewis*, 518 U.S. at 353 & n.3)).

Here, Baltas has not shown that his transfer to Virginia hindered his efforts to pursue any nonfrivolous legal claims. The record shows that Baltas was able to send and receive legal mail, have legal calls with his attorneys in Connecticut, and file documents with the courts. Defs.' Rule 56(a)at ¶¶ 75, 95-96. Baltas admits that his court appearances were accommodated by Virginia DOC. *Id.* at ¶ 97. It is undisputed that Baltas was able to file numerous documents in

this case, and file and litigate four other lawsuits while he was in Virginia custody.[27] Baltas

complains that he could not communicate with his counsel, but the Virginia DOC's log sheet

shows that he participated in multiple legal calls throughout his incarceration in Virginia. Defs.'

Rule 56(a)at ¶¶ 95-96; Sandler decl. at ex. HH.

Further, Baltas has made no showing that his habeas case presented any non-frivolous

claims that were dismissed.[28] Baltas complains that he was not able to secure a trial for his

habeas case due to his habeas counsel's inability to provide effective assistance of counsel. In

support of this assertion, Baltas relies for upon a request for a continuance dated June 30, 2020,

filed by his habeas counsel (Jessica Walker of the Kirshenbaum Law Group) in case TSR-CV-

17-4008624-S, asserting that she could not effectively conduct a trial of this magnitude by video

conference. Baltas decl. at T, ECF No. 246-2 at 155. By that time, Governor Lamont had

declared a public emergency and suspended all non-critical court operations due to the COVID-

19 pandemic. Lamont Executive Order, § 2. The Connecticut judicial website states: "The

Judicial Branch has been conducting court business using alternatives to in-person presence since

---

[27] *See Baltas v. Rizvani et al.*, 3:21cv436 (MPS) (filed on 3/30/21); *Baltas v. Jones*, 3:21cv 469 (MPS) (filed on 4/5/21); *Baltas v. Fitzgerald*, 3:21cv587 (MPS) (filed on 4/29/21); *Baltas v. Clarke*, 3:21cv1461 (MPS) (commenced on 4/15/20 in the District of Virginia).

[28] The Connecticut judicial website shows that Baltas has pending habeas cases with trial dates for his habeas petitions. *See* https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=TSRCV174008624S (trial scheduled for August 1 and 3, 2023); https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=TSRCV195000247S. (trial scheduled for September 21, 2022). https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=TSRCV215000943S (trial date scheduled for June 2-3, 2025);
In TSR-CV-19-500247-S, Baltas, as a self-represented party, was able to submit numerous filings during his Virginia incarceration, including an objection to a motion to dismiss, and was able to appear to argue his objection to the motion to dismiss, which was denied. https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=TSRCV195000247S.

March 30, 2020, and has steadily increased the types of matters that are being handled remotely."[29] Thus, in light of the record and the relevant circumstances caused by the COVID-19 pandemic at the time, Baltas has not shown that the scheduling for an in-person rather than a remote habeas trial was hindered or delayed by the Defendants or by his incarceration in Virginia, and no reasonable juror could conclude that Baltas sustained an actual injury based on a denial of his constitutional right to court access while incarcerated in Virginia.

Alternatively, even if Baltas did sustain an actual injury, Defendants are entitled to qualified immunity, which "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). A right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cty., New York*, No. 19-4167, 2021 WL 5183543, at *17 (2d Cir. Nov. 9, 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right. *See Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Here, the record shows

---

[29] *See* https://jud.ct.gov/LawLib/covid19-faq2.htm#5.

that under the circumstances, Defendants could reasonably believe that their conduct in connection with Baltas's incarceration in Virginia did not deprive him of his right to court access. Thus, Defendants are entitled to qualified immunity from liability for any deprivation of Baltas's right to access to the courts.

