# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:20cv1177 (MPS) |
| v. | : | |
| | : | |
| DAVID MAIGA, in his individual and official | : | |
| capacities, ROLLIN COOK, in his individual | : | |
| and official capacities, ANGEL QUIROS, in his | : | |
| individual and official capacities, JACLYN | : | |
| OSDEN, in her individual and official | : | |
| capacities, and JESSICA SANDLER, in her | : | |
| individual and official capacities, | : | |
| Defendants. | : | |

## <u>MEMORANDUM OF DECISION</u>

The plaintiff, Joe Baltas, who was formerly incarcerated at the Red Onion State Prison

("Red Onion") in Pound, Virginia, commenced this civil rights action under 42 U.S.C. § 1983.

ECF No. 1. Baltas asserted constitutional violations related to his transfer to Virginia and

confinement in Virginia against Rollin Cook, who was at the time Commissioner of the

Connecticut Department of Correction ("DOC"), then-Deputy Commissioner and current

Commissioner Angel Quiros, Director of Offender Classification and Population Management

("OCPM") David Maiga, and Correctional Counselors Jessica Sandler and Jacklyn Osden. ECF

No. 1; ECF No. 63.[1]

## I.      PROCEDURAL BACKGROUND

After initial review of the amended complaint under 28 U.S.C. § 1915A, I permitted

Baltas to proceed on his individual capacity claims under 42 U.S.C. § 1983 for (1) First

---

[1] The Court takes judicial notice of publicly-available information on the DOC website showing that Baltas is serving a sentence of 95 years and six months and is currently housed in a Connecticut DOC correctional facility. http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=339650; *see Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (court may "take judicial notice of relevant matters of public record.").

Amendment retaliation based on his transfer to Virginia DOC's Red Onion against Defendants Cook, Quiros and Maiga; (2) deprivation of his First Amendment right to free flow of mail, communication with counsel, and access to the courts due to interference with his legal mail while housed at the Red Onion against all Defendants; (3) Sixth Amendment violations based on his right to speedy trial and effective assistance of counsel while housed at the Red Onion against all Defendants; (4) Fourteenth Amendment equal protection violation based on his being transferred while comparators remained confined within Connecticut DOC against all Defendants; (5) Eighth Amendment violations based on his conditions of confinement at the Red Onion against all Defendants; and (6) Fourteenth Amendment due process violation based on failure to review his administrative segregation status against all Defendants. ECF No. 116; ECF No. 63.[2]

Defendants filed a motion for summary judgment on all claims, which I granted on August 24, 2022. ECF No. 285; ECF No. 229.[3] I determined that Baltas had not complied with the exhaustion requirement of the Prison Litigation Reform Act ("PLRA") for his claims of First, Sixth and Eighth Amendment violation arising from his confinement in Virginia. ECF No. 285 at

---

[2]  The Court also permitted Baltas to proceed on official capacity claims against Maiga and Quiros for ongoing constitutional violations alleged in his amended complaint. *Id.* at 116. After Baltas was transferred back to Connecticut DOC, the Court ruled that his requests for official capacity relief were moot. *See* ECF No. 152, ECF No. 207. *See, e.g.*, *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) ("An inmate's transfer from a prison facility moots his claims for declaratory or injunctive relief against officials of the transferring facility.").

[3] Defendants submitted a memorandum of law (ECF No. 229-1), a Local Rule 56(a)1 statement of facts (ECF No. 229-2) and supporting exhibits (ECF Nos. 229-3 to 229-9 & 272). Baltas filed an opposition (ECF No. 245), a Local Rule 56(a)2 statement (ECF No. 246) and supporting exhibits (ECF No. 246-1 to 246-4). Both Defendants and Baltas filed reply memoranda. Defs.' Reply, ECF No. 256, Pl.'s Reply, ECF No. 263.

26. I granted the Defendants' motion for summary judgment on the merits of Baltas's claims that his transfer to Virginia DOC was retaliatory in violation of the First Amendment and violated his rights to Fourteenth Amendment equal protection; his claims of First Amendment court access deprivation and Sixth Amendment effective assistance to counsel and speedy trial violations arising from conduct by Connecticut DOC staff; and his claim of Fourteenth Amendment due process violation arising from Connecticut DOC Defendants' failure to conduct reviews of his Connecticut administrative segregation status. *Id.* at 38-50. I declined to exercise supplemental jurisdiction over Baltas's state law claims. *Id.* at 50-51.

Baltas filed an appeal.[4] Notice of Appeal, ECF No. 297. The Second Circuit appointed Baltas *pro bono* counsel and instructed counsel to file an Appellant Brief. *Baltas v. Magia*, 22-2895 (Second Circuit).

In his appellate brief, Baltas raised the following issues:

1. Whether the district court erred in granting summary judgment with respect to Mr. Baltas's First Amendment-based claim for retaliatory transfer from Connecticut to Virginia and with respect to his due process-based claim for failure to review his administrative segregation status;

2. Whether the district court erred in finding, at summary judgment, that Mr. Baltas failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), given that Virginia officials prevented him from accessing those remedies and despite Connecticut's unlawful and opaque requirement that out-of-state prisoners must exhaust the remedies of both the sending state (i.e., Connecticut) and the receiving state (i.e. Virginia); and

3. Whether the district court erred as part of its initial review, in dismissing Mr. Baltas's due process claim regarding (i) his lack of access to exculpatory video evidence, (ii) his claim regarding the violation of Connecticut's Interstate Corrections Compact ("ICC"),

---

[4] The Second Circuit affirmed the initial review dismissals of Baltas's Section 1983 claims of Interstate Corrections Compact violation, Fourteenth Amendment due process violation arising from denial of video evidence, and Eighth Amendment deliberate indifference to his transfer to the Red Onion. *Baltas v. Maiga*, No. 22-2895-PR, 2024 WL 4474409, at *1-*3 (2d Cir. Oct. 11, 2024).

and (iii) his Eighth Amendment deliberate indifference claim regarding his transfer. ECF No. 106, *Baltas v. Magia*, 22-2895 (Second Circuit). He did not appeal my rulings granting summary judgment on his claims of Fourteenth Amendment equal protection violation, First Amendment court access deprivation, or Sixth Amendment effective assistance to counsel and speedy trial violations.

The Second Circuit affirmed the grant of summary judgment on Baltas's claims of First Amendment retaliatory transfer and Fourteenth Amendment due process violation based on failure to review his Connecticut administrative segregation status. *Baltas v. Maiga*, 119 F.4th 255 (2d Cir. 2024); *Baltas v. Maiga*, No. 22-2895-PR, 2024 WL 4474409, at *1 (2d Cir. Oct. 11, 2024). It vacated my determination that Baltas had failed to comply with PLRA exhaustion requirement for his First, Sixth, and Eighth Amendment rights arising from his incarceration in Virginia. *Baltas v. Maiga*, 119 F.4th 255, 262-269 & n.2 (2d Cir. 2024); *Baltas v. Maiga*, No. 22-2895-PR, 2024 WL 4474409, at *1 (2d Cir. Oct. 11, 2024). Accordingly, the Second Circuit remanded Baltas's claims of First Amendment violations regarding deprivation of his rights to his free flow of mail, legal communications, and access to the courts resulting from implementation of Virginia DOC regulations and policy; his Sixth Amendment right to counsel claims arising from implementation of Virginia DOC procedures; his Eighth Amendment claims based on unlawful conditions of confinement and deliberate indifference to his safety while incarcerated at the Red Onion; and his state law claims. *Baltas v. Maiga*, 119 F.4th 255, 262, n. 2, 269 & n. 5 (2d Cir. 2024).

There is an overlap between the remanded First Amendment court access and Sixth Amendment right to counsel claims arising from implementation of Virginia DOC procedures and the First and Sixth Amendment claims addressed by my prior ruling, which Baltas did not

4

appeal to the Second Circuit. In an abundance of caution, I address here Baltas's claims of denial of court access and denial of the right to counsel arising from Virginia DOC procedures and policy.

After advising the parties that I intended "to address the merits of Plaintiff's First, Sixth, and Eighth Amendment claims arising from his incarceration at the Red Onion State Prison that the court previously found unexhausted and to consider whether to exercise supplemental jurisdiction over any state law claims" and to rely on the parties' previously submitted memoranda and exhibits, ECF No. 320, I afforded them the opportunity to provide supplemental briefing. Defendants did not submit any response; Baltas submitted a memorandum on March 14, 2025. ECF No. 323.

## II.    FACTS[5]

The following facts, taken from the parties' Local Rule 56 statements and the record, pertain to Baltas's First, Sixth, and Eighth Amendment claims arising from Baltas's incarceration in Virginia.[6] These facts are undisputed unless otherwise indicated.

---

[5]The record includes the sworn allegations of the amended complaint. *See Jordan v. LaFrance*, No. 3:18-cv-01541 (MPS), 2019 WL 5064692, at *1 n.1, *4 (D. Conn. Oct. 9, 2019) (a "verified complaint ... may be considered as an affidavit" for summary judgment purposes); *Walcott v. Connaughton*, No. 3:17-CV-1150, 2018 WL 6624195, at *1, n. 1 (D. Conn. Dec. 18, 2018).

[6] Local Rule 56(a)(1) provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides, in relevant part: "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to 52 testify as to the facts at trial, or (2) other evidence that would be admissible at trial." It states that the "[f]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1[]." *Id.*

Connecticut DOC's Interstate Management Unit ("IMU") is responsible for transferring Connecticut inmates to out-of-state facilities under the Interstate Corrections Compact ("ICC"). Defs.' Rule 56(a) at ¶ 2. Out-of-state transfers can occur on a voluntary basis (when the inmate consents) or on an involuntary basis (when the inmate does not consent). *Id.*

As Director of OCPM and Director of Sentence Calculation and Interstate Management, Maiga supervises DOC employees at the Interstate Management Unit ("IMU"). ECF 229-5 at ¶¶ 2-3. Sandler is a Connecticut DOC Correctional Counselor Supervisor who was previously assigned to the IMU. Defs.' Rule 56(a) at ¶ 1. Osden is the Connecticut Interstate Compact Supervisor and is responsible for overseeing the ICC Unit (although she was out on leave from September 23, 2019 and January 2, 2020, when Baltas was transferred to Virginia DOC). *See id.* at ¶ 113; ECF No. 229-4 at ¶¶ 2-4.

The IMU attempts to arrange for involuntary interstate transfers for an inmate after a warden or another supervisor within DOC submits a request and Director Maiga has authorized the search for a state to accept the inmate. Defs.' Rule 56(a) at ¶¶ 3. The IMU decides which states to pursue for an out-of-state transfer. *Id.* at ¶ 33. In accordance with its ICC contracts, Connecticut must retake an inmate who is housed in another state if the receiving state requests removal of that inmate *Id.* at ¶ 10; *see* ECF No. 229-4 at ¶ 23.

ICC Contract Between Connecticut and Virginia

The contract for implementation of the ICC between Connecticut and Virginia provides:

---

Generally, the Court cites only the relevant paragraph in the Local Rule 56(a)1 Statement where the facts are not disputed. The page numbers cited in this ruling for any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

> It shall be the responsibility of the administration of the institution in the receiving state to confine inmates from a sending state; to give them care and treatment, ... to provide for their physical needs; ... to retain them in safe custody; to supervise them; to maintain proper discipline and control; to make certain that they receive no special privileges and that the sentences and orders of the committing court in the sending state are faithfully executed. But nothing herein contained shall be construed to require the receiving state … to provide treatment, facilities or programs for any inmate confined pursuant to the Interstate Corrections Compact which it does not provide for similar inmates not confined pursuant to said Compact.

Defs.' Rule 56(a) at ¶ 9; *see* ECF No. 229-3 at ¶ 68, p. 99 (ICC Contract at ¶ 13). It specifies that "[i]nmates while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed." Defs.' Rule 56(a) at ¶ 8; *see* ECF No. 229-3 at ¶ 67, p. 100 (ICC Contract at ¶ 17). Under the contract, the sending state must "retake the inmate" within thirty days after a request from the receiving state. *Id.* at p. 102 (ICC Contract at ¶ 25).

After a decision not to return Baltas to his ICC placement within Massachusetts DOC, Director Maiga authorized the IMU to seek an out-of-state facility for Baltas. Defs.' Rule 56(a) at ¶ 31. Maiga avers that he authorized the search for another out-of-state facility as the safety and security concerns that had necessitated Baltas's transfer to Massachusetts remained. Maiga Decl. at ¶ 5, ECF No. 229-5.

Sandler spoke with Virginia DOC staff on September 24, 2019 about transferring Baltas under the ICC. Defs.' Rule 56(a) at ¶¶ 36, 37. Sandler made clear to Virginia DOC staff that Baltas needed to have capacity to participate in videoconferences at his Virginia facility for his Connecticut court matters, and Virginia DOC determined that it had videoconferencing equipment compatible with the Connecticut Superior Court. *Id.* at ¶¶ 38, 40.