### 4.      Sixth Amendment Access to Counsel/Effective Assistance of Counsel

Baltas claims that "he was not provided any means of private, confidential communications with his attorneys, which severely prejudiced his ability to receive effective assistance of counsel." ECF No. 245-1 at 23 (cleaned up). This claim arises primarily from his complaint about implementation of the Virginia regulations, a claim he was obligated to first exhaust through the Virginia grievance procedures. Nonetheless, to the extent he claims that the Defendants did or did not do something that violated his Sixth Amendment right to effective assistance of counsel, the Court considers whether the record raises any inference that Defendants violated such right.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. Under the Sixth Amendment, a criminal defendant is constitutionally entitled to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). The Sixth Amendment right to effective assistance of counsel "only applies to a defendant's trial and first appeal as of right, not to appeals afforded on a discretionary basis, collateral proceedings, or civil proceedings such as civil rights claims challenging prison conditions." *Bourdon v. Loughren,* 386 F.3d 88, 96 (2d Cir. 2004) (citing *Pennsylvania v. Finley,* 481 U.S. 551, 555-57 (1987)); *see also Wolff v. McDonnell*, 418 U.S. 539, 576 (1974) (noting that the "reach [of the Sixth

43

Amendment] is only to protect the attorney-client relationship from intrusion in the criminal setting" and refusing to recognize claim that "would insulate all mail from inspection, whether related to civil or criminal matters").

Baltas references his habeas counsel's motion for continuance on the basis of her inability to provide effective assistance of counsel in a video access trial. But the Sixth Amendment right to effective assistance of counsel does not apply to habeas cases, which are civil, not criminal, proceedings. *See Banister v. Davis*, 140 S. Ct. 1698, 1702–03 (2020) (noting that "[h]abeas proceedings…are civil in nature."); *Harris v. United States*, 367 F.3d 74, 77 (2d Cir. 2004) ("[A] habeas petitioner has no constitutional right to counsel in his habeas proceeding."); *Wainwright v. Torna,* 455 U.S. 586, 587 (1982) (where there is no constitutional right to counsel, there can be no deprivation of effective assistance). Further, the Virginia DOC Officer Log Book shows that Baltas was able to have numerous legal telephone calls, and Baltas admits that his court appearances were facilitated while in Virginia (although he cites three missed court dates). *See* Sandler decl. at ex. HH. Pl.'s Rule 56(a) at ¶ 97.

Here, the record fails to show that Defendants had any involvement in preventing Baltas from receiving effective assistance of counsel while he was incarcerated in Virginia. And it does not show that he was denied his Sixth Amendment right to the effective assistance of counsel at any time. Thus, no reasonable juror could conclude that Defendants violated Baltas's Sixth Amendment right to effective assistance of counsel. Alternatively, the record demonstrates that it was objectively reasonable for Defendants to believe that their conduct did not deprive Baltas of his Sixth Amendment right to effective assistance of counsel, and Defendants are entitled to qualified immunity on this claim.

5.       **Sixth Amendment Speedy Trial Claims**

In his amended complaint, Baltas alleged that his attorney filed a motion for speedy trial on February 19, 2020 in criminal matter, H14H-CR 19-733623-S. Am. Compl. at ¶ 84; Compl. at ex. 8. Defendants maintain that Baltas cannot establish a Sixth Amendment speedy trial violation.

The Supreme Court has explained that "[t]he speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative.'" *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quoting *Barker v. Wingo,* 407 U.S. 514, 522 (1972)). The Court has formulated a four-factor balancing test for evaluating a defendant's claim of a speedy trial right violation: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly." *United States v. Ghailani*, 733 F.3d 29, 42–43 (2d Cir. 2013) (internal quotation marks omitted). Although "no single factor is dispositive and ... each serves to guarantee a fundamental, enumerated right of the accused," the Second Circuit has explained that "'[t]he length of the delay is to some extent a triggering mechanism,' because until there exists 'some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *United States v. Tigano*, 880 F.3d 602, 612 (2d Cir. 2018) (quoting *Barker*, 407 U.S. at 530).