Virginia DOC accepted Baltas on November 8, 2019. *Id.* at ¶ 40. On December 20, 2019, Connecticut transferred Baltas to Virginia as part of an inmate exchange with Virginia DOC. *Id.* at ¶¶ 41, 42; ECF No. 229-3  at ¶¶ 34, 36. According to his verified complaint, Baltas was first placed in a suicide watch cell for approximately two weeks and then transferred to general population housing, Unit B6, Cell 601. ECF No. 63 at ¶¶ 40, 47.

After Baltas transferred to Virginia DOC, the IMU received a letter from him dated December 23, 2019, which requested Connecticut DOC to forward his money, property, a copy of the DOC ICC contract, copies of Connecticut DOC grievance forms, and copies of pending grievances. Defs.' Rule 56(a) at ¶ 43. On December 31, 2019, Sandler responded to Baltas's letter and sent him ten Level 1 and 2/3 Grievance forms. *Id.* at ¶¶ 44-45. Baltas asserts that she did not send him any other requested materials. Pl.'s Rule 56(a) at ¶ 44, ECF No. 246.

On January 2, 2020, the IMU received a letter from Baltas's public defender, Robert Famiglietti, which posed questions about Baltas's transfer to Virginia and whether he would be in Hartford, Connecticut, for his court date on January 9, 2020. Defs.' Rule 56(a) at ¶ 46; ECF No. 229-3 at p. 50 (Famiglietti letter). Sandler responded to Attorney Famiglietti's questions; specifically, she explained that Baltas was transferred involuntarily under the Connecticut ICC to the State of Virginia due to safety and security concerns and that Attorney Famiglietti could contact the Red Onion for video conferencing arrangements unless a court issued a writ of habeas corpus to request his physical presence. Defs.' Rule 56(a) at ¶ 47; ECF No. 229-3 at p. 52 (Sandler letter).

On January 13, 2020, the IMU received another letter from Baltas, which requested all of DOC's administrative directives. Defs.' Rule 56(a) at ¶ 48. Sandler avers that on January 15,

8

2020, she contacted a Virginia DOC attorney about providing Baltas with copies of the Connecticut administrative directives, and that the attorney informed her inmates could access the directives online. ECF No. 229-3 at ¶ 43. Baltas asserts that he did not have any access to the internet. ECF No. 246-1 at p. 7 (¶ 34).

<u>Baltas's Safety and Conditions at the Red Onion</u>

On Saturday January 18, 2020, Virginia DOC's Interstate Compact staff sent Sandler an email advising that Baltas had been stabbed, was "going on outside medical with non[-]life threatening injuries[,]" and that Virginia DOC staff would provide more information after the incident reports were received. Defs.' Rule 56(a) at ¶ 50; ECF No. 229-3 at 56 (email), 60-62 (incident report).

On January 21, 2020, Sandler had a telephone call with Virginia DOC staff who advised her that Baltas had received medical care, that the other inmates involved in the assault would be separated from him, and that he could be moved into protective custody at his request or at the discretion of the Virginia DOC. Defs.' Rule 56(a) at ¶ 51; ECF No. 229-3 at ¶ 45.[7] That same day, she sent a follow-up email to Virginia DOC ICC staff regarding the telephone call, stating:

> Just to follow up, it was reported that on Saturday January 18, 2020 at approximately 1:48 pm, two offenders assaulted Offender J. Baltas … Offender Baltas was transported to Norton Community Hospital for assessment and treatment if needed. At this time offender Baltas is back in custody of the Red Onion Correctional Facility, currently in medical isolation. He will be moved back to his housing unit and the offenders involved in the altercation will not be housed with him. If need be, offender Baltas can be placed in Protective Custody at his request or at the discretion of the VA DOC.

---

[7] Baltas objects to Sandler's description of the call as hearsay, but because it is offered to show the effect on Sandler, rather than for the truth of the statements made by the Virginia DOC, it is not hearsay.

*Id.* at ¶ 46, p. 58 (email). In an email response that day, the Virginia DOC ICC staff member wrote: "This is correct. We will keep you posted of any pertinent information or changes. At this time, there are no concerns about housing Mr. Baltas in Virginia." *Id.*[8]

Sandler received a copy of the incident report and forwarded it to Director Maiga. Defs.' Rule 56(a) at ¶ 53. Director Maiga forwarded the incident report up the chain of command to District Administrator Murphy. *Id.* at ¶ 54; ECF No. 229-5 at ¶ 14, p. 13 (email).

After learning from Maiga's email about the assault, then-Deputy Commissioner Quiros informed then-Commissioner Cook, who inquired whether there was a plan to return Baltas to Connecticut. Defs.' Rule 56(a) at ¶¶ 55-56.

Director Maiga informed Deputy Commissioner Quiros that Virginia DOC had no issues about continuing to house Baltas. Defs.' Rule 56(a) at ¶ 58. Deputy Commissioner Quiros avers that he interpreted Virginia DOC's representation to mean that the situation had been addressed, and that Baltas could be safely housed in Virginia. ECF No. 229-6 at ¶ 11. Deputy Commissioner Quiros determined that Baltas would remain housed within the Virginia DOC. Defs.' Rule 56(a) at ¶ 59.

After Baltas completed his stay in the Red Onion Medical Center, Virginia DOC housed him in the Red Onion Restrictive Housing Unit ("RHU"). Defs.' Rule 56(a) at ¶ 62. *See* ECF No. 63 at ¶ 77 (alleging he was placed in RHU B4 on January 22, 2020). The Red Onion Officer's Log Sheet reflects that Baltas's RHU status was reviewed on several dates between December 31, 2019 and May 25, 2021. Defs.' Rule 56(a) at ¶ 63; Sandler Decl. at p. 121 (Officer's Log),

---

[8] Osden and Maiga also received this email from Virginia DOC staff confirming that Baltas received medical care and had been separated from his attackers and that Virginia DOC had no concerns about continuing to house him. *Id.*

ECF No. 229-3. Sandler avers she received confirmation from Virginia DOC staff that Baltas's

RHU conditions provided for his access to daily recreation, three showers per week, commissary,

email, video visits, an in-cell television, and access to medical and mental health professionals.

ECF No. 229-3 at ¶¶ 50-53, 57. Virginia DOC advised that Baltas refused its offers for protective

custody in its Sussex I State Prison, where the protective custody pod conditions included, *inter*

*alia*, daily access to recreation, daily showers, approximately 4-5 hours of out-of-cell time,

telephone calls, commissary and personal television and JPay device. Defs.' Rule 56(a) at ¶ 66;

ECF No. 229-3 at ¶¶ 52-53, pp. 64-76 (email indicating refusal and protective custody

documents).

  In a letter postmarked January 10, 2020, Baltas requested removal from Virginia DOC

custody and complained about threats from facility staff, deprivation of his property and money,

inability to access a telephone to call his attorney, and harsh conditions of confinement,

including denial of soap and showers. ECF No. 229-3 at pp. 78-82 (letter and envelope). The

envelope containing the letter was addressed to "Interstate Compact Administrator Rollin Cook"

at the "Interstate Compact Office, 1153 East Street South, Suffield, CT 06080." Defs.' Rule 56(a)

at ¶ 69; ECF No. 229-3 at p. 82 (envelope). Then-Commissioner Cook worked at DOC's main

office in Wethersfield, Connecticut, not at the address on the envelope for the Interstate Office in

Suffield, Connecticut. *Id.* at ¶ 55.[9]

  The envelope bears a yellow sticker stating, "UNABLE TO FORWARD /FOR

REVIEW" dated "01/17/20." *Id.* Both Cook and then-Deputy Commissioner Quiros aver that

---

[9] Cook's waiver-of-service form filed on the docket in this case confirms that he worked at DOC Central Office, which for many years has been located at Wolcott Hill Road, Wethersfield, Connecticut. *See* ECF No. 25.

they do not recall having received any letters from Baltas in January 2020. ECF No. 229-6 at ¶ 8; ECF No. 229-7 at ¶¶ 7-8.

Sandler declares that, on February 3, 2020, the IMU received Baltas's letter postmarked January 10, 2020. ECF No. 229-3 at ¶¶ 54, 55. She states: "With regards to his complaints about Virginia's prison conditions and safety concerns, I called the Virginia's Interstate Compact Coordinator on the same day I received the letter to inquire about Mr. Baltas and get an update to make sure that Mr. Baltas's issues were being addressed and confirmed that Mr. Baltas was appropriately and safely housed at Red Onion." *Id.* at ¶ 57.[10]

In an email from a Red Onion staff member dated May 10, 2021, Sandler was later advised that an inmate had spit at Baltas while he was at recreation on April 30, 2021, and that Baltas may have been involved with orchestrating this incident as he was seen walking to the front of the area "which made it accessible for him to be spit on." ECF No. 229-3 at ¶ 75, p. 117 (email). The incident report noted that Baltas was offered but refused a medical assessment and shower. *Id.* at p. 118 (Incident Report).

Maiga avers that that Connecticut DOC assumes a receiving state under the ICC manages an inmate in an appropriate manner. ECF No. 229-5 at ¶ 19. Likewise, Sandler and Osden declare that the IMU staff expected that Virginia DOC would request Baltas's removal from its custody to Connecticut if Virginia DOC determined that he could not be safely and appropriately managed under its custody. ECF No. 229-3 at ¶ 73; ECF No. 229-4 at ¶ 24. They both attest to assurances from Virginia DOC staff that Baltas was housed appropriately, and that any safety

---

[10] Sandler explains that she had already taken steps to ensure that Baltas's property was transferred to Virginia and that the funds in his Connecticut inmate trust account were forwarded to his Virginia inmate trust account. ECF No. 229-3 at ¶ 56.

concerns had been addressed. ECF No. 229-3 at ¶¶ 57, 72; ECF No. 229-4 at ¶ 20. Maiga also

declares that he was always assured that Virginia DOC was safely and appropriately housing

Baltas. ECF No. 229-5 at ¶ 18.

Virginia DOC Mail Policy and Legal Communications

The IMU attempted to mail correspondence to Baltas, but it was returned as he had

refused to sign the Virginia DOC mail policy, which permits Virginia DOC to review non-legal

mail, to provide only a copy to the inmate, and to destroy the original letter and envelope. Defs.'

Rule 56(a) at ¶¶ 73-74; *see* ECF No. 229-3 at p. 85 (General and Special Purpose Offender

Notice). The Virginia DOC General and Special Purpose Offender Notice ("Notice") set forth the

Virginia DOC mail policy as follows:

> "Legal Correspondence" shall be opened only in [the inmate's] presence and inspected for
> contraband. This procedure occurs only if the sender is adequately identified on the
> envelope.

> "Special Purpose Correspondence" shall be opened in the mailroom and inspected for
> contraband; legitimate "Special Purpose Correspondence" will not be read for content.

> "General Correspondence" shall be opened and inspected for contraband in the mailroom
> and may be read by authorized staff. The envelope will be photocopied and shredded in
> the facility mailroom with a copy of the envelope provided to you with the original
> contents. At security Level 2 and above facilities, the envelope and all enclosed contents
> will be photocopied with a maximum of three photocopied pages front and back
> delivered to you; the original envelope and all enclosed contents will be shredded in the
> facility mailroom.

*Id.* at 85. The Notice shows Baltas refused to indicate his consent to the Virginia DOC mail

policy. *Id.* On January 6, 2020, Baltas wrote on the side of the Notice:

> I, Joe Baltas, am held under an interstate compact [and] am governed by the laws of
> Admin. Regulations of Conn. I do want my mail, you are not permitted to copy or destroy
> my mail. Such action will result in a federal complaint for felony tampering.

*Id.* Baltas was, however, still able to send mail and receive legal mail. Defs.' Rule 56(a) at ¶¶ 75, 94.

On April 28, 2020, Sandler requested Virginia DOC to hand-deliver Baltas a letter advising that he must consent to the mail policy in order to receive mail from Connecticut DOC. Defs.' Rule 56(a) at ¶ 76. In response, Baltas mailed the IMU a letter complaining about Virginia DOC's mail policy, which, he said, was not allowing him to receive correspondence from Connecticut DOC; he requested Connecticut DOC to ensure he received its communications (the letter also noted he had reported to Connecticut DOC that Virginia DOC staff had orchestrated his assault and continued to make threats). ECF No. 229-3 at p. 89 (Baltas letter).