The record shows that Baltas's court date for this criminal case was first continued to May 13, 2020 due to the COVID-19 public health emergency, then postponed to July 22, 2020, and later dismissed. Defs.' Rule 56(a) at ¶¶ 84-87. As any delay was attributable to reasons beyond Defendants' control and there is no inference that Baltas sustained any prejudice, no

reasonable finder of fact could conclude that Defendants violated Baltas's speedy trial rights by permitting him to remain incarcerated in Virginia while he had a criminal case pending in Connecticut. Alternatively, the record demonstrates that it was objectively reasonable for Defendants to believe that their conduct did not violate Baltas's Sixth Amendment speedy trial right. The Court grants the motion for summary judgment in Defendants' favor on Baltas's claim of a violation of his Sixth Amendment speedy trial right.

### 6.      Fourteenth Amendment Due Process

Baltas alleges that Defendants violated his due process rights by failing to conduct reviews of his Connecticut administrative segregation status and retaining him as an improperly classified Administrative Segregation status inmate in the Connecticut DOC system. Am Compl. at ¶¶ 119, 221. On initial review, the court permitted this claim to proceed, noting that procedural due process requires prison officials to engage in periodic review of an inmate's administrative confinement. *Baltas*, 2021 WL 2206966, at *13 (citing *Proctor v. LeClaire*, 846 F.3d 597, 608-12 (2d Cir. 2017)).

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property." U.S Const. amend. XIV. The Court must analyze a claim of violation of procedural due process by (1) asking whether there exists a liberty or property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the State were constitutionally sufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). In the prison context, which involves persons whose liberty interests have already been severely restricted because of their confinement in a prison, a prisoner cannot show a cognizable deprivation of "liberty" unless he can show that he was subject to an "atypical and significant

46

hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). As the Second Circuit has explained, courts must examine the actual circumstances of the confinement received, as well as the conditions and duration of the confinement. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Id.* (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).

If there is a liberty interest, the court considers whether the prisoner received the proper process due to him. Due process requires prison officials to conduct meaningful periodic reviews of whether an inmate who is confined in administrative segregation continues to pose a threat to the prison and therefore must stay in administrative segregation, or whether the inmate can be released into the prison's general population as no longer posing a threat. *Proctor*, 846 F.3d at 601, 609-10. The Second Circuit has observed that periodic reviews of an inmate's placement in administrative segregation are "flexible and may be based on 'a wide range of administrative considerations,'" including observations of the inmate in administrative segregation, knowledge about prison conditions, misconduct charges, ongoing tensions in the prison, and any ongoing investigations. *Id.* at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9). Due process is not satisfied when prison officials "go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in [administrative segregation] no matter what the evidence shows[,]" and "review with a pre-ordained outcome is

tantamount to no review at all." *Id.* at 610. First, prison officials must consider whether the

inmate's continued confinement in administrative segregation is justified. *Id.* "Second, the

reviewing officials must evaluate whether the justification for [administrative segregation] exists

at the time of the review or will exist in the future, and consider new relevant evidence as it

becomes available." *Id.* at 611. Third, prison officials "must maintain institutional safety and

security (or another valid administrative justification) as their guiding principles throughout an

inmate's [administrative segregation] term" but "may not use  [administrative segregation] as a

charade in the name of prison security to mask indefinite punishment for past transgressions." *Id.*

at 611.

Here, Defendants do not to contest that Baltas has a liberty interest at stake but claim that

they did not violate Baltas's procedural due process rights. Osden averred that the IMU

conducted regular classification reviews in January 2020, July 2020, January 2021, and July

2021 while Baltas was housed in Virginia DOC. Osden decl. at ¶ 25. [30]

Baltas counters that Defendants violated his procedural due process rights by failing to

conduct meaningful periodic reviews, which would have revealed that he had remained

discipline free for over a year and had not engaged in any violent acts or behaviors for over two

years, and that he should have been removed from Administrative Segregation status. Pl.'s Opp.