In April 2021, the IMU received a letter (forwarded from the Office of Governor Lamont) from Baltas's attorney, Frank Cannatelli, regarding Baltas's assertedly "cruel and inhumane" segregated confinement causing him "psychiatric harm" in Virginia DOC. Defs.' Rule 56(a) at ¶ 78; ECF No. 229-3 at p. 93 (letter from Cannatelli). In a response, Osden wrote that DOC could not release any specific case information about Baltas but offered to address "the nature of [his] concern in a general manner with the public information that is available." Defs.' Rule 56(a) at ¶ 79; ECF No. 229-3 at ¶ 64, p. 95 (Osden letter). Her letter went on to explain that under the ICC contract between Virginia and Connecticut, the receiving institution is responsible for, *inter alia*, providing the inmate with "care and treatment," and retaining the inmate in "safe custody[.]" *Id.* Osden elaborated that "the expectation is that Virginia will house Baltas as they deem fit" but the DOC IMU "regularly communicate[s] about our interstate inmate population with our counterparts in our contracted states" and the DOC IMU staff would address any "alarming" information in a Virginia DOC's report or communication. *Id.*

Baltas was able to have many telephone calls with attorneys while at the Red Onion, as shown in the Officer Log document received by the IMU. Defs.' Rule 56(a) at ¶ 96. Virginia DOC permits an inmate to submit a request to block attorney numbers from recording and monitoring. *See* ECF No. 229-3 at ¶ 77. Sandler avers that she received a copy of one of Baltas's requests to block an attorney number from being recorded or monitored. *Id.* at pp. 107-108 (attorney number block request form), ECF No. 229-3. The attorney block request form advises inmates that "it may take up to 30 days for [the block request form] to be processed[;]" that the inmate will not receive a confirmation that the recording block is in place; and that "[w]hen … the recording block is in place, [the inmate does] not hear the message that the call is being recorded and monitored." *Id.* Baltas avers, however, that he noticed periodic beeps during his attorney calls, indicating that the calls were recorded or monitored. *See* ECF No. 246-2 at ¶¶ 21-22.

Connecticut Court Dates

The IMU received a habeas order dated February 24, 2020 from the Connecticut Superior Court for Baltas to appear on March 25, 2020 in Connecticut for his criminal case. Defs.' Rule 56(a) at ¶ 82; ECF No. 229-4 at pp. 10 (Habeas), ECF No. 229-4. Sandler made arrangements for Baltas's return to Connecticut for this court date. Defs.' Rule 56(a) at ¶ 83; *see* ECF No. 229-4 at p. 9 (email). The IMU subsequently learned that this court date was continued to May 13, 2020, after the Governor's declaration of a public health emergency due to COVID-19, and it was later postponed a second time to July 22, 2020. Defs.' Rule 56(a) at ¶¶ 84-85; *see* ECF No. 229-4 at 12-14 (emails between DOC and Superior Court staff regarding postponement). Osden avers that

in September 2020, the IMU learned that Baltas no longer had pending criminal charges in Connecticut.[11] *Id.* at ¶ 11.

Baltas maintains that Osden failed to have him brought to Connecticut from Virginia for any proceeding. ECF No. 246-2 at ¶ 49. But Baltas admitted that Virginia DOC generally accommodated his court appearances in Connecticut. Defs.' Rule 56(a) at ¶ 97. Baltas asserts that he could not appear in-person for his criminal case, H14-CR-19-0733623-S, on: January 13, 2020 (Baltas was represented by counsel and the matter was continued to February 10, 2020); February 10, 2020 (Baltas was represented by counsel); and February 24, 2020 (Baltas was represented by counsel and the court continued the matter to March 25, 2020 with an order for Baltas to be transported to court on that date to address his speedy trial motion). ECF No. 246-2 at pp. 137-149 (Transcripts). He also admits that his Connecticut criminal case for which DOC had a habeas order for his appearance was dismissed because the speedy trial date had expired. Defs.' Rule 56(a) at ¶ 87;[12] ECF No. 272 (Pl. Dep.) at 12:10-12:20. He represents that days after that dismissal, he was served with a warrant, and that he signed the warrant and requested a speedy trial on July 28, 2020. *See* Pl.'s Rule 56(a) at ¶ 86; ECF No. 246-2 at ¶¶ 47-48, pp. 150-151 (Warrant/Detainer); ECF No. 272 (Pl. Dep.) at 12:16-12:25.

---

[11] The Court takes judicial notice of the Connecticut judicial website showing that Baltas has several criminal cases now pending for offenses that occurred after he was transferred from Virginia DOC custody. See https://www.jud2.ct.gov/crdockets/parm1.aspx. The judicial website also shows one recent criminal conviction for an offense of criminal contempt of court on September 23, 2022 in case T19R-CR22-0186616-S. https://www.jud2.ct.gov/crdockets/SearchByDefDisp.aspx.

[12] There is no longer a record of this case on the Connecticut judicial website.

### III.    APPLICABLE LEGAL STANDARDS

#### 1.  Summary Judgment

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Affidavits or declarations used to support or oppose a motion for summary judgment must be made on

personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4).

## 2.  Individual Capacity Claims under 42 U.S.C. § 1983

Under Section 1983, a defendant must be personally involved in the constitutional violation to be liable. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). To survive summary judgment, "[a] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004).

In *Tangreti v. Bachman*, the Second Circuit clarified that "there is no special rule for supervisory liability." 983 F.3d 609, 618 (2d Cir. 2020). Instead, a plaintiff proceeding with claims for liability under 42 U.S.C. § 1983 "must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Id.* (quoting *Ashcroft*, 556 U.S. at 676). For a plaintiff to sustain a constitutional claim against government officials, the defendant officials "—and not merely their subordinates—must have engaged in unconstitutional conduct." *Reynolds v. Arnone*, No. 3:13-CV-1465 (SRU), 2025 WL 974843, at *11 (D. Conn. Mar. 31, 2025). The plaintiff must establish the violation against the supervisory official directly. *Tangreti*, 983 F.3d at 618. A prison official's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in a constitutional violation. *See Young v.*

18

*Choinski*, 15 F. Supp. 3d 172, 190 (D. Conn. 2014) (failure of prison official to respond to inmate's request insufficient to show personal involvement in Eighth Amendment claim).

### 3.  Qualified Immunity

The qualified immunity doctrine shelters a defendant whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brandon v. Kinter*, 938 F.3d 21, 39 (2d Cir. 2019) (internal quotation marks omitted). A right is clearly established when "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotation marks and alterations omitted). Even when a right is clearly established, defendants "may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (internal quotation marks omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

## IV.  DISCUSSION

I now consider Baltas's claims that he sustained (1) deprivations of his First Amendment rights to free flow of mail, legal communications, and access to the courts; (2) deprivations of his Sixth Amendment right to counsel; and (3) Eighth Amendment violations based on unlawful conditions of confinement and deliberate indifference to his safety while housed at the Red Onion. S*ee* IRO Am. Compl. at 12-13, 16-26, ECF No. 116**.**

19

Defendants argue that there is no evidence to support these claims; and in the alternative, they are shielded from liability by qualified immunity. Defs.' Mem., ECF No. 229-1.[13]

### A.    Remanded Claims Under 42 U.S.C. § 1983

### 1.    Connecticut vs. Virginia Regulations and Policies

At the outset, I address a recurring theme in Baltas's papers. He asserts that he was entitled to be managed under Connecticut—rather than Virgina—DOC regulations and policies while housed in Virginia at the Red Onion. *See* ECF No. 63 at ¶¶ 49, 69, 108. But inmates do not have a liberty interest in prison directives or policies. *Sandin v. Conner*, 515 U.S. 472, 483 (1995) (noting prison directives, which are designed primarily to guide correctional staff, do not confer rights on inmates); *Riddick v. Chevalier*, No. 3:11-cv-1555 (SRU), 2013 WL 4823153, at *4 (D. Conn. Sept. 9, 2013) ("State prison directives do not confer any constitutionally protected rights on inmates .... Fourteenth Amendment due process protections are not implicated by the defendants' alleged failure to comply with administrative directives."). Under the ICC contract, Baltas was subject to the authority of the law and regulations of Virginia during his incarceration. *See Baltas v. Clarke*, No. 7:20CV00276, 2021 WL 1080516, at *14 (W.D. Va. Mar. 18, 2021) (noting "that many of Baltas's issues with his confinement in Virginia arise from his mistaken understanding that he is not subject to the policies and regulations of the VDOC," but "while in the custody of the VDOC, Baltas is subject to all the provisions of law and regulations applicable to other inmates in Virginia.") (internal quotation marks omitted); *see also Garcia v. Lemaster*, 439 F.3d 1215, 1220 (10th Cir. 2006) (New Mexico as  sending state "retains jurisdiction over" inmate transferred under the ICC with respect to transfer decisions and

---

[13] Defendants asserted qualified immunity as an affirmative defense in their answer to the amended complaint. ECF No. 166.

"matters concerning his New Mexico conviction and sentence" but "[the] ICC does not command California to administer the classification and recreation rules of the various states from which its prisoners have been transferred."); *Jaben v. Moore*, 788 F. Supp. 500, 504 (D. Kan. 1992) ("common-sense reading of [ICC] provision must allow authorities having daily, physical custody of the transferred inmate to evaluate this aspect of his program."); *Glick v. Holden*, 889 P.2d 1389, 1392 (Utah Ct. App. 1995) (Arkansas's disciplinary, classification, visitation, and grooming policies did not govern management of inmate who was transferred to Utah state prison under the ICC).

### 2. Alleged First Amendment Violations of Right to Free Flow of Mail and Legal Communications[14]

Baltas claims deprivation of his First Amendment right to the free flow of his nonlegal (publications and social) mail and interference his legal communications during his Virginia DOC confinement at the Red Onion. ECF No. 188-189. He maintains that Defendants were repeatedly made aware of the unjustified mail violations but failed to take steps to remedy them by removing Plaintiff from the custody of the Virginia DOC. ECF No. 323 at 7.

---

[14] In his case filed in the Western District of Virginia, Baltas asserted that Red Onion Officer Stanley violated his rights under the First and Sixth Amendments when he interfered with Baltas's receipt of mail. *Baltas v. Clarke*, 2021 WL 1080516, at *21. He alleged that Officer Stanley denied him "'publications, magazines, newspapers, etc.,'" and "'open[ed] his legal mail outside his presence.'" *Id.* (quoting Plaintiff's allegations). The district court held that Baltas had not alleged sufficient facts to state a constitutional claim arising from the Virginia mail policy. *Id.* It noted the mail policy "comports with the First Amendment" as determined by district courts in the Eastern and Western Districts of Virginia, and that "Baltas cannot manufacture constitutional claims simply by withholding his consent to a valid policy and then complaining that he is not receiving his mail." *Id.* As for his complaint about Officer Stanley opening his legal mail, the district court ruled that Baltas did not state a constitutional claim arising from the alleged opening of one envelope outside of his presence. *Id.* at *22. And to the extent Baltas claimed that his legal mail had been improperly returned to sender, the district court observed that neither of the two attached envelopes provided notice that "it was legal mail and should have been delivered to Baltas despite his refusal to consent to the mail policy." *Id.*

A prisoner has a First Amendment right to "free flow of incoming and outgoing mail." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). Generally, courts afford "greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* Interference with "legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *See id.* at 351.

Further, "inmates have a First Amendment right to access to publications consistent with prison security[.]" *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995); *see also Prison Legal News v. Cheshire*, No. 1:04CV173DAK, 2005 WL 8174874, at *2 (D. Utah Feb. 3, 2005) ("[i]nmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison."). Under the First Amendment, restrictions on prisoners' mail are justified only if they "further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Davis*, 320 F.3d at 351.

### a.    Non-Legal Mail

As a result of being housed in Virginia, Baltas claims, he was denied the ability to receive mail. Am. Compl. at ¶ 108. Baltas asserts that he never received any social mail while at the Red Onion; that although the Virginia officials permitted his receipt of publications, the mail room returned most of his subscriptions; and he never received a response to his letters sent to Sandler, Osden, Maiga, and IMU staff about his mail issues. ECF No. 246-2 at ¶¶ 24-29. He complains

Defendants failed to remedy the First Amendment violation after he provided them notice of his non-legal mail deprivations. ECF No. 245-1 at 21; ECF No. 323 at 7.

Under Virginia DOC policy, at some institutions including the Red Onion, DOC officials make a copy of all inmate general correspondence, provide the copy to the inmate, and shred the original, including the envelope. *See, e.g.*, *Couch v. Clarke*, No. 7:18-cv-00049, 2019 WL 1433777 (W.D. Va. Mar. 29, 2019). It is undisputed that Baltas refused to sign a consent to this policy on the form provided to him, which advised him that his non-legal mail would be returned to the sender if he did not consent to the policy. ECF No. 246-2 at ¶ 23; ECF No. 229-3 at 85. The Fourth Circuit has upheld the Virginia DOC's policy as reasonably related to legitimate penological interests in compliance with First Amendment standards. *See Couch v. Clarke*, 782 F. App'x 290, 291-292 (4th Cir. 2019), *affirming*, 2019 WL 1433777, at *6 (W.D. Va. Mar. 29, 2019). In any event, the record fails to support an inference that any Defendant was involved with creating or implementing that policy. Nor does the record suggest that any Defendant was directly involved with the rejection of his mail or decision to return any mail to its sender. No reasonable jury could determine based upon review of the record that any Defendant should be liable for a First Amendment violation based on interference with Baltas's non-legal mail.