---

[30] Baltas asserts that Defendants failed to afford him periodic review of his Administrative Segregation status every thirty days as mandated under Administrative Directive 9.4. Pl.'s Opp. at 7, 28. But claims based on deviation from the state correctional department's regulations or institutional policies are not cognizable under section 1983, which protects only rights secured under the Constitution and federal law. *See Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone, without a due process violation, "would not be enough generally to establish a constitutional claim"); *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 373 (N.D.N.Y. 2020) (no procedural due process violation where prison officials conducted periodic reviews approximately every two months, as opposed to every sixty days as required by agency policy).

at 7, 29; Am. Compl. at ¶ 120. Courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Proctor*, 846 F.3d at 610. In effect, this means that the Court must focus on the adequacy of the CT DOC's procedures for reviewing Baltas's ad seg status, not on the substance of the decision the Defendants reached after each periodic review. Baltas has failed to submit any evidence to rebut Defendants' evidence that they conducted periodic reviews focused on the pertinent considerations. Instead, Baltas is essentially challenging *the substance* of Defendants' decision to continue his Connecticut DOC classification as an Administrative Segregation status inmate while he was confined in Virginia. Accordingly, the Court will grant the motion for summary judgment on this claim.

Moreover, even if Defendants had failed to afford Baltas' classification periodic review in compliance with procedural due process standards while he was confined in Virginia, Defendants would have committed at most harmless error. "The Second Circuit has endorsed harmless-error review for inmate due process claims." *See Gibson v. Heary*, No. 17-CV-272S, 2021 WL 854736, at *10 (W.D.N.Y. Mar. 5, 2021) (citing *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)). Courts perform this review on a case-by-case basis to determine whether an inmate was prejudiced. *Id.*

Here, it is undisputed the ICC contract between Connecticut and Virginia provides that the receiving state institution has the responsibility, *inter alia*, to confine inmates from the sending state, provide for their physical needs, make available programs for training and treatment, retain safe custody, provide supervision, and maintain proper discipline and control.

*See* Osden decl. at ex. BB (Contract ¶ 13) (Responsibility of the Offenders Custody). No evidence in the record suggests that Baltas's continued Connecticut status as an Administrative Segregation status inmate resulted in his restrictive confinement in Virginia. Because Virginia DOC was contractually responsible for confining Baltas in accordance with safety and security interests, Defendants' reviews of Baltas's Connecticut Administrative Segregation status did not implicate *Proctor*'s due process concerns about confining Baltas in administrative segregation without justification, as a "pre-ordained outcome," or as an "indefinite punishment for past transgressions" without valid penological safety and security reasons. *See Proctor*, 846 F.3d at 610-611. Accordingly, no reasonable juror could conclude that Defendants' review of Baltas's status as a Connecticut Administrative Segregation inmate resulted in a violation of Baltas's due process rights.

Alternatively, Defendants are entitled to qualified immunity from liability because it was objectively reasonable for them to believe that Virginia was responsible under the ICC contract for providing the appropriate confinement for Baltas in the interest of safe inmate custody, supervision, and control, and that the adequacy of their own periodic reviews of his Connecticut administrative segregation status would make no difference in the circumstances of his confinement in Virginia. Accordingly, the Court GRANTS the motion for summary judgment in Defendants' favor on Baltas's Fourteenth Amendment due process claim.

### 7.    Supplemental Jurisdiction Over State Law Claims

Because no federal claim in this action survives the motion for summary judgment, the Court declines to exercise supplemental jurisdiction over any pending state law claims. See 28 U.S.C. § 1367(c)(3) (providing that the court may decline to exercise supplemental jurisdiction

over a state law claim if the court has dismissed all claims over which it has original jurisdiction). Accordingly, these claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [ECF No. 229] is GRANTED. Any state law claims are DISMISSED without prejudice because the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

The clerk is instructed to enter judgment in Defendants' favor and to close this case.


_____/s/_____

Michael P. Shea
United States District Judge

**SO ORDERED** this 24th day of August 2022, at Hartford, Connecticut.

51