Even if Baltas had shown a First Amendment violation due to Defendants' failure to take remedial action concerning the Virginia mail policy, Defendants would be entitled to qualified immunity. Defendants could have reasonably believed (1) that the regulations of the Virginia DOC—not Connecticut DOC—applied to Baltas, ECF No. 229-3 at pp. 99-100 (ICC Contract ¶¶ 13, 17); (2) that the rejection of Baltas's non-legal correspondence was valid after he refused to sign his consent on the mail policy form, *id.* at p. 85 (General and Special Purpose Offender

Notice); and (3) that the Virginia policy was not constitutionally deficient and complied with First Amendment standards. *See Couch*, 2019 WL 1433777, at *6. Thus, it was objectively reasonable for Defendants to believe that their conduct was not in violation of the First Amendment. The Court grants the motion for summary judgment in Defendants' favor on this claim.

### b.    Interference with Legal Communications

An inmate must show that the prison officials "regularly and unjustifiably" interfered with the incoming legal mail, and therefore, an isolated incident of mail tampering is generally insufficient to establish a constitutional violation. *Davis*, 320 F.3d at 351.

Baltas avers that the Red Onion staff refused to provide him with his legal mail, regularly interfered with the delivery of his legal mail, opened his legal mail outside of his presence, and returned his legal mail to sender. ECF No. 246-2 at ¶¶ 30-35; [15] *see id. at* pp. 37-58. He submits the affidavit of Attorney Cannatelli, who avers that his two items of legal correspondence sent to Baltas were returned from the Red Onion with the handwritten note, "Inmate doesn't want to receive mail." *Id.* at pp. 37-39 (affidavit and envelopes).[16] In any event, Baltas testified "there have been several instances where my mail was returned improperly. But for the most part, yes, I

---

[15] Baltas submits copies of nine envelopes from either an attorney or a court—all received in 2020— which he asserts were opened outside of his presence. *See* ECF No. 246-2 at 45-53. Five envelopes include the following notations: "opened by mistake", "arrived at ROSP taped at the top", "opened to verify sender", "opened to verify identify not marked legal," and "arrived open", while the remaining four contain no notation. *See id.* This evidence does not support an inference of regular and unjustified mail tampering.

[16] Review of the envelopes for the legal mail returned—attached to Mr. Cannatelli's affidavit—reveals no indication that the mail was legal in nature. *Id.* at 38-39. The envelopes contained a return address sticker for "Frank P. Cannatelli" without any identification of Mr. Cannatelli's status as an attorney. *Id.* As noted by the Western District of Virginia, "[w]hoever received and returned this mail would have had no way of knowing that it was legal mail and should have been delivered to Baltas despite his refusal to consent to the mail policy." *Baltas v. Clarke*, 2021 WL 1080516, *22.

received my legal mail." ECF No. 272 (Pl. Dep.) 7:8-7:10. Baltas claims that Defendants were aware of the interference with his legal mail while he was housed at the Red Onion, but they failed to act to remedy the First Amendment violation. ECF No. 245-1 at 21.

No evidence suggests that the Defendants had any direct involvement with any such interference.[17] Even if the Defendants were notified by Baltas that this legal mail was occasionally being opened, there is no evidence that they could have (or should have) stopped the Virginia DOC mailroom staff from opening mail for the reasons indicated in the notations on the envelopes—"not marked legal," "to verify sender," "arrived at ROSP taped at top!" and "arrived open." ECF No. 246-2 at 50-54. In any event, most of these mailings were plainly not letters from lawyers who were actually representing Baltas.

Accordingly, no reasonable jury could conclude that Defendants are personally liable for a First Amendment violation arising from interference with Baltas's legal communications.

In any event, Defendants are entitled to qualified immunity because the evidence supports their reasonable belief that Baltas had not sustained any unconstitutional interference with his legal mail or communications. I grant the motion for summary judgment on this claim.

---

[17] With respect to his legal telephone conversations, the record reflects Baltas was able to have many telephone calls with attorneys while at the Red Onion, as shown in the Officer Log document received by the IMU. Defs.' Rule 56(a) at ¶ 96. Baltas complains that these calls were all recorded but provides no evidence for this assertion other than his statement that he knew the calls were monitored due to periodic beeps heard during the calls. *See* ECF No. 246-2 at ¶¶ 21-22. Even if he is correct, Baltas has submitted no evidence that Defendants had any personal involvement in any such monitoring. In addition, the record shows that Sandler contacted the Virginia DOC Interstate Correction Compact coordinator after she received his letter on February 3, 2020, which included a complaint about his lack of access to telephone calls to his attorney. ECF No. 229-3 at ¶ 57, pp. 78-81. She attests to having inquired about Baltas "to make sure [his] issues were being addressed and confirmed that [he] was appropriately and safely housed at Red Onion." *Id.*

3.    **Access to the Courts**

Baltas complains that his access to court proceedings for his legal matters were delayed and frustrated due to his incarceration at the Red Onion, ECF No. 245-1 at 22, and that Red Onion staff interference with his legal mail and his inability to have private communications with his attorney burdened his access to the courts. *Id.*; *see* ECF No. 245-2 at ¶¶ 20-22, 30-36. He asserts that he was hindered in pursuing discovery for his case, *Baltas v. Frenis*, 3:18cv1168,[18] and that he was unable to secure a trial date for his habeas case. ECF No. 245-1 at 23. He alleges he had to attend court proceedings only through video conferencing while shackled and handcuffed to a security chair, which made it impossible to write, sort papers, or represent himself. ECF No. 63 at ¶ 121.

It is well settled that inmates have a First Amendment "right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996). The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional

---

[18] In asserting that his transfer to the Red Onion caused a delay in his Connecticut civil rights case—*Baltas v. Frenis* 3:18cv1168—Baltas refers to docket entries, ECF No. 93 through ECF No. 102 in that case. But review of the records cited by Baltas reveals that he was represented by counsel at the time relevant to those docket entries. His counsel even filed a notice advising: "Counsel for the parties … conferred and … resolved the discovery difficulties that gave rise to their October 8, 2020 teleconference with Judge Bryant and her subsequent order for an October 22, 2020 in-person status conference discovery." ECF No. 99, *Frenis*, 3:18cv1168. Counsel explained further: "This resolution means that it is no longer necessary to have the Plaintiff appear in person and, consequently, the parties ask that the status conference be marked off." *Id.* Plaintiff also refers to Judge Bryant's order dismissing his case without prejudice due to the parties' failure to file a joint trial memorandum. ECF No. 163. Again, Baltas was then represented by counsel, who shortly thereafter filed a motion to reopen and a trial memorandum. ECF Nos. 166 & 168. The case was set down for jury selection [ECF No. 176] and, to date, this case is open and proceeding. *See* ECF No. 424. This evidence fails to support an inference that Baltas's incarceration in Virginia caused him to suffer an actual injury, which is a requirement for any access-to-court claim.

rights to the courts." *Bounds*, 430 U.S. at 825. To state a claim for denial of access to the courts, an inmate is required to demonstrate that he suffered an actual injury as a result of the conduct of the defendants. *Lewis*, 518 U.S. at 351-53. The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). To establish an actual injury, an inmate must allege facts showing that the defendant took or was responsible for actions that hindered his efforts to pursue a "nonfrivolous" legal claim. *Id.* at 414–15 ("Whether access claim turns on a litigating opportunity yet to be gained or an opportunity already lost. . . plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim" that he sought to pursue or seeks to pursue in court) (quoting *Lewis*, 518 U.S. at 353 & n.3)). The plaintiff must allege facts to describe the underlying claim "well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 416. Courts have held that officials in the state sending an inmate to another state under the ICC retain responsibility to provide assistance necessary for prisoner to access the courts. *Perfetto v. Duffy*, 2024 WL 712813, at *3 (D.N.H. Jan. 22, 2024), *report and recommendation adopted*, 2024 WL 710279 (D.N.H. Feb. 20, 2024) (citing cases including *Trujillo v. Williams*, 465 F.3d 1210, 1226 (10th Cir. 2006)).

My prior summary judgment ruling addressed Baltas's access-to-court claim arising from Connecticut DOC staff conduct, including failure to transport him back to Connecticut for court proceedings. *See Baltas*, 2022 WL 3646199, at *19. As noted in that ruling, the record shows Baltas could send and receive legal mail, engage in legal calls with his attorneys in Connecticut, file documents with the courts, and that he received accommodations from Virginia DOC for his court appearances in Connecticut. *See Baltas*, 2022 WL 3646199, at *19. Defs.' Rule 56(a) at ¶¶

---

*Lewis v. Casey*, 518 U.S. 343, 351-53 (1996).        27

75, 95-97. It is undisputed that Baltas was able to file numerous documents in this case, and file and litigate four other lawsuits while he was in Virginia custody.

My prior ruling also noted that although Baltas complained that he was unable to secure a trial for his habeas case due to his counsel's inability to provide effective assistance of counsel, he failed to show that any non-frivolous claims were dismissed, or that his incarceration in Virginia delayed scheduling for an in-person rather than a remote habeas trial in light of circumstances caused by the COVID-19 pandemic. *Baltas*, 2022 WL 3646199, at *19. I found that "no reasonable juror could conclude that Baltas sustained an actual injury based on a denial of his constitutional right to court access while incarcerated in Virginia." *Id.*[19]

In his most recent memorandum, Baltas maintains that Defendants willfully and intentionally denied him his right under Connecticut law to be present for his legal proceedings. ECF No. 323 at 8. But the record fails to support an inference that Defendants' conduct caused him an actual injury as required for his federal claim of constitutional deprivation of court access.

Even if Baltas did sustain a court access deprivation as a result of regulations and conditions at the Red Onion, Defendants would be entitled to qualified immunity. Before Baltas's transfer to Virginia, the Virginia DOC advised Sandler that it had videoconferencing equipment compatible with the Connecticut Superior Court. Defs.' Rule 56 at ¶¶ 38, 40. Baltas admits that Virginia DOC generally accommodated his court appearances. *Id.* at ¶ 97. In addition, Osden was able to arrange for Baltas's transport to Connecticut for his appearance in his criminal case, although the COVID-19 public health emergency delayed the scheduling of

---

[19] As noted, Baltas did not challenge this ruling on appeal. *See* Pl.-Appellant Brief, ECF No. 106, *Baltas v. Magia*, 22-2895 (Second Circuit).

that case. Defs.' Rule 56(a) at ¶¶ 83-85; s*ee* Pl.'s Rule 56(a) at ¶ 84. No evidence suggests Defendants were aware that Baltas's litigation efforts were hindered by his Virginia DOC confinement to the point that he sustained deprivation of court access. The record shows it was reasonable for Defendants to believe that Baltas's incarceration in Virginia did not deprive him of his constitutional right to court access.

Accordingly, I grant the motion for summary judgment in Defendants' favor on this claim.

### 4.    Sixth Amendment Access to Counsel/Effective Assistance of Counsel

Baltas claims that "he was not provided any means of private, confidential communications with his attorneys, which severely prejudiced his ability to receive effective assistance of counsel" while housed at the Red Onion. ECF No. 245-1 at 23 (cleaned up).[20]

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. Under the Sixth Amendment, a criminal defendant is constitutionally entitled to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). The Sixth Amendment right to effective assistance of counsel "only applies to a defendant's trial and first

---

[20] In his amended complaint, Baltas alleged that his attorney filed a motion for speedy trial on February 19, 2020, in criminal matter, H14H-CR 19-733623-S. ECF No. at ¶ 84; ECF No. 1 at ex. 8. As to this claim, I granted summary judgment in the Defendants' favor because the record showed "Baltas's court date for this criminal case was first continued to May 13, 2020 due to the COVID-19 public health emergency, then postponed to July 22, 2020, and later dismissed." *Baltas*, 2022 WL 3646199, at *21. I concluded the evidence failed to support a Sixth Amendment speedy trial violation because "any delay was attributable to reasons beyond Defendants' control and there was no inference that Baltas sustained any prejudice." *Id.* To the extent Baltas asserts a Sixth Amendment speedy trial violation due to his confinement or regulations at the Red Onion, I grant the motion for summary judgment on any such claims on the same grounds articulated in my prior ruling.

appeal as of right, not to appeals afforded on a discretionary basis, collateral proceedings, or civil proceedings such as civil rights claims challenging prison conditions." *Bourdon v. Loughren,* 386 F.3d 88, 96 (2d Cir. 2004) (citing *Pennsylvania v. Finley,* 481 U.S. 551, 555-57 (1987)); *see also Wolff v. McDonnell*, 418 U.S. 539, 576 (1974) (noting that the "reach [of the Sixth Amendment] is only to protect the attorney-client relationship from intrusion in the criminal setting" and refusing to recognize claim that "would insulate all mail from inspection, whether related to civil or criminal matters").

In his declaration, Baltas complained that his habeas attorney moved for a continuance of his habeas trial on the basis of her inability to provide effective assistance of counsel with only remote video access, Pl. Decl. at ¶ 50, pp. 155-156, ECF No. 246-2, but the Sixth Amendment does not apply to habeas cases. *Baltas,* 2022 WL 3646199, at *20 (citing cases). In addition, the Virginia DOC Officer Log Book shows that Baltas was able to have numerous legal telephone calls, and Baltas agreed that Virginia DOC had "always accommodated" his court appearances for his legal proceedings in Connecticut. *See* ECF No. 229-3 at 121-132 (Officer Log); ECF No. 272 (Pl. Dep.) at 10:19-10:23.

In the prior ruling on summary judgment, I determined that "the record fails to show that Defendants had any involvement in preventing Baltas from receiving effective assistance of counsel while he was incarcerated in Virginia. And it does not show that he was denied his Sixth Amendment right to the effective assistance of counsel at any time." *Baltas*, 2022 WL 3646199, at *20. I reiterate and adopt that ruling here.

5.       **Eighth Amendment**

Baltas is proceeding on Eighth Amendment claims of deliberate indifference to his

safety, conditions of confinement, and physical and mental suffering against Cook, Maiga,

Quiros, Osden and Sandler in their individual capacities. Order, ECF No. 116.

The Eighth Amendment, which forbids cruel and unusual punishment, has been

interpreted to prohibit conditions in state prisons that subject incarcerated individuals to the

"wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To

constitute an Eighth Amendment violation, however, a condition must be "sufficiently serious"

such that it results in a deprivation of "the minimal civilized measure of life's necessities."

*Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted). Even where a condition

meets that high bar, a plaintiff seeking to hold prison officials liable under the Eighth

Amendment must additionally allege that in subjecting inmates to the particular condition, "the

defendant official acted with a sufficiently culpable state of mind .... such as deliberate

indifference to inmate health or safety." *Id.* (citation omitted). Those two requirements—a

sufficiently serious condition and culpable state of mind—are often referred to as the "objective"

and "subjective" elements required for stating a plausible Eighth Amendment claim. *See, e.g.,*

*Brock v. Wright*, 315 F.3d 158, 162-64 (2d Cir. 2003).

To satisfy the subjective element, a defendant's actions must be more than merely

negligent. The prison official must have acted with "a mental state equivalent to subjective

recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d

Cir. 2006). A plaintiff must establish that a defendant had "knowledge" of but "disregard[ed]" a

"substantial risk of serious harm . . . by failing to take reasonable measures to abate the harm."

31

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). A plaintiff "must do so 'in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns[.]'" *Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003). This is because "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security[.]'" *Johnson v. Chappius, Jr.,* No. 24-1225, 2025 WL 999674, at *2 (2d Cir. Apr. 3, 2025) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

a.     **Deliberate Indifference to Safety**

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates" in their custody. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (internal quotation omitted); *see also Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("The Eighth Amendment ... imposes on prison officials a duty ... to protect prisoners from violence at the hands of other prisoners." (internal quotation marks and citation omitted)). A plaintiff may satisfy the subjective prong by showing that a defendant was aware of past aggression toward him or specific threats made against him. *See White v. Gutwein*, 2022 WL 2987554, at *5 (S.D.N.Y. July 28, 2022) (citing cases). In addition, to establish liability for an Eighth Amendment claim based on a defendant's failure to protect him, the plaintiff must also show that (1) a defendant "had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." *Ryan v. Bell*, 2024 WL 36591, at *3 (N.D.N.Y. Jan. 3, 2024) (citation and alteration omitted); *see Anderson v.*

32

*Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.") (citation omitted).

The record supports an inference that Baltas was subjected to a serious risk of being harmed by Virginia DOC staff at the Red Onion. *See Baltas,* 119 F.4th at 268 (concluding—after review of Baltas's averments and that of another inmate—that Baltas had produced "'hard evidence' consisting of testimony from personal knowledge … showing his version of events is not wholly fanciful.'").[21] Baltas declares that on December 27, 2019, he was confronted by a Virginia DOC official who threatened to arrange for physical violence to be taken against him after he filed a grievance at the Red Onion that day. ECF No. 1-2 at ¶ 6; ECF No. 63 at ¶¶ 43-44 (asserting Sergeant Mead threatened "we will get you out [of] the way" if he continued "writing everything up and filing lawsuits" and that Mead stated "they" had arranged for the death of another "troublesome" inmate). Baltas submits the affidavit of a Red Onion inmate who swears that on January 11, 2020, he and another inmate were solicited by Red Onion correctional staff to attack Baltas, promised him special privileges in return for the attack, and provided with a weapon (shank). ECF No. 100 (under seal). The inmate avers that on January 18, 2020, his cellmate provided the shank to other inmates who "subsequently attacked and stabbed Baltas." *Id.*

---

[21] There is no evidence Baltas suffered any serious harm from an assault by other inmates or Red Onion staff after he filed a complaint against several Red Onion staff members on April 15, 2020 in the Western District of Virginia (ECF No. 1, *Baltas v. Clarke*, 7:20-cv-276 (TTC-RSB)). More than a year after he filed his complaint in the Western District of Virginia, another inmate spit at Baltas on April 30, 2021, but the record does not support an inference that he sustained any serious injury or required medical attention. *See* ECF No. 229-3 at ¶ 75, pp. 117-118 (email & incident report).

The next question is whether the Defendants were deliberately indifferent to Baltas's risk of being assaulted at the Red Onion. ECF No. 229-1 at 31. It is helpful to divide the evidence on this point into the periods before and after the January 18, 2020 assault on Baltas.

    **i.**    **Prior to January 18, 2020**

Neither Baltas nor his lawyer raised any safety concerns in letters undisputably received by IMU staff before the attack on January 18, 2020.[22] *See* ECF No. 229-1 at 30. Baltas did, however, send a letter addressed to the Connecticut Interstate Compact Office to request his removal from Virginia DOC due to threats by Virginia DOC officials that they would arrange to have him killed if he filed any complaints or lawsuits. ECF No. 229-3 at pp. 78-81 (letter). The question is whether the Defendants received this letter before the January 18, 2020 attack. Sandler avers that the IMU did not receive it until February 3, 2020--<u>after</u> she had already learned of the assault on Baltas—and that she acted to confirm with Red Onion staff that he was being appropriately and safely housed. ECF No. 229-3 at ¶¶ 54, 57. Defendants argue that no evidence shows they received this letter prior January 18, 2020. Defs.' Mem. at 31, ECF No. 229-1.

Because the Defendants have produced evidence that they did not receive the letter until after January 18, 2020, it is up to Baltas to "come forward with specific evidence demonstrating

---

[22] This correspondence includes a (1) letter addressed to Connecticut DOC's Interstate Compact Office dated December 23, 2019, requesting ten copies of the grievance level 1 and 2/3 forms and forwarding of his property, money, grievance or property investigation responses, and mail (ECF No. 229-3 at p. 48, ECF No. 229-3); (2) a letter to Maiga dated December 20, 2019 from Baltas's public defender for a criminal matter seeking information about his transfer (*id.* at p. 50); and (3) a letter to the Interstate Compact Office from Baltas, date stamped as received by the IMU on January 13, 2020, requesting a complete copy the Connecticut DOC administrative directives (*id.* at p. 54).

the existence of a genuine dispute of material fact," *Robinson*, 781 F.3d at 34, i.e., he must submit some evidence that the Defendants did receive the letter before the attack.

An inspection of the letter and accompanying envelope yields no such evidence and, if anything, supports the Defendants' position. The letter includes the handwritten notation "1.6. 19" in the upper right-hand corner of the first page. *Id.* at p. 78. Baltas avers that he wrote the letter on January 6, 2020. ECF No. 246-2 at p. 4 (¶ 16). The envelope is postmarked January 10, 2020, and addressed to "Interstate Compact Administrator Rollin Cook, Interstate Compact Office, 1153 East St. South, Suffield, CT 06080." *Id.* at p. 82 (envelope). Mr. Cook, who was then the DOC Commissioner, maintained his office at Connecticut DOC Central Office, which is located in Wethersfield, Connecticut. *See* www.portal.ctgov/doc/directions/central-office-directions.[23] Probably as a result of this error in addressing the envelope, the envelope also bears a yellow sticker apparently applied by the U.S. Postal Service stating, "unable to forward/for review" and dated January 17, 2020, *id.*, the day before the assault. The envelope also bears a stamp stating, "RECEIVED Jan 10 2020 MAILROOM," but it does not indicate which mailroom—the one in Virginia or the one in Connecticut—applied this stamp. But given that the envelope is postmarked—with a metered Pitney Bowes sticker—January 10, 2020, the evidence makes the former much more likely, as does the fact that the ink on the Pitney Bowes label is the same color—pink—as the ink used for the following notice placed on the envelope next to the Pitney Bowes posting sticker: "VA DOC HAS NEITHER CENSORED OR INSPECTED THIS

---

[23] The Court may take judicial notice of information on publicly available on government websites. *See Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (explaining that court may take judicial notice of documents from official government websites); *Wandel v. Gao*, 590 F. Supp. 3d 630, 636 n.4 (S.D.N.Y. 2022) (noting court "may take judicial notice of information available on government websites").

ITEM. THE DEPARTMENT DOES NOT ASSUME ANY RESPONSIBILITY FOR ITS CONTENTS." The letter itself is stamped as "RECEIVED" by OCPM on February 3, 2020. *Id.* at p. 78 (letter).[24]

The notations and stamps on the envelope suggest that the letter was stamped "received" in the Virginia mailroom, which applied the metered postmark, and then was placed in the U.S. mail, but that the post office initially had trouble delivering it and applied the "unable to forward" sticker on January 17 because the address of the only addressee – Cook – was erroneous. All of this supports Sandler's averment that she did not see the letter until the date it was stamped as received by OPCM – February 3. In any event, Baltas offers no evidence suggesting that she did. He avers that "[b]ased upon my knowledge & information U.S. mail travels from [Red Onion State Prison] to Conn. within 5-7 calendar days, without fail or deviation." ECF No. 246-2 at p. 4 (¶ 17). But he cites no evidence to support this conclusory assertion or even to show he has the requisite personal knowledge to make it. *See, e.g., Smith v. American Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988)(affirming summary judgment where plaintiff's conclusory assertions in affidavit opposing motion were "supported by evidence of any weight"). In his Local Rule 56(a)(2) statement, ECF No. 246 at p. 15 (¶ 55), he points to four letters to support his belief that the mail invariably traveled from Red Onion to Connecticut within 5 to 7 days: (1) a letter dated "12.23.19" in his handwriting and a response from Connecticut DOC dated December 31, 2019; (2) a letter dated "1.5.19" in his handwriting bearing a stamp by OCPM that it was "RECEIVED" on January 13, 2020; (3) the letter

---

[24] Sandler declares that she "called the Virginia's Interstate Compact Coordinator on the same day [she] received the letter" to confirm whether Baltas was "appropriately and safely housed at Red Onion." *See id.* at ¶ 57.

describing the threats against him dated "1.6. 19" in his handwriting and stamped "RECEIVED by OCPM on February 3, 2020; and (4) a letter dated "4.28.20" in his handwriting containing no information about when or whether it was received. ECF No. 246-2 at pp. 19-33. None of this evidence suggests that mail invariably travelled from Red Onion to Connecticut DOC in 5 to 7 days even when it was properly addressed.

Further the "mailbox rule"—"a rebuttable, common-law presumption that a piece of mail, *properly addressed* and mailed in accordance with regular office procedures, has been received by the addressee," *Cooke v. United States*, 918 F.3d 77, 81 (2d Cir. 2019)(emphasis added), "usually three days after its mailing," *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996)—does not apply here. As noted and as Sandler points out in her declaration, ECF No. 229-3 at 11 (¶ 55), Baltas's missive was not "properly addressed" because he addressed it to then-Commissioner Cook at the wrong address – which, as noted, provides a basis to support Sandler's averment that the letter, despite being postmarked January 10, 2020, did not arrive until some three weeks later.

At the end of the day, then, Baltas has supplied no evidence to rebut the Defendants' evidence that they did not receive the letter regarding threats until after the January 18 attack. While I must draw all reasonable inferences from the evidence in Baltas's favor, he has provided no evidence from which a reasonable juror could infer that an improperly addressed letter bearing an "unable to forward" postal sticker dated January 17 arrived at OCPM or, for that matter, at any Connecticut DOC address, before the attack on January 18.  The only evidence in the record about when this letter reached either then-Commissioner Cook or the Defendants at OCPM suggests it arrived well after the attack occurred. Consequently, Baltas has failed to raise

a genuine dispute of fact about whether the Defendants were deliberately indifferent to his safety.[25]

As no reasonable jury could find that the Defendants were aware of the threats against Baltas before January 18, 2020, the Court grants the motion for summary judgment in their favor on this Eighth Amendment claim.

### ii.    After January 18, 2020

Defendants argue that Baltas has submitted no evidence that any Defendant acted with deliberate indifference to his safety by retaining him at the Red Onion following the assault.

The ICC contract provides that the receiving state must provide transferred inmates safe custody. *See* ECF No. 229-3 at ¶¶ 67-68, pp. 99, 100, 102 (ICC Contract at ¶¶ 13, 17, 25).

On January 21, 2020, Red Onion staff sent Sandler, Maiga and Osden an email to confirm that Baltas had received medical care; had been separated from the other inmates involved in the assault and could be moved to Protective Custody; and that Virginia DOC had no concerns about continuing to house Baltas. Defs.' Rule 56(a) at ¶¶ 51-52; ECF No. 229-3 at ¶ 45, p. 58 (email). Deputy Commissioner Quiros avers he decided that Baltas should stay in Virginia DOC custody after he was informed by Director Maiga about Baltas's assault and Virginia DOC

---

[25] In any event, there is no evidence to support a claim that either Commissioner Cook or Deputy Commissioner Quiros had the requisite personal involvement to support liability as to this claim. The evidence in the record suggests that at most, they would have forwarded the letter mentioning the threat for review by OCPM Director Maiga and IMU staff, Defendants Sandler and Osden. A supervisory official's forwarding of a letter is not sufficient to establish personal involvement in a constitutional violation. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (finding no personal involvement where DOCCS Commissioner referred inmate's letters to subordinates); *McCrary v. Marks*, 836 F. App'x 73, 74 (2d Cir. 2021) (affirming summary judgment in favor of supervisor in First Amendment claim because "the most he has alleged is that [the supervisor] received his letter and directed someone at the TVPA to respond to it. This is clearly not enough to state claim against [the supervisor]."); *Amaker v. Goord*, 2002 WL 523371, *16 (S.D.N.Y. Mar. 29, 2002) (holding that sending letters to commissioner, which were responded to by other prison officials, was insufficient to establish supervisory liability).

had "no issue keeping him," which he interpreted to mean that Virginia DOC could safely house him. ECF No. 229-6 at ¶¶ 9-12.

Sandler, Maiga, Quiros and Cook attest to their belief based on the information provided that Virginia DOC had addressed Baltas's safety concerns at the Red Onion. *See* ECF No. 229-3 at ¶ 48; ECF No. 229-5 at ¶ 13, ECF No. 229-6 at ¶ 11, ECF No. 229-6; ECF No. 229-7 at ¶¶ 12-13. Additionally, Sandler and Osden aver that the Virginia Interstate Compact Coordinator provided progress reports and assurances that Virginia DOC had addressed Baltas's safety concerns and were appropriately housing him at the Red Onion ECF No. 229-3 at ¶ 72; ECF No. 229-4 at ¶¶ 20-21; *see also* ECF No. 229-5 at ¶ 18 ("While Baltas was housed in VA DOC, I [Maiga] was always assured that VA DOC could safely and appropriately house him."). According to Maiga, Sandler and Osden, the IMU staff expected that Virginia DOC would advise them if Baltas were subject to danger or his needs could not be met and that it would request Connecticut DOC to remove Baltas if Virginia DOC determined he could not be safely and appropriately managed in its custody. ECF No. 229-3 at ¶¶ 70, 73; ECF No. 229-4 at ¶¶ 22-24; ECF No. 229-5 at ¶¶ 19-20. The ICC contract would have required Connecticut DOC to retrieve Baltas had the Virginia DOC requested it. *See* ECF No. 229-3 at ¶ 71, p. 102 (¶ 25).

The affidavit from Red Onion Assistant Warden Fuller submitted by Baltas on December 20, 2020 in support of his request in this case for removal from Virginia custody due to the risk of further attack underscores that the Red Onion took responsive action after his assault and measures to avoid a risk of another assault.[26] ECF No. 35-1. Assistant Warden Fuller explained

---

[26] Baltas has also submitted a partial copy of Fuller's affidavit as an exhibit to his opposition. ECF No. 246-2 at 113-118. Baltas first submitted Assistant Warden Fuller's affidavit in support of his motions for a temporary restraining and preliminary injunction (ECF Nos. 4 & 5) that were denied.

that an investigation of Baltas's claim about staff orchestrating his attack indicated that his assertion lacked merit as officials believed the attack resulted from a dispute between Baltas and other offenders in his pod. *Id.* at ¶ 50. She declared that the offenders who attacked him were not housed in his pod, would not be permitted to interact with him, and were referred for prosecution as a result of the assault. *Id.* at ¶ 36. Fuller averred that Baltas was housed in the highly-monitored RHU on SD-2 status—the least restrictive RHU status—in the interest of his own safety and that of other offenders given his violent history and need for a more structured living environment. *Id.* at ¶¶ 9-10, 17, 22, 38, 46. She also provided several penological reasons for his assignment to the RHU: (1) the need to house him separately from the offenders who attacked him as they or other members of their gang could try to attack him again; (2) the need to prevent Baltas from retaliating against his attackers (or individuals associated with them); (3) and his criminal and prison disciplinary history. *Id.* at ¶¶ 46, 47, 54.

This record reflects that Defendants were not indifferent to Baltas's risk of harm after receiving notice he was assaulted in Virginia as they made inquiries about his safety and received assurances that Virginia DOC could safely house him. Even drawing all reasonable inferences from the record in Baltas's favor, I find no evidence to suggest that the Defendants ignored a substantial risk of his being seriously harmed by further attack at the Red Onion. The record offers no basis for me to eschew the deference courts ordinarily owe to the prison administrators' decisions concerning the penological measures necessary for Baltas's safe custody. *See Bell*, 441 U.S. at 548 ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *see*

*also Overton v. Bazzetta,* 539 U.S. 126, 132 (2003) (noting deference owed by the court to "professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). Thus, no reasonable jury could conclude upon review of the evidence that the Defendants acted with deliberate indifference to Baltas's safety after notice of the assault.

To the extent that Defendants violated Baltas's Eighth Amendment rights because they should not have relied upon assurances from Red Onion staff and/or should have removed him from Virginia custody, Defendants are entitled to qualified immunity. Considering the provisions of the ICC contract and the information communicated by Virginia officials, it was reasonable for Defendants to rely on the Red Onion officials' assurances that Baltas was safely housed and the situation did not require his repatriation from Virginia to ensure his safety. Accordingly, the Court grants the motion for summary judgment in Defendants' favor on Baltas's Eighth Amendment claim of deliberate indifference to his risk of being physically assaulted while in Virginia DOC custody.

### b.    Deliberate Indifference to Conditions of Confinement

Baltas's remaining Eighth Amendment claims assert deliberate indifference to the conditions at the Red Onion, including his inability to maintain personal hygiene; inadequate nutrition; an unjustified use of restraints for his out-of-cell movement; lack of opportunity for meaningful exercise; isolation and solitary confinement; twenty-four-hour in-cell illumination; and lack of medical attention for physical and mental health suffering. IRO Am. Compl. at 18-26, ECF No. 116.[27]

---

[27] On March 19, 2021—prior to Baltas's return to Connecticut in July 2021 after a request by Virginia DOC [ECF Nos. 144, 149]—the District Court for the District of Western Virginia determined that

The Eighth Amendment protects prisoners from an official's deliberate indifference to conditions posing an unreasonable risk of serious harm to the prisoner's health. In *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993). Conditions are objectively serious enough to implicate the Eighth Amendment where, alone or in combination, they produce "deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). The Constitution does not permit "inhumane" prisons, but it does not "mandate comfortable prisons." *Farmer*, 511 U.S. at 832 (citation omitted). There is no bright-line rule or "static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012). In addition, the length of time an inmate is subjected to the condition is relevant in determining whether it is sufficiently serious. *See Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards"). Thus, the inquiry focuses on the duration and severity of the condition. *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). In addition, a plaintiff must provide evidence to support a claim that a defendant knew of and disregarded a serious risk of harm to his health and wellbeing. *See Tangreti*, 983 F.3d at 619; *Trammell*, 338 F.3d at 162 ("[I]n prison condition cases the state of mind requirement is one of deliberate indifference to inmate health or safety." (internal quotation marks and alterations omitted)).

---

Baltas's similar complaints about his confinement failed to state a constitutional violation. *Baltas*, 2021 WL 1080516, at *24 (dismissing for failure to state an Eighth Amendment violation claims concerning continuous cell lighting; food portions; "lack of access to schooling, programming, a window, a mirror, storage containers for his property, hot food, and trips to the dining hall, as well as limits on his commissary spending, limitation to non-contact visitation, community nail clippers, 40-minute cell checks, showers three times per week, outdoor recreation for one hour per day five days per week, and limitations on his telephone usage.").

### i.    Supervisory Defendants

In support of his Eighth Amendment conditions claim, Baltas submits a letter dated February 12, 2021 to Governor Lamont that indicates a copy was sent to Quiros (who was at that time DOC Commissioner). ECF No. 245-1 at 28; ECF No. 246-2 at 68-72. The letter set forth his alleged deprivations concerning solitary confinement, twenty-four-hour illumination, inadequate meals, unsanitary living conditions, and lack of exercise. ECF No. 245-1 at 28; ECF No. 246-2 at 67-72.[28] But Quiros's "mere receipt of [this] letter . . . without personally investigating or acting thereon, is insufficient to establish personal involvement." *Richard v. Corcella*, No. 3:20-CV-1354 (CSH), 2023 WL 4595695, at *4 (D. Conn. July 18, 2023) (citations omitted); *see also Smart v. Annucci*, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (failure "to act on plaintiff's complaints ... cannot support the inference that these Defendants, through '[their] own individual actions, [have] violated the Constitution.'").[29] Even if Quiros directed Baltas's letter to IMU staff, that is not enough to establish his personal involvement for a constitutional violation under Section 1983. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (finding no personal involvement where DOCS Commissioner referred inmate's letters to subordinates).

Likewise, there is no evidence Director Maiga was personally involved in any deliberate indifference to Baltas's conditions of confinement. Even if, as supervisor of IMU staff Sandler

---

[28] He also submits letters from his attorney to the Department of Justice Civil Rights Division. ECF No. 246-2 at 75-95. The letters asserted that Baltas and another inmate were in danger at the Red Onion, called for an investigation, and attached affidavits including averments from Baltas about his unconstitutional conditions of solitary confinement, constant illumination and mental and physical deterioration. *Id*. There is no evidence these letters and attachments were forwarded to any Connecticut DOC staff.

[29] Moreover, there is no indication in the record that the letter was ever forwarded to OCPM or that Maiga, Sandler and Osden were aware of the letter.

and Osden, Maiga received communications about Baltas's complaints concerning his Red Onion

conditions, "[a] supervisor's 'mere knowledge ...' is not sufficient because that knowledge does

not 'amount[ ] to the supervisor's violating the Constitution.'" *Tangreti*, 983 F.3d at 616–17

(quoting *Iqbal*, 556 U.S. at 677); *see Calhoun v. Quiros,* 2024 WL 2846886, at *8 (D. Conn.

June 5, 2024) (no supervisory liability under Section 1983 based on information passed up the

chain of command or shared with supervisors). Further, any failure by Maiga to supervise

subordinates is not sufficient to hold him liable for a constitutional violation under Section 1983.

*See Robinson v. Graham*, No. 9:20-CV-1610 (MAD/ML), 2021 WL 2358415, at *3 (N.D.N.Y.

June 9, 2021) (dismissing claim against supervisor for failure to train and manage staff).

On the present record, no reasonable jury could find that the supervisory DOC officials,

Cook, Quiros, and Maiga acted with conscious disregard to any substantial risk of harm to

Baltas's health or wellbeing resulting from his conditions at the Red Onion.

I next consider whether the record shows the remaining Defendants, Sandler and Osden,

acted with deliberate indifference to Baltas's alleged unconstitutional conditions at the Red

Onion.

## ii.    Hygiene

Under the Eighth Amendment, inmates have a right to sanitary living conditions and the

necessary materials to maintain adequate personal hygiene. *See Walker v. Schult,* 717 F.3d 119,

127 (2d Cir. 2013) (citing cases for the proposition that "the failure to provide prisoners with

toiletries and other hygienic materials may rise to the level of a constitutional violation").

Baltas alleged that he was not able to maintain personal hygiene because he was afforded

only one razor per month and had no access to a mirror, nail care, and haircuts. ECF No. 63 at ¶

44

144(h). He submits the affidavit of another inmate who was housed in the RHU at the Red Onion in 2020 and 2021, ECF No. 246-4 at 98, and who avers that RHU inmates had no mirrors, the used-inmate razors were stored together in one container, and the "single community nail clipper" was "never cleaned or disinfected" and caused the spread of infections. *Id.*

The record shows that IMU staff received six letters from Baltas between 2019 and 2021, but none complained of hygiene deprivations related to shaving, nail clipping, haircuts, or the need for a mirror. *See* ECF No. 229-3 at ¶¶ 38, 40, 42, 54-55, 62-63, 65.[30]

Baltas submits evidence that Defendants Sandler, Osden and Maiga received an email dated August 31, 2020, from Virginia DOC, which attached his complaint filed in the Western District of Virginia. ECF No. 246-4 at pp. 2-96. In his Virginia complaint, Baltas alleged, *inter alia*, that he cut himself after a Red Onion Correction Officer forced him to shave in the shower in late December 2019, (*id.* at ¶ 62), and that he had no mirror and access to only a community nail clipper in the RHU, *id.* at ¶ 160. These allegations were not sufficient to alert the Defendants that Baltas was subject to any imminent harm from a serious hygiene deprivation at the Red Onion in August 2020. *See Baltas*, 2021 WL 1080516, at *24 (finding that Baltas's complaints about, *inter alia*, "community nail clippers" and lack of a mirror "do not support an Eighth

---

[30] The six letters included: (1) A letter from Baltas dated December 23, 2019 requesting Connecticut DOC to forward his money and property to Virginia; (2) a letter marked received on January 2, 2020, from Baltas's attorney posing six questions about his transfer to Virginia DOC; (3) a letter from Baltas marked received on January 13, 2020, requesting a complete set of the Connecticut DOC Administrative Directives be sent to him in Virginia; (4) a letter dated April 28, 2020, complaining about Virginia DOC's mail policy, access to his social mail and legal calls; (5) the letter (discussed above) dated January 6, 2019, complaining about failure to send him his money and property, and harsh Red Onion conditions including threats, being held in a suicide cell, denial of soap and showers, lack of access to a phone and attorney calls, and twenty-four hour illumination; and (6) a letter from Baltas's attorney dated April 16, 2021 and forwarded to Defendants from the Department of Justice Civil Rights Division asserting Baltas had suffered psychiatric harm after being placed in segregation for more than a year while incarcerated at Virginia DOC. *See* ECF No. 229-3 at ¶¶ 38, 40, 42, 54-55, 62-63, 65.

Amendment claim."). Furthermore, the record shows that by the time the Defendants received a copy of Baltas's Virginia complaint, Sandler had twice contacted Virginia DOC staff to ensure that Baltas was being housed safely and appropriately in the Red Onion RHU, ECF No. 229-3 at ¶¶ 50-51 ("I confirmed that Baltas received numerous privileges while in the restrictive housing unit, including having a television in his cell and . . . access to daily recreation, three showers per week, commissary, email, and video visits."), 57.

No reasonable jury could determine upon review of this evidence that the Defendants acted with deliberate indifference to a risk of serious harm from a hygiene deprivation. "[A] court does not err in granting summary judgment where the evidence presented is 'merely colorable' or is 'not significantly probative.'" *In re Mosdos Chofetz Chaim Inc.*, 2023 WL 6532954, at *2 (2d Cir. Oct. 6, 2023) (citing *Anderson*, 477 U.S. at 249-50; *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (opposing party "must offer some hard evidence showing that its version of the events is not wholly fanciful" in order to survive summary judgment).

Furthermore, it was reasonable for the Defendants to rely on the representations from Virginia DOC staff that Baltas's confinement at the Red Onion was appropriate and safe, [31] and to believe that under the ICC contract, Virginia DOC staff was immediately responsible for addressing Baltas's complaints about the lack of a mirror and the community nail clipper in the

---

[31] Defendants Sandler, Osden and Maiga attest that they relied on Virginia DOC to provide appropriate, safe confinement for interstate inmates and that Virginia DOC would advise Connecticut DOC if any inmate's needs were not reasonably being met. ECF No. 229-3 at ¶¶ 68-70 (Sandler); ECF No. 229-4 at ¶ 24 (Osden); ECF No. 229-5 at ¶ 19 (Maiga).

RHU.[32] Accordingly, the Defendants are entitled to qualified immunity. The Court grants the motion for summary judgment in the Defendants' favor on this claim.

### iii.     Meals

The Eighth Amendment requires that inmates be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983). "Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 241 (N.D.N.Y. 2019). But "only *extreme* deprivations are sufficient to sustain a conditions-of-confinement claim," *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999), and there is "a high bar" for an inmate's constitutional challenge to prison food. *Wright v. Cook*, No. 3:21-CV-01732 (SRU), 2025 WL 2968031, at *8 (D. Conn. Oct. 21, 2025) (citing *Rombousek v. Trinity Co.*, 2022 WL 2343236, at *4 (S.D.N.Y. June 29, 2022)). A key consideration is whether the provision of food ultimately poses an "imminent danger to the inmate's health and well-being." *Harris v. Ashlaw*, No. 9:07-CV-0358 (LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007).

---

[32] It is not clear under the ICC contract what degree of oversight Connecticut DOC—as the sending state—must provide for an ICC inmate after transfer. Under Article IV(c) of the Interstate Corrections Compact, the sending state retains jurisdiction over inmate, Conn. Gen. Stat. § 18-106, but the contract sets forth the responsibilities of each state. *See Barnes v. Fla. Parole Comm'n.*, No. 3:04CV775 (SRU), 2004 WL 1553610, at *2 (D. Conn. July 9, 2004) (citation omitted). As previously discussed, the contract between Connecticut and Virginia requires Virginia DOC to provide Connecticut inmates with "care and treatment," "medical services and supplies, and "safe custody" but is not required "to provide treatment, facilities or programs for any inmate confined pursuant to the Interstate Corrections Compact which it does not provide for similar inmates not confined pursuant to said Compact." ECF No. 229-3 at 99. That said, if there was evidence that the Defendants received information that Baltas was facing a substantial risk of serious harm—and failed to secure assurances from their Virginia DOC colleagues that something was being done to mitigate that risk—I would deny summary judgment.

In his amended complaint, Baltas alleged that he was served meals that were often spoiled and that did not meet minimum portion sizes or nutritional values required by state and federal mandates. ECF No. 63 at ¶ 144(i). The affidavit from the Red Onion inmate avers that meals in the RHU were eaten in the cell and served from "filthy uncleaned carts" that had been exposed to bacteria after being left on the meal carts with doors "open and not plugged in for hours" in "common traffic areas." ECF No. 246-4 at 99. He describes the meals as cold, two-thirds of the standard portion size, often with rotten food or lacking "condiments, butter, bread, vegetable servings and/or beverages." *Id.*

There is no evidence the Defendants were aware that Baltas was subject to imminent danger due to the meals served at the Red Onion. The letters from Baltas received by the IMU did not complain about his meals or a food deprivation, *see* ECF No. 229-3 at ¶¶ 38, 40, 42, 54-55, 62-63, 65, and as discussed, Sandler acted to address Baltas's complaints raised in his letter she received on February 3, 2020. Nor do the allegations of Baltas's Virginia complaint—that he ate cold meals left out for extended periods of time in his cell within feet of the toilet, ECF No. 246-4 at pp. 2-96 at ¶ 160—suggest he was subject to imminent harm from a serious deprivation of food so that the IMU staff should investigate. Indeed, the District Court for the Western District of Virginia held that "Baltas's claims about the food portions … fail to allege a constitutional violation." *Baltas v. Clarke*, 2021 WL 1080516, at *23. A reasonable jury reviewing the evidence could not determine that the Defendants acted with deliberate indifference to a serious food deprivation.

To the extent the Defendants had a duty under the Eighth Amendment to investigate his complaints about cold meals with small portions served in unsanitary conditions after receiving

the copy of his Virginia complaint, the Defendants are entitled to qualified immunity. It was reasonable for them to rely on the representations from Virginia DOC staff that Baltas had appropriate and safe confinement at the Red Onion, and for the Defendants to believe that under the ICC contract, Virginia DOC staff was immediately responsible for addressing Baltas's complaints about his meals at the Red Onion. The motion for summary judgment is granted in the Defendants' favor on this claim.

### iv.    Use of Restraints

The Court permitted Baltas to proceed on an Eighth Amendment claim arising from the alleged use of restraints for his out-cell- movement and in his cell at staff discretion. ECF No. 115 at 20-21; ECF No. 63 at ¶ 144(k).

Generally, the use of restraints on an inmate does not violate the Eighth Amendment unless it was "totally without penological justification," "grossly disproportionate," or "involve[s] the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (citing *Rhodes v. Chapman,* 452 U.S. 337, 346, (1980)). As with other restrictions imposed on inmates, the Court should "consider whether the use of restraints was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [the inmate's] health and safety." *Trammel*, 338 F.3d at 163.

In his affidavit, the other Red Onion inmate declared that "all inmate out-of-cell movement [in the Red Onion RHU] is in restraints." ECF No. 246-4. But the record affords no inference that Defendants had notice that Baltas was subject to restraints without penological justification. The six letters received by IMU did not refer to any complaint about restraints.

Further, evidence in the record indicates Virginia DOC managed Baltas in the RHU after review of his penological needs. Assistant Warden Fuller's affidavit explains that Baltas had been classified according to his disciplinary issues and that, while on SD-2 status, he was allowed to walk unrestrained to showers or recreation. ECF No. 35-1 at ¶¶ 14-23. A jury reviewing this evidence could not conclude that the Defendants acted with deliberate indifference to an unjustified use of restraints imposed upon Baltas at the Red Onion.

Even if Defendants should have taken some corrective action after receiving his Virginia complaint that also alleged restraints for all out-of-cell movement, ECF No. 246-4 at pp. 2-96; *id.* ¶ 160, the Defendants are entitled to qualified immunity. In light of Sandler's communications with Virginia DOC staff and the deference due to Virginia DOC's safety and security determinations, it was reasonable for the Defendants to believe that Baltas was not subjected to restraints at the Red Onion inconsistent with legitimate penological reasons. The motion for summary judgment is granted in the Defendants' favor on this claim.

> v.    **Exercise**

The Court permitted Baltas to proceed on an Eighth Amendment claim based on allegations that he was afforded the opportunity to exercise in a recreation cage only two to three times, where "no equipment [was] provided," "exercise on the concrete in sandals would cause injury," and the opportunity for exercise was not regularly provided at the Red Onion. ECF No. 116 at 24; *see* ECF No. 63 at ¶ 144(e). According to the averments in the other Red Onion inmate's affidavit, the RHU inmates at Red Onion had no access to a gym, yard or exercise equipment and had recreation only two to three times per week in a recreation cage "where it is not possible to interact or socialize." ECF No. 245-4 at 98-99.

The Second Circuit has recognized that, under the Eighth Amendment, "some opportunity for exercise must be afforded to prisoners." *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985). Not every denial of physical exercise amounts to a constitutional violation, and "deprivations of physical exercise for short periods will not rise to constitutional dimension...." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (holding that the plaintiff had sufficiently alleged an Eighth Amendment claim when he asserted a denial of physical exercise for a four-month period). Prison officials also are permitted to limit the right to out-of-cell exercise where there is a valid safety reason, or in unusual circumstances. *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996).

No evidence suggests that the Defendants were aware Baltas was subject to serious harm from a substantial exercise deprivation without justification at the Red Onion. Baltas did not raise a complaint about his lack of exercise in the six letters received by the Defendants. In addition, the record, including Baltas's own allegations in both the Connecticut and Virginia complaints[33] and averments from the other Red Onion inmate, indicate that he was not denied all access to exercise. In her affidavit, Assistant Warden Fuller explained that inmates in Baltas's pod were permitted outdoor recreation when weather permitted and when construction work did not interfere with inmate recreation. ECF No. 35-1 at ¶ 25-27; ECF No. 264-4 at 115.

Upon review of the record, no reasonable jury could determine that the Defendants acted with deliberate indifference to a substantial risk of serious harm to Baltas resulting from an exercise deprivation at the Red Onion. In any event, the Defendants are entitled to qualified

---

[33] The district court for the Western District of Virginia determined that Baltas's allegations about "outdoor recreation for one hour per day five days per week" did not support an Eighth Amendment exercise deprivation claim. *Baltas v. Clarke*, 2021 WL 1080516, at *24.

immunity as to this claim. The evidence shows that it was reasonable for Defendants to believe Baltas was not subject to a serious risk of harm due to an exercise deprivation in violation of the Eighth Amendment.

      **vi.**    **Twenty-Four-Hour Illumination**

Defendants argue that Baltas cannot demonstrate an Eighth Amendment violation based on constant illumination at the Red Onion. They rely on Assistant Warden Fuller's averment that the cell lights are continuously lit for security reasons so that the officers can see into the cells without shining lights directly onto the prisoners at night. ECF No. 35-1 at ¶ 53. Constant illumination of the cells may be justified by legitimate penological interests, *Green v. Caron,* 2023 WL 6809620, at *5 (D. Conn. Oct. 16, 2023) (citing cases). In any event, Baltas has not submitted evidence suggesting the Defendants' deliberate indifference to a substantial risk of serious harm from the level of illumination at the Red Onion.

In his letter received by OCPM on February 3, 2020, Baltas complained about twenty-four-hour illumination causing sleep deprivation, headaches, and dizziness. ECF No. 246-2 at 27. Sandler avers that on the day she received the letter, she contacted the Virginia DOC Interstate Compact Coordinator to address Baltas's complaints about his prison conditions and confirmed that he was "appropriately and safely housed." ECF No. 229-3 at ¶ 57. She had previously confirmed that Baltas had access to medical and mental health professionals after Baltas was moved to the RHU. *Id.* at ¶ 51. No reasonable jury reviewing this evidence could determine that Sandler ignored Baltas's complaint about the Red Onion illumination after she received his letter on February 3, 2020.

To the extent the Defendants should have taken further action to investigate the claims about harm from illumination at the Red Onion after Sandler's communications with Red Onion staff about his conditions on February 3, 2020, the Defendants are entitled to qualified immunity. No evidence supports an inference that the Defendants unreasonably relied on Virginia DOC staff representations about Baltas's safe and appropriate confinement and access to medical professionals.[34] Thus, under the circumstances, it was reasonable for the Defendants to believe that Baltas's confinement was safe and appropriate. The motion for summary judgment is granted in the Defendants' favor on this claim.

### vii.    Isolation/Solitary Confinement

The Court permitted Baltas to proceed on his allegations that he was subject to solitary confinement and isolation (with no visual stimuli, human contact or social interaction) at the Red Onion in violation of the Eighth Amendment. ECF No. 116 at 18-19; *see* ECF No. 63 at ¶¶ 144, 146-147. On initial review, the Court permitted Baltas to proceed because his allegations indicated he was subject to a combination of conditions for an indefinite period with no opportunity for social contact and interaction, no programs, and limitations on his telephone and visitation. ECF No. 116 at 18-19. In support of his claim, Baltas submits the affidavit of the other Red Onion inmate, who avers that Red Onion inmates in the RHU live in isolation with no "outside" visual stimuli and have two to six telephone calls per month, no programming or opportunities for rehabilitation, and limited opportunity to socialize. ECF No. 246-4 at 98-99.

Defendants argue that Baltas's RHU confinement at the Red Onion did not constitute isolation or solitary confinement in violation of the Eighth Amendment. *See* ECF no. 229-1 at

---

[34] The Western District of Virginia determined that Baltas's complaint about "continuous cell lighting" failed to state a claim for a violation of the Eighth Amendment. *Baltas*, 2021 WL 1080516, at *23; *see*

34. Defendants rely upon Assistant Warden Fuller's affidavit, which described Baltas's conditions as an SD-2 inmate in the RHU. ECF No. 35-1. She attested that he had a single cell; could walk unrestrained to and from the showers or recreation; was afforded four hours of out of cell time each day and outdoor recreation (weather permitting); and was allowed greater privileges than other RHU inmates, including having television and access to the commissary. ECF No. 35-1 at ¶¶ 23-30, 35. This evidence, which the RHU inmate's affidavit does not significantly contradict, suggests that Baltas was not subject to isolation or solitary confinement in violation of the Eighth Amendment.

"Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney,* 437 U.S. 678, 685 (1978). In its recent decision, *Baltas v. Chapdelaine*, the Second Circuit held qualified immunity applied to claims of Eighth Amendment violation arising from inmates who were housed for twenty-two hours in a Connecticut DOC special housing unit. 153 F.4th 328, 335-336 (2d Cir. 2025). The Second Circuit recognized that the "physical and psychological consequences of long periods of social isolation may be severe," but it observed that "the 22 hours per day of isolation alleged by Plaintiffs is only one hour more than the periods of isolation faced by inmates in the general prison population, and the Supreme Court has never held that 22 hours per day of isolation constitutes cruel and unusual punishment." *Id.* In considering what conditions of isolation or solitary confinement give rise to an Eighth Amendment violation, the Second Circuit looked to out-of-circuit decisions. *Id.* at 336. It noted the Third Circuit found an Eighth Amendment violation where a mentally-ill inmate was held in "'almost complete isolation for seven months'" for "all but three one-hour intervals per week[,]" *id.* at 336 (citing *Clark v. Coupe, 55 F.4th 167*

---

ECF No. 246-4 at 39 (¶ 160(y)).                54

(3d Cir. 2022); and the Fourth Circuit determined an Eighth Amendment violation where inmates spent years alone in a small cell for 23 to 24 hours a day, *id.* (citing *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019). Thus, the Second Circuit concluded that the level of social isolation in the Connecticut DOC special housing unit—which was "not designed for solitary confinement and provided more recreation, as well as daily visitation—did not clearly violate the Eighth Amendment. *Id.*

In this case, there is also no indication that Baltas was subjected to serious conditions of isolation or solitary confinement comparable to those determined to be cruel and unusual by the Third and Fourth Circuit. Sandler confirmed that Baltas had access to medical and mental health professionals, three showers per week, television privileges, access to daily recreation and commissary, and access to email and video visits while in the RHU. ECF No. 229-3 ¶¶ 50-1. 65. Assistant Warden Fuller's affidavit described that Baltas was afforded four hours of out-of-cell time each day and outdoor recreation (weather permitting), the ability to walk unrestrained to the showers, and privileges including having television and access to the commissary. ECF No. 35-1 at ¶¶ 23-30, 35. This Court has previously held that conditions involving twenty-three hours of cell time and harsh restrictions in Connecticut DOC do not violation the Eighth Amendment. *Doyle v. Santiago*, No. 3:19-CV-901 (MPS), 2019 WL 5298147, at *8 (D. Conn. Oct. 18, 2019) (holding that no objective deprivation occurred where plaintiff's two-year confinement in SRG Program conditions included only one hour of outdoor recreation per weekday with 23 hours in the cell, visits only from immediate family, limited telephone calls, no access to books, and no programming); *Pagan v. Dougherty*, No. 3:18-cv-1668 (VLB), 2019 WL 2616975, at *6 (D. Conn. June 26, 2019) (allegations that, during two-year administrative confinement in SRG

program, prisoner was deprived of telephone use, visits from friends and family, eligibility for

parole, access to educational and vocational services; showers were limited to three per week;

and prisoner was confined in his cell for 23 hours per day did not support objective component

of Eighth Amendment claim for inhumane conditions of confinement) (citing cases).

In any event, Defendants are entitled to qualified immunity because it was reasonable for

the Defendants rely on the Virginia DOC staff's descriptions of Baltas's RHU conditions, which

did not include conditions that imposed cruel and unusual punishment according to any clearly

established law. *See Baltas v. Chapdelaine*, 153 F.4th at 336 (affirming district court's grant of

qualified immunity because it is not clearly established that the level of social isolation, which

including twenty-two hours in a cell and provisions for recreation and visits, violated the Eighth

Amendment). The motion for summary judgment is granted as to this claim.

### viii.    Medical and Mental Health Treatment

The Court permitted Baltas to proceed on his claim that the Defendants were deliberately

indifferent to his need for medical and mental health care. ECF No. 116 at 25-26.

Prison officials violate the Eighth Amendment if they are deliberately indifferent to the

serious medical needs of a sentenced prisoner. *See Darby v. Greenman*, 14 F.4th 124, 128 (2d

Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

Defendants do not dispute that Baltas has satisfied the Eighth Amendment objective

element as to this claim.[35] However, no evidence refutes Sandler's averment that she contacted

Virginia DOC staff to confirm Baltas had access to medical and mental health professionals after

he was transferred to the RHU. ECF No. 229-3 at ¶ 51, and that she later received confirmation

---

[35] However, the Court notes that a "sufficiently serious" deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122.

from VA DOC's Interstate Compact coordinator that Baltas was appropriately and safely housed on February 3, 2020, *id.* at ¶ 57.

There is no evidence the Defendants were aware of any direct complaints from Baltas about his inability to access medical care for his physical health after Sandler communicated with the Virginia DOC staff to confirm Baltas's access to medical and mental health professionals. Thus, no reasonable jury could conclude after review of the record that the Defendants acted with deliberate indifference to Baltas's lack of medical care for his physical health at the Red Onion.

In April 2021, the IMU received the letter forwarded from the Connecticut Governor's office and sent by Baltas's attorney to the Department of Justice Civil Rights Division. ECF No. 229-3 at ¶ 63, p. 93, 95. The letter represented that Baltas had "experienced psychiatric harm" from his segregation and requested assistance from the Civil Rights Division because Baltas's requests to Connecticut DOC Interstate Compact had been "to no avail." *Id.* at 93. In a response, Osden advised that IMU staff "regularly communicate about [the Connecticut DOC] interstate inmate population with [the state] counterparts" and that IMU staff address any "alarming" information in any of Virginia DOC's reports summarizing the "inmate's progress and adjustment." *Id.* at 95.

No evidence suggests that Osden acted with culpable intent to ignore any serious mental health issues Baltas had; instead, she confirmed that he had access to medical and mental health professionals.[36] *See Salahuddin,* 467 F.3d at 280; *see also Warwick v. Doe*, No. 3:20-CV-227

---

[36]  ECF No. 229-3 at ¶¶ 68-70 (Sandler); ECF No. 229-4 at ¶ 24 (Osden); ECF No. 229-5 at ¶ 19 (Maiga).

(JAM), 2020 WL 2768804, at *6 (D. Conn. May 27, 2020) (failure of prison staff to discharge duties properly without culpable intent does not does not constitute deliberate indifference). Furthermore, the letter provides no detail and no suggestion that Baltas had requested and been denied mental health treatment for psychiatric harm resulting from his RHU confinement.

In any event, even if the Defendants did have a duty under the Eighth Amendment to investigate Baltas's provision for mental health care after receiving the letter forwarded by the Governor's office, the Defendants are entitled to qualified immunity. It was reasonable for the Defendants to believe that they did not act with deliberate indifference after their prior communications with the Virginia DOC. I grant the motion for summary judgment in the Defendants' favor on grounds of qualified immunity.

### 5.    Supplemental Jurisdiction Over State Law Claims

Baltas asserts state law claims Article First, §§ 7, 8, 9, 10, 12, 14, and 20.

In *Binnette v. Sabo*, 244 Conn. 23 (1998), the Connecticut Supreme Court recognized a private cause of action for monetary damages against municipal police officers for violations of Article First, §§ 7 and 9 of the Connecticut Constitution arising from unreasonable search and seizure and unlawful arrest. *Id.* 41-47. In reaching its decision, the Connecticut Supreme Court relied on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and "emphasize[d] that [its] decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* at 47. Here, Baltas's claims present new contexts for a cause of action under the Connecticut Constitution, and because recognizing such a cause of action presents a novel and complex issue of state law, the Court declines to exercise supplemental jurisdiction over the state

constitutional claims and dismisses them without prejudice. *See* 28 U.S.C. § 1367(c)(1);

*Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 187–88 (D. Conn. 2015) (declining to

exercise supplemental jurisdiction over state constitutional claim under Article First, § 8);

*Woolard v. Santiago*, 2020 WL 2079533, at *11 (D. Conn. Apr. 30, 2020) (declining jurisdiction

for claims concerning inmate's confinement under section 9); *Baltas v. Dones*, 2022 WL

1239989 at *20 (D. Conn. April 27, 2022) (declining to exercise supplemental jurisdiction over

Section 7, 9, and collecting cases declining to recognize a private right of action

under Article First, Sections 1, 4, 8, 10, 14, and 20); *see also Lopez v. Smiley*, 375 F. Supp. 2d

19, 26 (D. Conn. 2005) (refraining from exercising supplemental jurisdiction over novel and

undeveloped state constitutional claims under Article I).

      In his amended complaint, Baltas also refers to Connecticut General Statutes §§ 4-166,[37]

46a-51,[38] 18-86a[39] and 18-106. To the extent he seeks relief under these state statutes—which do

not provide for a private right of action for damages—the Court refrains from exercising

jurisdiction over such novel and undeveloped state law claims under 28 U.S.C. § 1367(c)(1)

("The district courts may decline to exercise supplemental jurisdiction over a claim under

subsection (a) if--(1) the claim raises a novel or complex issue of State law").

      Also, the district court has discretion to retain or decline a state law claim asserted against

a defendant who has no federal claims pending against it. *See* 28 U.S.C. § 1367(c)(3) (if federal

court dismisses all federal claims, it may decline to exercise supplemental jurisdiction over

---

[37] Definitions under the Connecticut Uniform Administrative Procedure Act.

[38] Definitions under the Connecticut Human Rights Act.

[39] Contracts with Other States for Confinement of Connecticut Inmates.

supplemental state law claims). As no federal claims remain, the Court declines jurisdiction over any state law claims under 28 U.S.C. § 1367(c)(3).

### V.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motion for summary judgment [ECF No. 229] on Baltas's remanded federal claims. The Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(1) and (c)(3) and dismisses those claims without prejudice.

The clerk is instructed to enter judgment and to close this case.

_____/s/_____
Michael P. Shea
United States District Judge

**SO ORDERED** this 24th day of November, 2025, at Hartford, Connecticut.